**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Case No. 26-00077-ELG |
| TURNER DEVELOPMENT, LLC, | ) | |
| | ) | (Chapter 11) |
| Debtor. | ) | |
| | ) | |

**DEBTOR'S OPPOSITION TO MOTION TO APPOINT TRUSTEE
AND REPLY TO OMNIBUS OPPOSITION TO
DEBTOR'S MOTION TO EXTEND EXCLUSIVITY AND DEBTOR'S APPLICATION
TO EMPLOY COLDWELL BANKER COMMERCIAL REALTY**

Turner Development, LLC, the debtor and debtor-in-possession herein (the "**Debtor**"),

hereby files its opposition (the "**Opposition**") to the Motion to Appoint Trustee [Docket No. 32]

(the "**Trustee Motion**") filed by secured creditor Fuse 10, LLC ("**Fuse 10**") and its reply (the

"**Reply**") to Fuse 10's Omnibus Opposition [Docket No. 35] (the "**Fuse Omnibus Opposition**")

to the Motion for Entry of an Order Pursuant to Section 1121(d) of the Bankruptcy Code

Extending the Debtor's Exclusive Periods to File a Chapter 11 Plan and to Solicit Acceptances

Thereto [Docket No. 25] (the "**Motion to Extend Exclusivity**") and the Application to Employ

Coldwell Banker Commercial Realty to Provide Commercial Real Estate Brokerage Services

[Docket No. 26] (the "**Coldwell Banker Application**").  In support of its Opposition and Reply,

the  Debtor respectfully states as follows:

Stephen E. Leach (DC Bar No. 925735)
Kristen E. Burgers (DC Bar No. 500674)
HIRSCHLER FLEISCHER, PC
1676 International Drive, Suite 1350
Tysons, Virginia 22102
Telephone:  (703) 584-8900
Facsimile:  (703) 584-8901
Email:  sleach@hirschlerlaw.com
            kburgers@hirschleraw.com

*Counsel to Turner Development, LLC*

**Preliminary Statement**

While the Fuse 10 Opposition initially presents as a compelling read – an alleged criminal abusing the bankruptcy system to further his fraudulent scheme and continue to line his pockets at the expense of his victims – it does not withstand scrutiny. Much like the newspaper stories from which it draws its "facts," the Opposition creates a sensationalized story with little relation to the truth.

As addressed in detail below, the Aiken County, South Carolina Sheriff issued four warrants for the arrest of Tracey Turner, the Debtor's representative. The warrants each set forth, as the basis of the alleged fraud (which, not coincidentally, are also the subject of pre-petition civil lawsuits pending against the Debtor) that Mr. Turner took money from individuals and did not invest it in the real estate development project. These allegations are not based in fact. Turner Development used the investment to pay for the not insubstantial soft costs necessary to turn raw land into the approved "Weeping Willows" development project.

Fuse 10 further alleges that Mr. Turner is intentionally dragging his feet and delaying the bankruptcy process, because – based on the docket activity – very little appears to have happened in this bankruptcy case. The reality is that the Debtor filed this bankruptcy case with a brokerage agreement in place and the intention to sell the Weeping Willow Property (as defined herein) and propose a plan of reorganization which would pay creditors and allow Turner Development to retain other properties and continue in business. Unfortunately, it became apparent that the initial broker was drawing heavily from the local South Carolina development community and the purchase offers were not in the range that would pay secured creditors in full, let alone support a plan. The Debtor decided, in an exercise of its business judgment, that the only way to get a higher price for the Weeping Willows Property and maximize returns to creditors was to

terminate the existing agreement and move to a new broker with the ability to market the Weeping Willows Property to national and international residential development companies capable of developing a large-scale project. This process took time.

Finally, Fuse's allegation that Mr. Turner, if left in control of the Debtor, will drain the Debtor of its assets and leave creditors with nothing is nonsensical. The Debtor's only assets are multiple parcels of real property. Mr. Turner cannot steal real property. He cannot do anything that would drain the value of the property. At this juncture, until the Weeping Willows Property is sold, there is nothing for a Trustee to protect in this case. When the sale closes, the lien of Fuse 10 will be paid at closing from the proceeds of sale. Moreover, to give Fuse 10 additional comfort that the sale proceeds will be safeguarded, the Debtor has offered to have all sale proceeds held by a third party escrow agent and distributed only upon order of this Court.

<u>**Background**</u>

1.      On February 23, 2026 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code initiating this chapter 11 case (the "**Chapter 11 Case**"). The Debtor continues to manage its property and financial affairs as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner, and no official committee of creditors has been appointed in this Chapter 11 Case.

2.      The Debtor is a District of Columbia limited liability company formed on January 1, 2018, for the purpose of developing, constructing, and modernizing residential properties. The Debtor initially operated primarily in the Washington, D.C. metropolitan area, with a focus on renovating single family homes. The Debtor later branched out into government contracting

work and was awarded contracts through the District of Columbia for the renovation of apartments and other buildings.

3.      In 2020, the Debtor was presented with development opportunities in Aiken County, South Carolina.  Mr. Turner is a native of Aiken County and hoped that the Debtor could build affordable and attractive housing for middle income wage earners, such as teachers and municipal workers.

4.      In February 2021, the Debtor purchased 185 acres located at 1001 Old Aiken Road, Beech Island, Aiken County, South Carolina (the "**Weeping Willows Property**") which was comprised of the former Lamar Plantation.  The original house, which is still standing, was built in 1850. An article published on June 10, 2021, in the Augusta Business Daily, which describes the Weeping Willows Property and the development plan, is attached hereto as Exhibit A.[1]

5.      As of the Petition Date, in addition to the Weeping Willows Property, the Debtor owns real property located at 310 Landing Drive, North Augusta, South Carolina[2], 1050 Atomic Road, North Augusta, South Carolina, and 1005 Georgia Avenue, North Augusta, South Carolina.

**A.      The Weeping Willows Property and the Fuse 10 Loan**

6.      The Debtor paid $1,500,000 for the Weeping Willows Property, which was funded, in part, by a loan from Fuse 10 (the "**Fuse 10 Loan**") in the original principal amount of $1,000,000.[3]  The Fuse 10 Loan was secured by a first priority lien on the Weeping Willows

---

[1] https://augustabusinessdaily.com/aiken-county-native-spends-1-5-million-to-construct-mixed-use-development-on-site-of-former-slave-plantation/
[2] Ownership of 310 Landing Drive is disputed.
[3] The amount of the Fuse 10 Loan was later increased to $1,176,418.

Property.  The maturity date of the Fuse 10 Loan, as extended and modified, was March 8, 2024.  Mr. Turner is a guarantor of the Fuse 10 Loan.

7.  After purchasing the Weeping Willows Property, the Debtor commenced the development process.  It retained, among others, Renz Collaborative Architecture as its architect, Cranston Engineering as its land surveyor, and CES Group Engineers, LLP, as its civil engineer and landscape architect.  It ordered wetlands delineation and soil studies and developed storm water management plans, grading and drainage plans, retaining wall plans, and construction plans.  In short, the Debtor did everything necessary to have the Weeping Willows Property approved as a "Traditional Neighborhood Development," with 342 single-family homes, 107 townhomes, 150 apartments, a mixed-use Town Center, a trail, and sidewalks to be constructed in six phases.  A true and correct copy of the overview of the plan for the development of the Weeping Willows Property is attached hereto as Exhibit B.  The first phase was approved to commence construction on January 10, 2023.  *See* letter dated February 1, 2023, from Joel T. Duke of the Aiken County Planning and Development Department, a true and correct copy of which is attached hereto as Exhibit C.

8.  The soft costs associated with the development process were substantial, totaling over $1 million.  The Debtor funded these expenditures through loans and investments made by individuals and from Mr. Turner.

9.  The Debtor was unable to pay off or refinance the Fuse 10 Loan at maturity.  On March 15, 2024, Fuse 10 filed a mortgage foreclosure complaint against the Debtor and Mr. Turner in the Court of Common Pleas for Aiken County, South Carolina (Case No. 2024CP0200667) (the "**Fuse Foreclosure Action**").  The Fuse Foreclosure Action was stayed by the automatic stay.

**B.      The Melissa Oden JV Investment and Ansermo Arthur Loan**

10.      On or about September 20, 2022, the Debtor entered into a Joint Venture Agreement (the "**JV Agreement**") with W. Melissa Oden for the development of the Weeping Willows Property.  As part of the JV Agreement, Ms. Oden agreed to loan the Debtor $600,000 (the "**Oden Loan**").  The Debtor agreed to pay interest on the Oden Loan at the rate of 8%.  The Oden Loan matures on October 1, 2026.  The Debtor never executed a note evidencing the Oden Loan.

11.      The Debtor further agreed to secure the Oden Loan by granting Ms. Oden a mortgage interest in Phase I and Phase II of the Weeping Willows Property.  Like the note, the mortgage was never signed by the Debtor, and it was not recorded.

12.      In the JV Agreement, the Debtor also agreed to transfer approximately seven acres of the Weeping Willows Property to Ms. Oden for the construction of a gym.  The Debtor did not transfer any property to Ms. Oden.

13.      Ms. Oden participated in the Fuse Foreclosure Action, asserting that the Oden Loan is secured by Phase I and Phase II of the Weeping Willows Property.

14.      On or about May 30, 2023, Ansermo Arthur made a loan to the Debtor in the amount of $1,000,000 (the "**Arthur Loan**") for the purpose of funding development and construction costs for the Weeping Willows Property.  The Arthur Loan is evidenced by a promissory note and secured by a mortgage recorded against approximately 6.72 acres within the Weeping Willows Property.  Additionally, the Debtor entered into a contract of sale with Dr. Arthur which provides for the sale of certain lots within the Weeping Willows Property to Dr. Arthur on a sliding scale of prices and other conditions.

15.     The Arthur Loan matured on November 11, 2024.  The Debtor had no liquid assets to pay and no means to refinance the Arthur Loan.

16.     On September 24, 2025, Dr. Arthur filed a complaint against the Debtor and Mr. Turner in the Court of Common Pleas for Aiken County, South Carolina, asserting claims for, among other things, breach of contract, fraud in the inducement, fraudulent misrepresentation, and unjust enrichment (Case No. 2025CP0202578) (the "**Arthur Civil Litigation**").  The Arthur Civil Litigation was stayed by the automatic stay.

**C.     The Arthur Arrest Warrants and Oden Arrest Warrants**

17.     On or about May 6, 2025, Dr. Arthur filed a complaint (the "**Arthur Criminal Complaint**") with the Aiken County Sheriff's Office alleging a breach of trust against Mr. Turner in reference to the Arthur Loan.  A true and correct copy of the Aiken County Sheriff's Office Investigating Officer's Summary (the "**Officer's Summary**") is attached hereto as Exhibit D.  The narrative purporting to support the alleged criminal conduct is set forth on the bottom of page 3 and on page 4 of the "Incident Report": "Arthur believes that Turner is not using the money for the development and is attempting to defraud him and others."  Officer's Summary, page 4.

18.     As a result of the Arthur Criminal Complaint, the Aiken County Sheriff's Office issued an arrest warrant for Mr. Turner for the violation of South Carolina Code 16-13-0240, as amended[4], in connection with the Arthur Loan (Arrest Warrant No. 2025A0210700319) and an

---

[4] South Carolina Code 16-13-0240, as amended, states in relevant part:

> A person who by false pretense or representation obtains the signature of a person to a written instrument or obtains from another person any chattel, money, valuable security, or other property, real or personal, with intent to cheat and defraud a person of that property is guilty of a:
>
> > (1) felony and, upon conviction, must be fined not more than five hundred dollars and imprisoned not more than ten years if the value of the property is ten thousand dollars or more; [ . . . ]

arrest warrant for Mr. Turner for violation of South Carolina Code 35-01-0501, as amended[5], in connection with the Arthur Loan (Arrest Warrant No. 2025A0210700318) (together, the "**Arthur Arrest Warrants**"). True and correct copies of the Arthur Arrest Warrants are included in Exhibit D.

19. Contemporaneously with the issuance of the Arthur Arrest Warrants, the Aiken County Sheriff's Office issued an arrest warrant for Mr. Turner for the violation of South Carolina Code 16-13-0240, as amended, in connection with the Oden Loan (Arrest Warrant No. 2025A0210700316) and an arrest warrant for Mr. Turner for violation of South Carolina Code 35-01-0501, as amended, in connection with the Oden Loan (Arrest Warrant No. 2025A0210700317) (together, the "**Oden Arrest Warrants**" and collectively with the Arthur Arrest Warrants, the "**Arrest Warrants**"). True and correct copies of the Oden Arrest Warrants are attached hereto as Exhibit E.

20. Mr. Turner turned himself in to the Aiken County Sheriff's Office on January 29, 2026, for the purpose of accepting the Arrest Warrants.

21. Mr. Turner denies the allegations against him and has engaged criminal counsel to represent him in these matters.

**D.   Sale Efforts**

22. Initially, the Debtor intended to sell finished lots in the Weeping Willows Property to residential home builders. To that end, the Debtor solicited and received letters of

---

[5] South Carolina Code 35-01-0501, as amended, is South Carolina's "General Fraud" statute. It states:

It is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly:
> (1) to employ a device, scheme, or artifice to defraud;
> (2) to make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
> (3) to engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

intent from Great Southern Homes, Eastwood Homes, and NVR/Ryan Homes. Unfortunately, each letter of intent required the Debtor to complete additional work for which it did not have funding.

23. The Debtor eventually realized that, rather than attempting to sell shovel-ready lots, it should solicit offers for the Weeping Willows development project as a whole. The Debtor obtained an appraisal from Valbridge Property Advisors dated April 8, 2024 (the "**Appraisal**"). The Appraisal gave an "as is" value to the Property of $51,991 per acre and $9,100,000 in the aggregate. A true and correct copy of the Appraisal is attached hereto as Exhibit F.

24. At the commencement of this case, the Debtor was a party to a commercial listing agreement with Berkadia Real Estate Advisors LLC ("**Berkadia**"), based in Charleston, South Carolina, to market and sell the Weeping Willows Property. The intention was for Berkadia to sell the Weeping Willows Property at a price that would pay the allowed secured claims of Fuse 10 and Dr. Arthur and would leave sufficient cash proceeds to fund a plan of reorganization.

25. After the Petition Date, it soon became apparent that Berkadia's marketing plan was only generating interest from local buyers who were familiar with the history of the Weeping Willows Property and were looking for a bargain. The bids received by Berkadia were only a fraction of the appraised value and were not sufficient to fund a plan of reorganization. The Debtor decided that it needed to engage a new broker which could expose the Weeping Willows Property to a national and international database of investors and home builders.

26. As a result, the Debtor was forced to go back to the drawing board. It commenced interviewing brokers with reputations for selling undeveloped land to national and international residential home builders and developers with strong financial backing and the

ability and know-how to manage large-scale projects. After an extended search, the Debtor ultimately selected the Charlotte, North Carolina office of Coldwell Banker Commercial Realty ("**Coldwell Banker**") to market and sell the Property. On June 23, 2026, the Debtor filed the Coldwell Banker Application, which is set for hearing on July 15, 2026.

27.     Coldwell Banker anticipates running a 60 to 90 day marketing process, with a call to bids sometime in early to late September, depending on the level of interest and participation in the process. Once the call to bids concludes, the Debtor will negotiate a Purchase and Sale Agreement with the buyer and thereafter file a motion to approve the sale.

**E. Other Post-Petition Activities**

28.     When the Debtor filed its chapter 11 petition, it was in a difficult position. It had not had any material investment or income for several years. Mr. Turner paid for necessary expenses of the business, such as insurance. With multiple litigation matters requiring time and attention, many things fell through the cracks. Now that the Debtor has some relief from the litigation, it is slowly catching up on matters.

29.     For example, as of the Petition Date, the Debtor had not filed its 2024 or 2025 tax returns. Those returns are now in process and should be filed shortly. Additionally, as part of its tax preparation, the  Debtor has been verifying its accounting entries and will ensure that its creditor information is accurate.

30.     The Debtor has also been able to explore options for debtor-in-possession financing. Initially upon filing the Chapter 11 Case, the Debtor intended to rely on a small amount of debtor-in-possession financing from Mr. Turner to pay administrative expenses during the pendency of the Chapter 11 Case. However, during the period of time that Berkadia was marketing the Weeping Willows Property, the Debtor realized that to maximize the value of the

- 10 -

Weeping Willows Property, it would need to obtain debtor-in-possession financing to pay for certain costs to bring the Weeping Willows Property back on-line and make it more attractive for potential buyers, such as cleaning up debris and addressing environmental issues.

31.     Since the Petition Date, the Debtor has met with numerous potential funding sources, investors, and JV partners.  Given the Debtor's current financial condition, it has not been able to obtain a financing commitment from third-party lenders.  Fortunately, an entity (the "**DIP Lender**") owned by a relative of Mr. Turner has agreed in principal to provide debtor-in-possession financing in an amount up to $2.5 million (the "**DIP Financing**") on an administrative expense basis.  The DIP financing will be used in accordance with a budget to pay the administrative expenses of the bankruptcy estate (the "**Estate**"), the costs of any necessary work in connection with the sale of the Weeping Willows Property, and the expenses for the development and/or construction of the other properties owned by the Debtor if necessary to fund the plan of reorganization. The Debtor and the DIP Lender are currently negotiating loan terms, and the Debtor anticipates filing a motion to approve the DIP financing shortly.

## Legal Argument

32.     Fuse 10 urges this Court to appoint a Chapter 11 Trustee for two reasons: first, the criminal complaints filed against Mr. Turner show a pattern of misconduct so nefarious that Mr. Turner cannot be trusted with Estate assets and second, that the Debtor simply has not done enough in the first 120 days of this Chapter 11 Case.  Fuse 10 argues that sufficient "cause" exists under section 1104(a)(1) of the Bankruptcy Code and such appointment is in the best interests of creditors under section 1104(a)(2) to warrant the appointment of a trustee.

33.     Section 1104(a) of the Bankruptcy Code states:

(a)    At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1)    for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2)    if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

34.    First, cause does not exist to warrant the appointment of a trustee. While the allegations of criminal misconduct based on fraud and dishonesty tell a salacious story, the facts upon closer inspection are decidedly more mundane. The Debtor simply did not have adequate funding to develop the Weeping Willows Property and take it through to completion (even completion of just one phase of the development). There is evidence to demonstrate that the Debtor used loans and investments to pay for the engineers, surveyors, studies, and other "soft" costs associated with the initial development of the Weeping Willows Property to take it through the approvals phase. All of this clearly happened, and – as evidenced by the letter from Mr. Duke attached as Exhibit C – commencement of Phase 1 of the project was authorized by Aiken County. The Debtor simply lacked adequate funding to finish the lots for sale or to construct the homes itself. This is not fraud, nor is it anything nefarious. It is nothing more than bad planning and maybe bad luck.

35.    The fact that Mr. Turner told Dr. Arthur and Ms. Oden that he was "working on getting their money back to them" and that "construction would begin soon" does not equate to

intentional fraud.[6]   In an insolvency scenario, these are common excuses offered to vendors, creditors, and lenders, because most people reckoning with an insolvent business remain stubbornly optimistic that they will be able to right the ship and pay everyone what they are owed.

36.     While it is admittedly true that based on the docket alone, the Debtor appears to have done very little thus far in the Chapter 11 Case, the Debtor has been working behind the scenes to screen and select the two parties most crucial to the success of this Chapter 11 Case – the real estate broker and the DIP Lender.  While it was not visible to the public, this process was time-consuming and challenging.  The lack of docket activity does not necessarily equate to a stagnant case and a debtor abusing the bankruptcy process.

37.     Even if the allegations of fraud were plausible (which they are not), denial of the Trustee Motion is appropriate because it does not serve the best interests of the creditors.  The Debtor has no assets other than real property.  It has no cash and no equipment – nothing that can be squandered, diverted, mismanaged, or otherwise harmed.  There would be no appreciable function for a trustee to serve, other than shepherding the sale process, which the Debtor has already initiated.  Once the Coldwell Banker Application is approved, the Debtor's role in the sale process will be limited to providing information and reviewing offers.  It is hard imagine a scenario in which the Debtor could derail the sale process to the harm of creditors.

38.     Here, the appointment of a trustee would add an additional layer of expense to the detriment of creditors, with no appreciable benefit.  To the extent this Court may have concerns about the distribution of cash once the Property is sold, the Debtor will consent to the

---

[6] It is worth noting that notwithstanding their criminal complaints, neither Dr. Arthur nor Ms. Oden – the parties allegedly harmed by the Debtor's purported fraud - have joined in or otherwise supported Fuse 10 in the Trustee Motion.

appointment of an escrow agent to hold the net sale proceeds and will enter into an escrow agreement that funds will be distributed from the escrow account only upon entry of a Court order.

39.     Based on the foregoing, the appointment of a trustee is not warranted in the Chapter 11 Case, either for cause under section 1104(a)(1) or in the best interest of creditors under section 114(a)(2).  The Trustee Motion should be denied.

### Reply to Omnibus Objection

40.     The Omnibus Objection to the Coldwell Banker Application and the Exclusivity Motion should be overruled.  The retention of Coldwell Banker is in the best interest of the Estate and creditors, as the sooner the sale process begins and the Weeping Willows Property is sold, the sooner creditors will receive distributions.  It is everyone's best interest to get the Weeping Willows Property sold as soon as possible at a market-rate price. A short extension of the exclusive period is warranted and appropriate to allow the sale process to play out.

### Alternative Relief

41.     As noted in paragraph 38, to the extent this Court may have concerns about the distribution of cash once the Weeping Willows Property is sold, the Debtor will consent to the appointment of an escrow agent to hold the net sale proceeds and will enter into an escrow agreement that provides for funds to be distributed from the escrow account only upon entry of a Court order. With an escrow arrangement in place, sale proceeds will be protected, and a trustee will not be necessary.

*REMAINDER OF PAGE INTENTIONALLY BLANK*

WHEREFORE, the Debtor respectfully requests that the Court enter an order (a) denying the Trustee Motion; (b) overruling the Omnibus Objection; and (c) granting the Debtor such other and further relief as may be just and appropriate.

Dated:  July 10, 2026                                          Respectfully submitted,

                                                                      */s/ Kristen E. Burgers*
                                                                      Stephen E. Leach (DC Bar No. 925735)
                                                                      Kristen E. Burgers (DC Bar No. 500674)
                                                                      HIRSCHLER FLEISCHER, PC
                                                                      1676 International Drive, Suite 1350
                                                                      Tysons, Virginia 22102
                                                                      Phone:  (703) 584-8900
                                                                      Facsimile:  (703) 584-8901
                                                                      Email:  sleach@hirschlerlaw.com
                                                                                     kburgers@hirschlerlaw.com

                                                                      *Counsel to Turner Development, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of July, 2026, I caused to be served a true and correct copy of the foregoing Debtor's Opposition to Motion to Appoint a Trustee and Reply to Fuse 10's Omnibus Opposition to Motion to Extend Exclusivity and Application to Employ Coldwell Banker Commercial Realty Services and all exhibits thereto by operation of this Court's CM/ECF electronic case management system on all parties entitled to receive notice thereby and (ii) on July 10, 2026, by first class U.S. mail, postage prepaid, on the parties identified below:

Maurice B. Verstandig, Esq.
The VerStandig Law Firm, LLC
9812 Falls Road
#114-160
Ptomoac, MD 20854

Pack Law
4649 Ponce de Leon Blvd., Suite 405
Coral Gables, FL 33146

*Kristen E. Burgers*
Kristen E. Burgers