# EXHIBIT A

7/10/26, 12:44 AM

Aiken County native spends $1.5 million to construct mixed-use development on site of former slave plantation - Augusta Business Daily

Case 26-00077-ELG    Document 37-1    Filed 07/10/26    Page 2 of 120



< https://augustabusinessdaily.com/>

Fri, July 10, 2026

< https://facebook.com/augustabusinessdaily>

https://www.youtube.com/channel/UCeM6EldIvrhyoHgypJOEyxA>

https://www.instagram.com/augustabusinessdaily>

Show Support < https://augusta-business-daily-llc.fundjournalism.org/augusta-business-daily-llc-page-2/>

< https://au landing-p

HOME    ABOUT US    MEMBERSHIP    ABD PRWIRE    EVENT INFO    MARKETING

SPECIAL MARKETING DEAL    •    B2B    CONSUMER    LOG IN

Search



**B2B Stories < Https://Augustabusinessdaily.Com/Category/B2b-Stories/> , Commercial Real Estate < Https://Augustabusinessdaily.Com/Category/B2b-Stories/Commercial-Real-Estate/>**

7/10/26, 12:44 AM

Aiken County native spends $1.5 million to construct mixed-use development on site of former slave plantation - Augusta Business Daily

Case 26-00077-ELG Document 37-1 Filed 07/10/26 Page 3 of 120

# Aiken County native spends $1.5 million to construct mixed-use development on site of former slave plantation

**June 7, 2021< Https://Augustabusinessdaily.Com/2021/06/07/>** • Josh Heath

The main house on the Lamar Plantation was built in 1850. The property later became Haskell's Dairy. (Photo courtesy of Turner Development, LLC)

Tracey Turner, an African American businessman, has big plans for a historic site in North Augusta that may change the course of black history in the CSRA and in South Carolina.



Turner plans to keep the former slave quarters as historic structures in the Weeping Willows development. (Photo courtesy of Turner Development, LLC)

Turner – owner of the Washington, D.C.-based Turner Development, LLC and a native of Aiken County – plans to build a 419-unit mixed-use development like the Hammond's Ferry neighborhood in North Augusta on a 185-acre lot located at 1001 Old Aiken Road near the intersection of Jefferson Davis Highway. His company paid $1.5 million for the property – the site of the former Lamar Plantation which was built in 1850 and later became Haskell's Dairy. "It's a beautiful house," he says. Turner plans to give minority-owned companies the opportunity to help with construction and open businesses in the development. While these opportunities will be available to everyone, "The focus will be on minorities and women," Turner says.

The new development – Weeping Willows – will also include both a community center and boutique hotel with event space for weddings and parties. He says the homes won't be cookie-cutter, and the former slave quarters will be kept as historical structures. Turner was initially concerned that opening a new development on a former plantation would turn people away, but that hasn't been the case. Instead, the feedback has been "overwhelmingly positive," he says. "It could change the wealth gap in this area." Turner explains the homes will be "workforce affordable," which means middle-class workers, such as construction employees, hospital workers, and teachers, can afford to buy them.

Turner says the property is centrally located about 10 minutes from Aiken and five minutes from both North Augusta and downtown Augusta, which will make it convenient for soldiers at Fort Gordon and contractors at the Cyber Center.

Case 26-00077-ELG    Document 37-1    Filed 07/10/26    Page 4 of 120



Turner Development paid $1.5 million for the land, which will be used to build a hotel, community center, houses, and commercial space. (Photo courtesy of Turner Development, LLC)

In July, Turner plans to hold a ribbon-cutting ceremony with the Aiken and North Augusta Chambers of Commerce and start Phase 1 of construction, which will include both the first 100 homes and commercial space. He hopes to complete this phase by May 2022. Turner has a five-year plan to complete the project, and he's currently working on securing financing for construction and building a relationship with a bank. "We're going to have stumbling blocks," Turner says. "It's not going to be easy."

Turner also has his eye on other possible projects in the CSRA. "I want to be involved in the Broad Street development," he explains. "I want to leave a footprint."

Changing the course of history one area at a time.



7/10/26, 12:44 AM

Aiken County native spends $1.5 million to construct mixed-use development on site of former slave plantation - Augusta Business Daily

Case 26-00077-ELG   Document 37-1   Filed 07/10/26   Page 5 of 120



7/10/26, 12:44 AM

Case 26-00077-ELG    Document 37-1    Filed 07/10/26    Page 6 of 120

Aiken County native spends $1.5 million to construct mixed-use development on site of former slave plantation - Augusta Business Daily

## Subscribe to our eNewsletter for the BEST local business news delivered to your Inbox each week day.

* indicates required

Email Address *

First Name

Last Name

Subscribe

## More Posts



New Arena Begins To Tower Over 7th Street < Https://Augustabusinessdaily.Com/New-Arena-Begins-To-Tower-Over-7th-Street/>

The size of the new arena is taking shape off Telfair Street between 7th Street and 8th Street and completely changes the skyline. The new

< https://augustabusinessdaily.com/new-arena-begins-to-tower-over-7th-street/>



2026 Predictions: Mid-Year Assessment And Prognosis < Https://Augustabusinessdaily.Com/2026-Predictions-Mid-Year-Assessment-And-Prognosis/>

PUBLISHER'S NOTE: This is part one of a two-part series. RICK: If nothing else, I am very consistent. In January, I provided you with my

< https://augustabusinessdaily.com/2026-predictions-mid-year-assessment-and-prognosis/>



Local Basketball Boosts Economy < Https://Augustabusinessdaily.Com/Local-Basketball-Boosts-Economy/>

A few tournaments in the next few weeks will bring in big money and big crowds to the CSRA tourism trade. Currently, Nike is hosting

< https://augustabusinessdaily.com/local-basketball-boosts-economy/>



Extending A Partnership That Began In 2016 < Https://Augustabusinessdaily.Com/6-Year-Renewal-With-Triad-Of-Large-Csra-Employers-Educators/>

The U.S. Army Cyber Center of Excellence, Fort Gordon, and Augusta University have signed a new memorandum of understanding (MOU). It ensures service members at

< https://augustabusinessdaily.com/6-year-renewal-with-triad-of-large-csra-employers-educators/>

7/10/26, 12:44 AM — Aiken County native spends $1.5 million to construct mixed-use development on site of former slave plantation - Augusta Business Daily

Case 26-00077-ELG    Document 37-1    Filed 07/10/26    Page 7 of 120

< https://augustabusinessdaily.com/local-financial-advisor-investor-'/augustabusinessdaily.com/new-chicken-concept-delayed-until-mid-august/>

**Augusta Business Daily**

930 Stevens Creek Road
Augusta, Georgia 30907
706.567.6671

< https://facebook.com/augustabusinessdaily>

< https://www.youtube.com/channel/UCeM6EIdIvrhxIyoit7xAIly9uvbJ9GyxA>

< https://www.instagram.com/augustabusiness daily>

neil@augustabusinessdaily.com

— Support Local News —
< https://augusta-business.fundjournalism.org/augusta-business-daily-llc-page-27>

## RECENT STORIES

New arena Street
< https://augustaarena-street-begins-to-tower-over-7th-street/>
July 9, 20

2026 and P
< https://augustapredictions-mid-year-assessment-and-prognosis/>
July 9, 20

Local
https://baske
< https://augustabasketball-boosts-economy/>
July 8, 20

## Have you subscribed to our FREE Weekday Business eNewsletter?

First Name

Last Name

Email Address

[ ] I'm not a robot — reCAPTCHA

Submit

## CATEGORIES

Top Story — 114
< https://augustabusinessdaily.com/category/top-story/>

Disability Claims — 5
< https://augustabusinessdaily.com/category/disability-claims/>

Business Negotiations — 2
< https://augustabusinessdaily.com/category/business-negotiations/>

B2B Stories — 281
< https://augustabusinessdaily.com/category/b2b-stories/>

Log In
Membership Account

# EXHIBIT B



ENGINEERS
PLANNERS
SURVEYORS
SCIENTISTS

CES Group Engineers, LLP

NC FIRM LICENSE #F-1240
274 N. Hwy. 16, SUITE 300
DENVER, NC 28037
T 704. 489.1500

www.ces-group.net

SEAL:

CO. SEAL:



SUBMITTALS

| DATE: | PURPOSE: |
|---|---|
| 8/3/22 | PH.2 UPDATE |

**CLIENT:** TURNER DEVELOPMENT LLC (ATTN: TRACEY TURNER) 2901 NORTH CAPITOL STREET WASHINGTON, DC 20002 P: 202.288.2128

**PROJECT DESCRIPTION:** WEEPING WILLOWS SUBDIVISION 1001 OLD AIKEN RD, NORTH AUGUSTA, SC 29841

**PROJECT NO:** 7784 - 1121

DRAWING REVISIONS

| NO: | REVISION DESC. | DATE: |
|---|---|---|
| - | - | - |
| - | - | - |
| - | - | - |
| - | - | - |
| - | - | - |
| - | - | - |
| - | - | - |

| DRAWN BY: | __ | REVISED BY: | __ |
| CHECKED BY: | __ | ISSUED BY: | __ |

DRAWING TITLE:

**OVERALL PHASING PLAN**

DRAWING NUMBER:

**C1.0**

GRAPHIC SCALE

( IN FEET )
1 inch = 200ft.

## Weeping Willows Notes

| | Acreage | | |
|---|---|---|---|
| Grand Total | 196.61 | | |
| **Phase I** | | | |
| *Site Data* | | QTY | SF/Space |
| Total Acreage: | 40.2 | | |
| Townhomes (TH) | 4.2 | 49 | |
| Single Family Resid. (SFR) | 25 | 40 | |
| Commercial | 11 | | 23,800 |
| Parking Provided | | | 110 |
| | | | |
| **Phase II** | | | |
| *Site Data* | | QTY | SF |
| Total Acreage: | 55.54 | | |
| Single Family Resid.(SFR) | | 87 | |
| Townhomes (TH) | | 68 | |
| | | | |
| **Phase III** | | | |
| *Site Data* | | QTY | SF |
| Total Acreage: 18.36 | | | |
| Single Family Resid. (SFR) | | 75 | |
| | | | |
| **Phase IV** | | | |
| *Site Data* | | QTY | SF |
| Total Acreage: 36.78 | | | |
| Single Family resid. (SFR) | | 63 | |
| | | | |
| **Phase V** | | | |
| *Site Data* | | QTY | SF |
| Total Acreage: 30.84 | | | |
| Single Family Resid. (SFR) | | 77 | |
| | | | |
| **Phase VI** | | | |
| *Site Data* | | QTY | SF/Space |
| Apartment Acreage: | 10.62 | | |
| Apartment Units | | 150 | |
| Town Center Acreage: | 7.88 | | |
| Town Center Commercial (TCC) | | | 71,900 |
| Parking (4 spaces/1k) | | | 287 |
| | | | |
| **Summary** | | | |
| Total Single Family | | 342 | |
| Total Townhomes | | 117 | |
| Total Apartments | | 150 | |
| Total Commercial SF(Cultural Site) | | 23,800 | |
| Parking Spaces Provided | | 110 | |
| Total Commercial SF(Town Center) | | 71,900 | |
| Parking Spaces Provided | | 287 | |

PH. IV

PH. V

PH. III

PH. II

PH. I

PH. VI

S41-24'01"E   4679.58' (TIE)

OLD AIKEN ROAD
(S-365) 66' R/W

JEFFERSON DAVIS HIGHWAY
(US-1 / US-78) R/W VARIES

OLD AIKEN ROAD

Copyright 2022 CES Group Engineers, LLP

# EXHIBIT C



# Aiken County
## Planning & Development Department

*Remembering the Past, Preparing for the Future*

Joel T. Duke, AICP
Chief Development Officer

February 1, 2023

Tracey D. Turner
Turner Development LLC
2901 North Capitol Street NE
Washington, DC 20002

> **RE:** **Weeping Willows Development**
> **Aiken County Tax Parcel #013-12-01-001**
> **Old Aiken Road, North Augusta, SC**

Dear Mr. Turner:

The Aiken County Planning Commission has reviewed multiple applications for the development known as Weeping Willows located on Aiken County Tax Parcel #013-12-01-001. On October 21, 2021, the Planning Commission conducted a public hearing and approved with conditions an application for a Planned Use Development (PUD) on the subject property. The Commission reviewed and approved with contingencies two subsequent amendments to the approved PUD at their regular meetings on March 17, 2022 and September 15, 2022. All conditions and contingencies placed on the PUD approval have been cleared. Final approval was granted on January 10, 2023.

On March 17, 2022, the Aiken County Planning Commission reviewed a preliminary subdivision plat for Phase 1 of the Weeping Willows PUD. The plat was approved with contingencies on March 17, 2022. All contingencies and conditions were cleared on January 10, 2023. The preliminary subdivision plat for Weeping Willows, Phase 1 is released to begin construction.

Questions regard these approvals may be direct to Rhonda Connelly at 803-642-1520, x2604 or rconnelly@aikencountysc.gov.

Sincerely,

Joel T. Duke, AICP
Chief Development Officer

1930 University Parkway • Suite 2800 • Aiken • South Carolina • 29801
803-642-1520 • www.aikencountysc.gov

# EXHIBIT D

## Aiken County Sheriff's Office
### GENERAL SESSIONS PACKET

Initial ☐
Final ☐
Supplemental ☐

| | |
|---|---|
| Deputy Name | Hernandez L |
| Case Number | 25-026327 |
| Lab Numbers | |

| Division/Shift | NV |
|---|---|

| | | | | | |
|---|---|---|---|---|---|
| Case Synopsis | ☑ | Defendant | Tracey Duane Turner | | |
| Incident Report | ☑ | Address | 301 Jackson Av | | |
| Supplemental | ☑ | City | North Augusta | State | Sc | Zip | 20841 |
| Miranda Waiver | ☐ | Race | B | | |
| Arrest Warrant | ☑ | Sex | M | Date of Birth | 07/02/74 |
| Booking Sheets | ☐ | Social Security Number | 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 | | |
| Search Warrant | ☑ | | | | |
| Crime Scene Sketch | ☐ | Co-defendant | | | |
| | | Co-defendant | | | |

### VICTIM STATEMENTS

| 1. Name | |
|---|---|
| Social Security Number | |
| Address | Date of Birth |
| City | State | Zip |
| 2. Name | |
| Social Security Number | |
| Address | Date of Birth |
| City | State | Zip |
| 3. Name | |
| Social Security Number | |
| Address | Date of Birth |
| City | State | Zip |

### WITNESS STATEMENTS

| 1. Name | |
|---|---|
| Social Security Number | |
| Address | Date of Birth |
| City | State | Zip |
| 2. Name | |
| Social Security Number | |
| Address | Date of Birth |
| City | State | Zip |
| 3. Name | |
| Social Security Number | |
| Address | Date of Birth |
| City | State | Zip |

DEFENDANT STATEMENT ☐

| MEDICAL REPORTS | | OTHER REPORTS | |
|---|---|---|---|
| EMS | ☐ | Bloodhound Call Out | ☐ |
| Hospital | ☐ | Fire Run Report | ☐ |
| Coroner | ☐ | Tow Sheet | ☐ |
| Sexual Assault Kit | ☐ | Warrant Service Supp. | ☐ |

| EVIDENCE REPORTS | |
|---|---|
| Lineups | ☐ |
| Evidence Receipts | ☐ |
| Evidence Analysis | ☐ |
| Lab Reports | ☐ |
| Property Recovered | ☐ |
| Photographs | ☑ |
| Video | ☐ |
| Audio | ☐ |

| NCIC CRIMINAL HISTORY | |
|---|---|
| Defendant | ☐ |
| Victim | ☐ |
| Witness | ☐ |

| WARRANT NUMBER | CHARGE |
|---|---|
| 2025A0210700319 | Breach of trust $10000/more |
| 2025A0210700318 | Securities fraud |
| | |
| | |

| TRAFFIC CASE | | | |
|---|---|---|---|
| UTT# | | Date | |
| UTT# | | Date | |

| DATA MASTER REPORT | | | | | |
|---|---|---|---|---|---|
| BWC | ☐ | In Car | ☐ | BA Room | ☐ |

ACSO Form: AD182 (11/27/2023)

RULE 5

Aiken County Sheriff's Office

Investigating Officer's Summary

Case Number:  25-028327

Defendant:  Tracey Duane Turner

Investigator: Luis A. Hernandez

In May of 2023, the defendant, Tracey Turner, did by false pretense and representation, obtained money from another person, Ansermo Arthur, by presenting a fraudulent investment opportunity in form of land development called "Weeping Willows", and obtaining a wire transfer totaling $1,000,000. The money was withheld and no investment was ever made.
Tracey Turned himself in to ACDC on 1/29/26.

This is a violation of code of laws 35-01-0501 and 16-13-0240 as amended. This incident took place at 25 Juniper Loop Aiken, SC 29801 within the jurisdiction of the Aiken County Sheriff's Office.



# Aiken County Sheriffs Office

Incident #: 25-028327

Reporting Officer: Luis Hernandez

Report Time: 05/06/2025 11:01:08

## Incident

| | | |
|---|---|---|
| **Incident Nature**<br>Breach Of Trust | **Address**<br>420 HAMPTON AVE NE;<br>AIKEN COUNTY SHERIFFS<br>OFFICE<br>Aiken, South Carolina 29801 | **Occurred From**<br>05/06/2025 11:01:06 |
| **Occurred To**<br>05/06/2025 11:01:06 | **Received By**<br>Makayla Hawkins | **How Received**<br>Officer Report |
| **Contact** | **Disposition**<br>Active | **Miscellaneous Entry** |
| **Disposition Date**<br>05/06/2025 | **Cleared**<br>N | **Judicial Status** |
| **Cleared Date** | **Clearance**<br>Report Required | **Cargo Theft Related**<br>N |

## ARTHUR, ANSERMO

**Complainant**

| Address | Phone | |
|---|---|---|
|  |  | |

**Sex**
Male

**Race**
N-Black/African American,
Non-

**Responding Officer(s)**
Luis Hernandez

## Offenses

## Breach of Trust

| Considered? | Method Of Entry? | Gambling Motivated? |
|---|---|---|
| C | | |
| Premises Entered? | Location Type | Cargo Theft Related? |
| | 20 | |
| Statute | Description | Category |
| 3471 16-13-0240 | Breach / Obtain signature or prop. under false pretenses, value $10,000 or more | |

Bias Motivation

88

Offender Used

N

## Persons

### ARTHUR, ANSERMO
**Victim**

| Address | Phone | DOB |
|---|---|---|
|  | | |
| | Sex | Ethnicity |
| N-Black/African American, Non- | Male | |
| Height | Weight | |
| 6'02" | 200 | |

### TURNER, TRACEY D
**Subject**

| Address | Phone | DOB |
|---|---|---|
| 239 HUBER CLAY RD Warrenville South Carolina 29851 | ( ) - | 07/02/1974 |
| Race | Sex | Ethnicity |
| N-Black/African American, Non- | Male | Non-Hispanic |
| Height | Weight | |
| 5'09" | 165 | |

## ARTHUR, ANSERMO
### Complainant



Address



N-Black/African American,   Male
Non-

Height
6'02"

Weight
200

## Property

### Cash

**Stolen**

Brand                          Model

Color                          Quantity

Serial Number:

Measurement

Total Value
$1,000,000.00

Amount Recovered
$0.00

Date Recovered

Status
Stolen, Not Recovered

Owner
ARTHUR, ANSERMO

## Narratives

### Original Narrative

05/12/2025 08:51:14

I/O was contacted by Dr. Ansermo Arthur in reference to a scam. Dr. Arthur advised that he was introduced to Tracey Turner of Turner Development LLC in 2022 by a friend. He was told of an investment opportunity involving the Weeping Willows subdivision off of Jefferson Davis/Old Aiken. Turner proposed an investment opportunity involving investing money into the development. Turner developed a contract and both parties agreed to the terms and signed it on 5/30/23. Dr. Arthur sent three separate payments:
5/12/23 $250,000,
5/15/23 $500,000,
5/31/23 $250,000.

Summary of the contact between DR. Ansermo Arthur and Tracey Turner (Transcripts attached to report)
Dr. Arthur contacted Turner to begin getting information on the status of the development. Tuner advised that he will get to him but he's busy traveling. Arthur inquired about which piece of land his money went into and if there's a mortgage on it. Turner provided him with a parcel number and advised that there was no mortgage on it. Arthur drew suspicion when the parcel came back to another piece of land in the clearwater area that was not part of the bigger development. After asking Turner why it was the smaller land and not the bigger development tuner advised it "should" be the bigger. After confronting Turner about the mistake, he advised that he can make it work for him for a great return. The contact slows between the two and turner continues telling Arthur that the development to break ground is in the works and he won't regret it.

Dr. Arthur advised that he was contacted via mail of a lawsuit he was named in involving land. He wasn't sure what it was in reference to and never sought a lawyer. By the time he realized what it was for it was to late and the case was settled.  Arthur advised that he believes that Turner is not using the money for the development and is attempting to defraud him and others. Tracey advised that that there are multiple victims in this investment and Turner is stringing them along after receive the wire transfers. Turner advised that he would like to pursue charges.



## Aiken County Sheriff's Office

### APPLICATION FOR CRIMINAL ARREST WARRANT

**Defendant Information**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Name | Tracey Duane Turner | | | | | | | |
| Alias | | | | | | | | |
| Address | ██████████ | | | | | | | |
| City | ██████████ | | State | SC | | Zip | ██████ | |
| Phone | ( ) - | | | | | | | |
| SSN | ██████████ | Sex | M | Race | B | Height | 5'09" | Weight | 179 |
| DL | ██████████ | | State | SC | Age | ████ | DOB | ████ |
| Scars, Marks, Tattoos | | | | | | | | |

**Prosecuting Information**

| | | | | | |
|---|---|---|---|---|---|
| Prosecuting Agency | *Aiken County Sheriff's Office* | | Agency ORI | SC 0020000 | |
| Prosecuting Officer | Hernandez | Rank | Inv. | Employee Number | 7892 |
| Acadis # | 9440-9482 | | Telephone | | |
| Affiant Address | 420 Hampton Ave., NE | | | | |
| City | Aiken | State | SC | Zip | 29801 |

**Nature of Offense**

| | | | | |
|---|---|---|---|---|
| Description of Offense | | Securities / Violations of Uniform Securities Act resulting in loss of $20,000 or more | | |
| Violation of South Carolina Code | 35-01-0501 | | CDR Code | 2615 |
| Incident Date | 05/12/23 | Incident Time | 1000 | Case Number | 25-028327 |
| Incident Location | 25 Juniper Loop Aiken, SC 29803 | | | |
| Witness | Dr. Ansermo Arthur | Address | ████████ | |
| City | Aiken | State | ████████ | Zip | 29803 |
| Telephone | ██████████ | Witness statement attached | | Yes ✓ No |

**Elements of Offense**

Upon information and belief, in May of 2023, the defendant, Tracey Turner, did employ a scheme, device, or artifice to defraud multiple victims including, Dr. Ansermo Arthur, by presenting a fraudulent investment opportunity in form of land development called "Weeping Willows", and obtaining multiple wire transfers totaling $1,000,0000. The money was withheld and no investment was made.

This is a violation of code of laws 35-01-0501 as amended. This incident took place at 25 Juniper Loop Aiken, SC 29803 within the jurisdiction of the Aiken County Sheriffs Office.

| | | | |
|---|---|---|---|
| Prosecuting Officer | Inv. Hernandez | Date | 12/30/25 |
| Affiant | | Date | |
| Probable Cause Established | ☐ Yes ☐ No | | |
| Magistrate Signature | | Date | |
| Court of Jurisdiction | GS | | |

ACSO Form: AD111 (Rev02/27/18)



# Aiken County Sheriff's Office

## APPLICATION FOR CRIMINAL ARREST WARRANT

### Defendant Information

| | |
|---|---|
| Name | Tracey Duane Turner |
| Alias | |
| Address | |
| City | North Augusta |

| | | | | | | |
|---|---|---|---|---|---|---|
| State | | Zip | | | | |
| Phone | ( , ) | - | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| SSN | | Sex | M | Race | B | Height | 5'09" | Weight | 179 |
| DL | | State | SC | Age | | DOB | | | |

Scars, Marks, Tattoos

### Prosecuting Information

| | | | | | |
|---|---|---|---|---|---|
| Prosecuting Agency | Aiken County Sheriff's Office | | Agency ORI | | SC 0020000 |
| Prosecuting Officer | Hernandez | Rank | Inv. | Employee Number | 7892 |
| Acadis # | 9440-9482 | | Telephone | | |
| Affiant Address | 420 Hampton Ave., NE | | | | |
| City | Aiken | State | SC | Zip | 29801 |

### Nature of Offense

| | |
|---|---|
| Description of Offense | Breach / Obtain signature or prop. under false pretenses, value $10,000 or more |

| | | | | |
|---|---|---|---|---|
| Violation of South Carolina Code | 16-13-0240 | | CDR Code | 3471 |
| Incident Date | 05/12/23 | Incident Time | 1000 | Case Number | 25-028327 |
| Incident Location | 25 Juniper Loop Aiken, SC 29803 | | | |
| Witness | Dr. Ansermo Arthur | Address | 25 Juniper Loop | |
| City | Aiken | State | SC | Zip | 29803 |
| Telephone | | Witness statement attached | | Yes ☐  ✓ No |

### Elements of Offense

Upon information and belief, in May of 2023, the defendant, Tracey Turner, did by false pretense or representation did obtain money from another person, Dr. Ansermo Arthur, by presenting a fraudulent investment opportunity in form of land development called "Weeping Willows", and obtaining multiple wire transfers totaling $1,000,0000. The money was withheld and no investment was made.

This is a violation of code of laws 16-13-0240 as amended. This incident took place at 25 Juniper Loop Aiken, SC 29803 within the jurisdiction of the Aiken County Sheriffs Office.

| | | | |
|---|---|---|---|
| Prosecuting Officer | Inv. Hernandez | Date | 12/30/25 |
| Affiant | | Date | |
| Probable Cause Established | ☐ Yes  ☐ No | | |
| Magistrate Signature | | Date | |
| Court of Jurisdiction | GS | | |

ACSO Form: AD111 (Rev02/27/18)

ARREST WARRANT

## 2025A0210700319

STATE OF SOUTH CAROLINA

[X] County/          [ ] Municipality of...

Aiken

|                      | THE STATE against | 25-028327 |
|----------------------|---|---|

Tracey Duane Turner

Address.

Phone.                          SSN: 2
Sex: M   Race: B   Height: 5  9   Weight: 179
DL State: SC   DL #:
DOB                      Agency ORI #: SC0020000
Prosecuting Agency   Aiken County Sheriff
Prosecuting Officer   Luis A Hernandez - S00874
Offense   Breach   Obtain signature or prop. under false pretenses, value $10,000 or more
Offense Code   3471
Code/Ordinance Sec   16-13-0240

This warrant is   CERTIFIED   FOR   SERVICE   in   the
[ ] County/   [ ] Municipality of

is   to   be   arrested   and   brought   before   me   The accused to be
dealt   with   according   to   the   law

(L.S.)

Date: _____   Signature of Judge

RETURN
A   copy   of   this   arrest   warrant   was   delivered   to   defendant
on

_____
Signature of Certifying Law Enforcement Officer

RETURN WARRANT TO:
General Sessions
P O Box 583
109 Park Avenue
Aiken, SC 29802

DEFENDANT COPY   DEFENDANT COPY   DEFENDANT COPY   DEFENDANT COPY

---

STATE OF SOUTH CAROLINA
[X] County/   [ ] Municipality of
Aiken

AFFIDAVIT

DEFENDANT COPY

Personally   appeared   before   me   the   affiant   Luis A Hernandez
being   duly   sworn   deposes   and   says   that   defendant   Tracey Duane Turner   who
did   within   this   county   and   state   on   or   about   5/12/2023
State   of   South   Carolina   (or   ordinance   of   [X] County/   [ ] Municipality of   Aiken   violate the criminal laws of the
in   the   following   particulars

DESCRIPTION OF OFFENSE:   Breach / Obtain signature or prop. under false pretenses, value $10,000 or more

I   further   state   that   there   is   probable   cause   to   believe   that   the   defendant   named   above   did   commit   the   crime   set   forth   and   that   probable   cause   is   based   on   the   following   facts.

Upon information and belief, in May of 2023, the defendant , Tracey Turner, did by false pretense or representation did obtain money from another person, Dr. Ansermo Arthur, by presenting a fraudulent investment opportunity in form of land development called "Weeping Willows", and obtaining multiple wire transfers totaling $1,000,0000. The money was withheld and no investment was made.   This is a violation of code of laws 16-13-0240 as amended. This incident took place at 25 Juniper Loop Aiken, SC 29803 within the jurisdiction of the Aiken County Sheriffs Office.

Signature of Affiant

STATE OF SOUTH CAROLINA
[X] County/   [ ] Municipality of
Aiken

Affiant's Address   420 Hampton Ave N E   Aiken, SC 29801-
Affiant's Telephone

ARREST WARRANT

TO ANY LAW ENFORCEMENT OFFICER OF THIS STATE OR MUNICIPALITY OR ANY CONSTABLE OF THIS COUNTY:
It   appearing   from   the   above   affidavit   that   there   are   reasonable   grounds   to   believe   that
on   or   about   5/12/2023   defendant   Tracey Duane Turner
did   violate   the   criminal   laws   of   the   State   of   South   Carolina   (or   ordinance   of
[X] County/   [ ] Municipality of   Aiken   as set forth below

DESCRIPTION OF OFFENSE:   Breach   Obtain signature or prop. under false pretenses, value $10,000 or more

Having found probable cause and the above affiant having sworn before me, you are empowered and directed to arrest the said defendant and bring him or her before me forthwith to be dealt with according to law. A copy of this Arrest Warrant shall be delivered to the defendant at the time of its execution or as soon thereafter as is practicable.
Sworn to and subscribed before me
on 12/30/2025

(L.S.)

Judge's Address

Signature of Issuing Judge
Patricia Yvonne Arthur Rushton
Judge Code   7372

Langley, SC 29834-

Judge's Telephone   (803)593-5171
Issuing Court   [X] Magistrate   [ ] Municipal   [ ] Circuit

DEFENDANT COPY   DEFENDANT COPY

ARREST WARRANT

## 2025A0210700318
STATE OF SOUTH CAROLINA

[X] County/    [ ] Municipality of

Aiken

THE STATE        25-028327
against

Tracey Duane Turner

Address:

Phone:                    SSN:
Sex: M   Race: B   Height: 5  9  Weight: 179
OpState: SC   DL #:
DOB:              Agency ORI#: SC0020000
Prosecuting Agency:   Aiken County Sheriff
Prosecuting Officer:  Luis A Hernandez - S00874
Offense:  Securities / Violations of Uniform Securities Act
          resulting in loss of $20,000 or more
Offense Code:    2615
Code/Ordinance Sec: 35-01-0501

This warrant is   CERTIFIED   FOR   SERVICE   in the
[ ] County/    [ ] Municipality of

The accused
is to be arrested and brought before me to be
dealt with according to the law.

                                          (L.S.)
_____
        Signature of Judge
Date

RETURN

A copy of this arrest warrant was delivered to
defendant
on _____

_____
Signature of Constable/Law Enforcement Officer

RETURN WARRANT TO:
    General Sessions
    P O Box 583
    109 Park Avenue
    Aiken, SC 29802

DEFENDANT COPY    DEFENDANT COPY

---

STATE OF SOUTH CAROLINA        )
[X] County/   [ ] Municipality of   )      AFFIDAVIT        DEFENDANT COPY
                               )
Aiken                          )

Personally appeared before me the affiant  Luis A Hernandez                  who
being duly sworn deposes and says that defendant  Tracey Duane Turner
did within this county and state on or about  5/12/2023                 violate the criminal laws of the
State of South Carolina (or ordinance of  [X] County/  [ ] Municipality of  Aiken                )
in the following particulars:

DESCRIPTION OF OFFENSE:  Securities / Violations of Uniform Securities Act resulting in loss of $20,000 or more

I further state that there is probable cause to believe that the defendant named above did commit
the crime set forth and that probable cause is based on the following facts:

Upon information and belief, in May of 2023, the defendant, Tracey Turner, did employ a scheme, device, or artifice to defraud
multiple victims including, Dr. Anserno Arthur, by presenting a fraudulent investment opportunity in form of land development
called "Weeping Willows", and obtaining multiple wire transfers totaling $1,000,0000. The money was withheld and no investment
was made.  This is a violation of code of laws 35-01-0501 as amended. This incident took place at 25 Juniper Loop Aiken, SC
29803 within the jurisdiction of the Aiken County Sheriffs Office.

_____
        Signature of Affiant

STATE OF SOUTH CAROLINA        )
[X] County/   [ ] Municipality of   )   Affiant's Address   420 Hampton Ave N E
                               )                            Aiken, SC 29801-
Aiken                          )   Affiant's Telephone

ARREST WARRANT

TO ANY LAW ENFORCEMENT OFFICER OF THIS STATE OR MUNICIPALITY OR ANY CONSTABLE OF THIS COUNTY:

It appearing from the above affidavit that there are reasonable grounds to believe that

on or about  5/12/2023                 defendant  Tracey Duane Turner
did violate the criminal laws of the State of South Carolina (or ordinance of
[X] County/  [ ] Municipality of  Aiken                ) as set forth below:

DESCRIPTION OF OFFENSE:  Securities / Violations of Uniform Securities Act resulting in loss of $20,000 or more

Having found probable cause and the above affiant having sworn before me, you are empowered and directed to arrest the said defendant and bring him or
her before me forthwith to be dealt with according to law. A copy of this Arrest Warrant shall be delivered to the defendant at the time of its execution, or as
soon thereafter as is practicable
Sworn to and subscribed before me
on  12/30/2025                          )
                                       )   Judge's Address
                               (L.S.)  )                   Langley, SC 29834-
_____       )   Judge's Telephone  (803)593-5171
Signature of Issuing Judge             )
Patricia Yvonne Arthur Rushton         )   Issuing Court:  [X] Magistrate  [ ] Municipal  [ ] Circuit
Judge Code:   7372                     )

DEFENDANT COPY   DEFENDANT COPY   DEFENDANT COPY   DEFENDANT COPY   DEFENDANT COPY   DEFENDANT COPY   DEFENDANT COPY

COUNTY of   Aiken                                                    AFFIDAVIT

### REASON FOR THE AFFIANT'S BELIEF THAT THE
### PROPERTY SOUGHT IS ON THE SUBJECT PREMISES

The affiant, I, Luis A. Hernandez, am a sworn officer of the Aiken County Sheriff's Office and have been employed as a law enforcement officer for more than 3.5 years. I am currently assigned as a Criminal Investigator with the Aiken County Sheriff's Office Criminal Investigations Division. I have investigated multiple manners of crimes against persons and property. My investigative experience includes criminal domestic violence, assaults, burglary, larceny of all types and degrees, death investigations, receiving/selling/possessing stolen property, firearms related offenses, fraud, forgery, and other commonly occurring adult criminal offenses. I received my Basic Law Enforcement Certification from the South Carolina Criminal Justice Academy. I have earned an Associates and Bachelor's Degree in Criminal Justice from Southern New Hampshire University.

Based on my training, experience, and specific knowledge of this incident, I have come to know the following:

1. On 05/06/25, the victim, Dr. Ansermo Arthur, reported that in May of 2023, he wire transferred a total of $1,000,000 to Turner Developments LLC, in reference to a investment agreement for the 'Weeping Willows" land project that was proposed to him. Dr. Arthur claims that he was not received any investment returns and nothing was done to the development and now he is out his money. He claims he was scammed by Tracey Arthur and would like to pursue charges.

2.

3. This agency is requesting the statements for Turner Developments to show the deposits going in and other deposits that would assist in showing if any effort was made to actually go forward with the development.

4. We request that information and /or documents available be returned to this agency via secure email to Lhernandez@aikencountysc.gov or by certified mail to:

>       Aiken County Sheriff's Office
> ATTN: Investigator Luis A. Hernandez
>       420 Hampton Ave NE
>       Aiken SC 29801

5. Thank you in advance

---

Sworn to and Subscribed before me

this __21__ day of __Nov__, 2025

_____ (L.S.)
Signature of Judge

Inv  Luis A. Hernandez

_____
Affiant

Address  420 Hampton Ave., Aiken, SC  29801

Phone __ 803-522-3025 ___ Fx: 803-642-2148 __

Lhernandez@aikencountysc.gov

# EXHIBIT E

**ARREST WARRANT**

## 2025A0210700316

STATE OF SOUTH CAROLINA

[X] County/   [ ] Municipality of

Aiken

| THE STATE | 25-030212 |
|---|---|
| against | |

Tracey Duane Turner

Address:

Phone:

Sex: M   Race: B   Height: 5 9   Weight: 179

DL State:   DL #:

DOB:

Agency ORI #   SC0020000

Prosecuting Agency:   Aiken County Sheriff

Prosecuting Officer:   Luis A Hernandez - S00874

Offense: Breach / Obtain signature or prop. under false pretenses, value $10,000 or more

Offense Code:   3471

Code/Ordinance Sec:   16-13-0240

This warrant is CERTIFIED FOR SERVICE in the

[ ] County/   [ ] Municipality of

The accused is to be arrested and brought before me to be dealt with according to the law.

(L.S.)

_____
Signature of Judge

Date _____

**RETURN**

A copy of this arrest warrant was delivered to defendant *Tracy Turner*

on _1/29/26 @ 0439_

_____   8360
Signature of Constable/Law Enforcement Officer

RETURN WARRANT TO:

General Sessions
P O Box 583
109 Park Avenue
Aiken, SC 29802

**DEFENDANT COPY   DEFENDANT COPY**

---

STATE OF SOUTH CAROLINA   )
[X] County/   [ ] Municipality of   )
)
Aiken   )

**AFFIDAVIT**   DEFENDANT COPY   Form Approved by S.C. Attorney General April 21, 2003 SCCA 518

Personally appeared before me the affiant   Luis A Hernandez   who being duly sworn deposes and says that defendant   Tracey Duane Turner   did within this county and state on or about   9/15/2022   violate the criminal laws of the State of South Carolina (or ordinance of [X] County/ [ ] Municipality of   Aiken   ) in the following particulars:

DESCRIPTION OF OFFENSE: Breach / Obtain signature or prop. under false pretenses, value $10,000 or more

I further state that there is probable cause to believe that the defendant named above did commit the crime set forth and that probable cause is based on the following facts:

Upon information and belief, in Sep of 2022, the defendant, Tracey Turner, did by false pretense or representation did obtain money from another person, Wynee Oden, by presenting a fraudulent investment opportunity in form of land development called "Weeping Willows", and obtaining a wire transfers totaling $600,000. The money was withheld and no investment was made. This is a violation of code of laws 35-01-0501 as amended. This incident took place at 260 E Shoreline Dr North Augusta, SC 29841 within the jurisdiction of the Aiken County Sheriffs Office.

_____
Signature of Affiant

STATE OF SOUTH CAROLINA
[X] County/   [ ] Municipality of

Aiken

Affiant's Address   420 Hampton Ave N E
Aiken, SC 29801-

Affiant's Telephone

**ARREST WARRANT**

TO ANY LAW ENFORCEMENT OFFICER OF THIS STATE OR MUNICIPALITY OR ANY CONSTABLE OF THIS COUNTY:

It appearing from the above affidavit that there are reasonable grounds to believe that on or about   9/15/2022   defendant   Tracey Duane Turner   did violate the criminal laws of the State of South Carolina (or ordinance of [X] County/ [ ] Municipality of   Aiken   ) as set forth below:

DESCRIPTION OF OFFENSE: Breach / Obtain signature or prop. under false pretenses, value $10,000 or more

Having found probable cause and the above affiant having sworn before me, you are empowered and directed to arrest the said defendant and bring him or her before me forthwith to be dealt with according to law. A copy of this Arrest Warrant shall be delivered to the defendant at the time of its execution, or as soon thereafter as is practicable.

Sworn to and subscribed before me on 12/30/2025   )
)
)   (L.S.)   )
_____
Signature of Issuing Judge
Patricia Yvonne Arthur Rushton
Judge Code:   7372

Judge's Address

Langley, SC 29834-

Judge's Telephone   (803)593-5171

Issuing Court: [X] Magistrate   [ ] Municipal   [ ] Circuit

**DEFENDANT COPY   DEFENDANT COPY   DEFENDANT COPY   DEFENDANT COPY   DEFENDANT COPY**

**ARREST WARRANT**

## 2025A0210700317

STATE OF SOUTH CAROLINA

[X] County/    [ ] Municipality of

Aiken

| THE STATE | 25-030212 |
|---|---|
| against | |

Tracey Duane Turner

Address:

Phone:

Sex: M   Race: B   Height: 5 9   Weight: 179

DL State: SC   DL #:

DOB:

Prosecuting Agency: Aiken County Sheri[ff]

Prosecuting Officer: Luis A Hernandez - S00874

Offense: Securities / Violations of Uniform Securities Act resulting in loss of $20,000 or more

Offense Code: 2615

Code/Ordinance Sec: 35-01-0501

This warrant is   CERTIFIED FOR SERVICE   in the

[ ] County/    [ ] Municipality of

The accused is to be arrested and brought before me to be dealt with according to the law

(L.S.)

_____
Signature of Judge

Date: _____

**RETURN**

A copy of this arrest warrant was delivered to defendant Tracey Turner on 1/29/26 @ 0439

_____
Signature of Constable/Law Enforcement Officer
836

RETURN WARRANT TO:

General Sessions
P O Box 583
109 Park Avenue
Aiken, SC 29802

**DEFENDANT COPY**    **DEFENDANT COPY**

---

STATE OF SOUTH CAROLINA    )

[X] County/   [ ] Municipality of    )

Aiken    )

**AFFIDAVIT**    **DEFENDANT COPY**

Form Approved by S.C. Attorney General April 21, 2003 SCCA 518

Personally appeared before me the affiant Luis A Hernandez who being duly sworn deposes and says that defendant Tracey Duane Turner did within this county and state on or about 9/15/2022 violate the criminal laws of the State of South Carolina (or ordinance of [X] County/ [ ] Municipality of Aiken ) in the following particulars:

DESCRIPTION OF OFFENSE: Securities / Violations of Uniform Securities Act resulting in loss of $20,000 or more

I further state that there is probable cause to believe that the defendant named above did commit the crime set forth and that probable cause is based on the following facts:

Upon information and belief, in Sep of 2022, the defendant, Tracey Turner, did employ a scheme, device, or artifice to defraud multiple victims including, Wynee Melissa Oden, by presenting a fraudulent investment opportunity in form of land development called "Weeping Willows", and obtaining a wire transfers totaling $600,000 The money was withheld and no investment was made. This is a violation of code of laws 35-01-0501 as amended. This incident took place at 260 E Shoreline Dr North Augusta, SC 29841 within the jurisdiction of the Aiken County Sheriffs Office.

_____
Signature of Affiant

STATE OF SOUTH CAROLINA    )

[X] County/   [ ] Municipality of    )

Aiken    )

Affiant's Address   420 Hampton Ave N E

Aiken, SC 29801-

Affiant's Telephone

**ARREST WARRANT**

TO ANY LAW ENFORCEMENT OFFICER OF THIS STATE OR MUNICIPALITY OR ANY CONSTABLE OF THIS COUNTY: It appearing from the above affidavit that there are reasonable grounds to believe that on or about 9/15/2022 defendant Tracey Duane Turner did violate the criminal laws of the State of South Carolina (or ordinance of [X] County/ [ ] Municipality of Aiken ) as set forth below

DESCRIPTION OF OFFENSE: Securities / Violations of Uniform Securities Act resulting in loss of $20,000 or more

Having found probable cause and the above affiant having sworn before me, you are empowered and directed to arrest the said defendant and bring him or her before me forthwith to be dealt with according to law. A copy of this Arrest Warrant shall be delivered to the defendant at the time of its execution, or as soon thereafter as is practicable

Sworn to and subscribed before me
on 12/30/2025    )

_____ (L.S.) )
Signature of Issuing Judge

Patricia Yvonne Arthur Rushton

Judge Code: 7372

Judge's Address

Langley, SC 29834-

Judge's Telephone (803)593-5171

Issuing Court: [X] Magistrate   [ ] Municipal   [ ] Circuit

**DEFENDANT COPY**   **DEFENDANT COPY**   **DEFENDANT COPY**   **DEFENDANT COPY**   **DEFENDANT COPY**

# EXHIBIT F



## Appraisal Report

Weeping Willows
1001 Old Aiken Road
Beech Island, Aiken County, South Carolina 29841

Report Date: April 8, 2024



FOR:

Turner Development LLC
Mr. Tracey D. Turner
CEO
2901 North Capital Street, NE
Washington, District of Columbia 20002

**Valbridge Property Advisors |**
**Charleston**

1250 Fairmont Avenue
Mount Pleasant, South Carolina, 29464
843-884-1266 phone
843-881-7532 fax
*valbridge.com*

Valbridge File Number:
SC01-24-0317-000



**1250 Fairmont Avenue**
**Mount Pleasant, South Carolina, 29464**
**843-884-1266 phone**
**843-881-7532 fax**
**valbridge.com**

April 8, 2024

Karl P. Finkelstein, MAI
843-884-1266 x116
kfinkelstein@valbridge.com

Mr. Tracey D. Turner
CEO
Turner Development LLC
2901 North Capital Street, NE
Washington, District of Columbia 20002

RE:     Appraisal Report
        Weeping Willows
        1001 Old Aiken Road
        Beech Island, Aiken County, South Carolina 29841

Dear Mr. Turner:

In accordance with your request, an appraisal of the above referenced property was performed. This appraisal report sets forth the pertinent data gathered, the techniques employed, and the reasoning leading to the value opinions. This letter of transmittal does not constitute an appraisal report and the rationale behind the value opinion(s) reported cannot be adequately understood without the accompanying appraisal report.

The subject property, as referenced above, is located the east side of Old Aiken road and north of US Highway 78 and is further identified as tax parcel number 013-12-01-001. The subject site is a 175.030-acre or 7,624,307-square-foot parcel. It is part of a larger 196.61 acreage tract that was approved as a mixed use PUD in 2023 by Aiken County. Total uses include the subject residential acreage slated for 411 SFR Units and 117 Townhouse units in Five phases. Other uses will possibly include retail and office. According to documents provided, the lots will range in size from widths of 50' to 75', with average depths of 125'.

There are two letters of intent to purchase the developed lots. Both Eastwood Homes and Great Southern Homes have committed to take down schedules for both the SFR lots and the Townhouse lots. Our analysis takes into account all relevant information related to the development of these lots in order to arrive at an "as is" valuation.

© 2024 VALBRIDGE PROPERTY ADVISORS | CHARLESTON



The analyses, opinions, and conclusions were developed, and this report was prepared in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Foundation; the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute; the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA); and the requirements of our client.

The client in this assignment is Turner Development LLC and the intended user of this report is Turner Development LLC, Aperture Real Estate Ventures and no others. The intended use is to aid in internal decision making purposes. The value opinions reported herein are subject to the definitions, assumptions, limiting conditions, and certifications contained in this report.

The findings and conclusions are further contingent upon the following extraordinary assumptions and/or hypothetical conditions, the use of which might have affected the assignment results:

## Extraordinary Assumptions:
- It is assumed the proposed horizontal improvements will be completed in a workman-like manner in accordance with the provided plans and cost budget on the upon completion date of value.
- It is assumed that the proposed Weeping Willows PUD will be developed, as proposed, as of the date of this appraisal. Any change in densities or unit mix could have an impact on the value conclusions.

## Hypothetical Conditions:
- None

Based on the analysis contained in the following report, our value conclusions are summarized as follows:

### Value Conclusion

| Component | As Is |
|---|---|
| Value Type | Market Value |
| Real Property Interest | Fee Simple |
| Effective Date of Value | April 1, 2024 |
| **Value Conclusion** | **$9,100,000** |
| | **$51,991 per Acre** |

© 2024 VALBRIDGE PROPERTY ADVISORS | CHARLESTON



Mr. Tracey D. Turner
Turner Development LLC

Respectfully submitted,
Valbridge Property Advisors | Charleston

Karl P. Finkelstein, MAI, MRICS
Senior Managing Director
South Carolina Certified General CG 3396
Expires 06/30/2024

Pledger M. "Jody" Bishop III,  MAI, SRA, AI-GRS, CRE
Senior Managing Director
South Carolina Certified General CG 795
Expires  6/30/2024

© 2024 VALBRIDGE PROPERTY ADVISORS | CHARLESTON



# Table of Contents

Cover Page

Letter of Transmittal

Table of Contents ........................................................................................................................................5

Summary of Salient Facts ........................................................................................................................6

Aerial and Front Views ..............................................................................................................................7

Location Map ..................................................................................................................................................8

Introduction ...................................................................................................................................................9

Scope of Work ............................................................................................................................................ 13

Regional and Market Area Analysis ................................................................................................. 15

City and Neighborhood Analysis ...................................................................................................... 21

Site Description .......................................................................................................................................... 28

Subject Photographs .............................................................................................................................. 38

Assessment and Tax Data .................................................................................................................... 40

Market Analysis ......................................................................................................................................... 42

Highest and Best Use Analysis .......................................................................................................... 45

Land Valuation ........................................................................................................................................... 46

Discounted Cash Flow Analysis ........................................................................................................ 57

Reconciliation ............................................................................................................................................. 65

    Exposure Time and Marketing Period ...................................................................................... 66

General Assumptions and Limiting Conditions ......................................................................... 67

Certification – Karl P. Finkelstein ...................................................................................................... 72

Certification – Pledger M. Bishop, III .............................................................................................. 73

Addenda ........................................................................................................................................................ 74

    Additional Subject Photographs ................................................................................................ 75

    Letter of Engagement ...................................................................................................................... 77

    Glossary ................................................................................................................................................... 80

    Qualifications ....................................................................................................................................... 87



# Summary of Salient Facts

## Property Identification

| | |
|---|---|
| Property Name | Proposed Residential Subdivision |
| Property Address | 1001 Old Aiken Road |
| | Beech Island, Aiken County, South Carolina 29841 |
| Latitude & Longitude | 33.495604, -81.91872 |
| Census Tract | 6931.02 |
| Tax Parcel Number | 013-12-01-001 |
| Property Owner | Turner Development LLC |

## Site

| | |
|---|---|
| Zoning | Planned Use Development (PUD A) |
| FEMA Flood Map No. | 45003C0481F |
| Flood Zone | Zone X |
| Gross Land Area | 175.030 acres |
| Usable Land Area | 175.030 acres |

## Valuation Opinions

| | |
|---|---|
| Highest & Best Use - As Vacant | Mixed Use Development |
| Reasonable Exposure Time | 12 months or less |
| Reasonable Marketing Time | 12 months or less |

### Value Indications

| Approach to Value | As Is |
|---|---|
| Sales Comparison | $9,100,000 |
| Cost | Not Developed |
| Income Capitalization | |
|    Yield Capitalization (DCF) | $9,100,000 |

### Value Conclusion

| Component | As Is |
|---|---|
| Value Type | Market Value |
| Real Property Interest | Fee Simple |
| Effective Date of Value | April 1, 2024 |
| **Value Conclusion** | **$9,100,000** |
| | **$51,991 per Acre** |



# Aerial and Front Views

**AERIAL VIEW**



**FRONT VIEW**





# Location Map



# Introduction

## Client and Intended Users of the Appraisal

The client in this assignment is Turner Development LLC and the intended user of this report is Turner Development LLC, Aperture Real Estate Ventures. Under no circumstances shall any of the following parties be entitled to use or rely on the appraisal or this appraisal report:

i.      The borrower(s) on any loans or financing relating to or secured by the subject property,

ii.     Any guarantor(s) of such loans or financing; or

iii.    Principals, shareholders, investors, members or partners in such borrower(s) or guarantors.

## Intended Use of the Appraisal

The intended use of this report is to aid in internal decision making purposes.

## Real Estate Identification

The subject property is located at 1001 Old Aiken Road, Beech Island, Aiken County, South Carolina 29841. The subject property is further identified by the tax parcel number 013-12-01-001.



## Legal Description

ALL that lot or parcel of land, with improvements thereon, situate, lying and being in the State of **South Carolina**, County of **Aiken**, being shown and designated as **Containing 195.30 Acres, more or less**, comprised of the "Farm Tract" and "Home Tract" on a plat prepared by John M. Bailey & Associates, PC, dated September 27, 2010, recorded in the Office of the Clerk of the Superior Court of **Aiken** County, **South Carolina**, in Plat Book **57**, Page **887**; reference being made to said plat for a more complete and accurate description as to the metes, bounds and location of said property.

**LESS AND EXCEPT THEREFROM** ALL that lot or parcel of land, with improvements thereon, situate, lying and being in the State of **South Carolina**, County of **Aiken**, being shown and designated as **Containing 10.83 Acres, more or less**, on a plat prepared for Heights Church, dated November 19, 2015, recorded in the Office of the Clerk of the Superior Court of **Aiken** County, **South Carolina**, in Plat Book **59**, Page **60**; reference being made to said plat for a more complete and accurate description as to the metes, bounds and location of said property.

**LESS AND EXCEPT THEREFROM** ALL that lot or parcel of land, with improvements thereon, situate, lying and being in the State of **South Carolina**, County of **Aiken**, being shown and designated as **Containing 11.00 Acres, more or less**, on a plat prepared for Mark A. Richards, dated November 19, 2015, recorded in the Office of the Clerk of the Superior Court of **Aiken** County, **South Carolina**, in Plat Book **59**, Page **44**; reference being made to said plat for a more complete and accurate description as to the metes, bounds and location of said property.

This being the same property conveyed to Haskell Family Properties, LLC by deed of Mary Bright Parker, Laura H. Phinizy and Judith H. McCarthy, dated November 30, 2018 and recorded on May 27, 2020 in Book/Volume 4847, at page 1203, aforesaid RMC Office.

Tax Map and Parcel number: 013-12-01-001

## Use of Real Estate as of the Effective Date of Value

As of the effective date of value, the subject was vacant land.

## Use of Real Estate as Reflected in this Appraisal

The as is opinion of value for the subject property reflects use as vacant land.

## Ownership of the Property

According to Aiken County Property Records, title to the subject property is vested in Turner Development LLC.

## History of the Property

Ownership of the subject property has changed within the past three years.

### Recent Transaction

Sale Date:                                  02-22-2021



| | |
|---|---|
| Grantor/Seller: | Haskell Family Properties, LLC |
| Grantee/Buyer: | Turner Development LLC |
| Deed Book/Page: | 4909/202 |
| Arm's Length: | Yes |
| Sales Price: | $1,222,000 |
| Remarks: | This was the purchase of raw land acreage. Since that time, the purchasers have secured PUD approval along with commitments for utility service. |

## Type and Definition of Value

The appraisal problem is to develop an opinion of the market value of the subject property. Market value is defined as the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale with the buyer and seller each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- *buyer and seller are typically motivated;*

- *both parties are well informed or well advised, and acting in what they consider their own best interest;*

- *a reasonable time is allowed for exposure in the open market;*

- *payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and*

- *the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale[1]*

Please refer to the Glossary in the Addenda section for additional definitions of terms used in this report.

## Valuation Scenarios, Property Rights Appraised, and Effective Dates of Value

Opinions of value for the subject property were developed under the following valuation scenarios:

| Valuation Scenario | Effective Date of Value |
|---|---|
| As Is Market Value of the Fee Simple Interest | April 1, 2024 |

## Date of Report

The date of this report is April 8, 2024.

## List of Items Requested but Not Provided

- All requested information was provided

---

[1] *FIRREA Code of Federal Regulations, Title 12,  Part 34 Subpart C - 34.42, 1990; also Interagency Appraisal and Evaluation Guidelines, Federal Register / Vol.75, No. 237, 2010*

## Assumptions and Conditions of the Appraisal

This appraisal assignment and the opinions reported herein are subject to the General Assumptions and Limiting Conditions contained in the report and the following extraordinary assumptions and/or hypothetical conditions, the use of which might have affected the assignment results.

### Extraordinary Assumptions

- It is assumed the proposed horizontal improvements will be completed in a workman-like manner in accordance with the provided plans and cost budget on the upon completion date of value.

- It is assumed that the proposed Weeping Willows PUD will be developed, as proposed, as of the date of this appraisal. Any change in densities or unit mix could have an impact on the value conclusions.

### Hypothetical Conditions

- None

# Scope of Work

The elements addressed in the Scope of Work are (1) the extent to which the subject property is identified, (2) the extent to which the subject property is inspected, (3) the type and extent of data researched, (4) the type and extent of analysis applied, (5) the type of appraisal report prepared, and (6) the inclusion or exclusion of items of non-realty in the development of the value opinion. These items are discussed as below.

## Extent to Which the Property Was Identified

The three components of the property identification are summarized as follows:

- Legal Characteristics - The subject was legally identified via legal description from deed, Aiken County Register of Deeds, Aiken County Register of Plats, plat, Aiken County assessor parcel number, site visit, Google Maps, public records and client provided information.

- Economic Characteristics - The subject property economic characteristics were identified via information provided by the property owner, Aiken County zoning information, Aiken County Tax Assessor.

- Physical Characteristics - The subject property physical characteristics were identified via physical inspection of the subject site along with an examination of Aiken County Government Tax Map(s), Aiken County public record(s) of ownership over the past three years, applicable flood map(s) published by the Federal Emergency Management Agency (FEMA), site plans.

## Extent to Which the Property Was Inspected

An appraisal inspection of the subject property exterior observations by the appraiser was completed on April 1, 2024. The improvements were not measured during the course of the inspection.

## Type and Extent of Data Researched

The following data was researched and analyzed: (1) market area data, (2) property-specific market data, (3) zoning and land-use data, and (4) current data on comparable listings and transactions. Professionals familiar with the subject market/property type were also interviewed.

## Type and Extent of Analysis Applied (Valuation Methodology)

Surrounding land use trends, the condition of any improvements, demand for the subject property, and relevant legal limitations were observed in the process of concluding a highest and best use for the subject property. The subject property was then valued based on the highest and best use conclusion.

There are four primary methods available to develop a land value estimate: (1) sales comparison, (2) land residual method, (3) ground rent capitalization, and (4) subdivision development method (discounted cash flow). While other methods, such as extraction and allocation, are applicable under limited conditions, one or more of these approaches are used in most circumstances to derive an indication of land value.

- Sales Comparison Approach - In the sales comparison approach, value is indicated by recent sales and/or listings of comparable properties in the market, with the appraiser analyzing the



impact of material differences in both economic and physical elements between the subject and the comparables.

- <u>Direct Capitalization: Land Residual Method</u> - The land residual methodology involves estimating the residual net income to the land by deducting from total potential income the portion attributable to the improvements, assuming development of the site at its highest and best use. The residual income is capitalized at an appropriate rate, resulting in an indication of land value.

- <u>Direct Capitalization: Ground Rent Capitalization</u> – A market derived capitalization rate is applied to the net income resulting from a ground lease. This can represent the leased fee or fee simple interest, depending on whether the income potential is reflective of a lease in place or market rental rates.

- <u>Yield Capitalization: Subdivision Development Method</u> – Also known as discounted cash flow analysis (DCF), the methodology is most appropriate for land having multiple lot development in the near term as the highest and best use. The current site value is represented by discounting the anticipated cash flow to a present value, taking into consideration all necessary costs of development, maintenance, administration, and sales throughout the absorption period.

All of these approaches to value were considered. The availability of data and applicability of each approach to value within the context of the characteristics of the subject property, along with the needs and requirements of the client, were assessed. Based on this assessment, both the sales comparison approach and the yield capitalization (DCF) were developed. The specific methods and analysis of each approach are further discussed in the respective valuation sections.

## Appraisal Conformity and Report Type

The analyses, opinions, and conclusions were developed and this report was prepared in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Foundation; the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute; the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA); and the requirements of our client. This is an Appraisal Report as defined by the Uniform Standards of Professional Appraisal Practice under Standards Rule 2-2a.

## Personal Property/FF&E

All items of non-realty are excluded from this analysis. The opinion of market value developed herein is reflective of real estate only.



# Regional and Market Area Analysis

**REGIONAL MAP**



**OVERVIEW**

The subject is located in Beech Island, in Aiken County. It is part of the Augusta-Aiken, GA-SC MSA. The Augusta-Aiken, GA-SC Metropolitan Statistical Area (MSA) is the second largest metro area in Georgia and includes Richmond, Columbia, Burke and McDuffie counties in Georgia and Aiken and Edgefield Counties in South Carolina.

The city of North Augusta lies along the Savannah River on the border of South Carolina and Georgia. North Augusta is part of the Augusta, Georgia's MSA.  Established in 1736, Augusta is Georgia's second largest city. Augusta is the principal city of the Augusta metropolitan area. In 2022 it had an estimated population of 615,953, making it the second-largest metro area in the state. It is the 93rd largest metropolitan area in the United States.

Augusta's warm climate made it a major resort town of the Eastern United States in the early and mid-20th century. Internationally, Augusta is best known for hosting The Masters golf tournament each spring. The Masters brings over 200,000 visitors from across the world to the Augusta National Golf Club. Membership at Augusta National is widely considered to be the most exclusive in the sport of golf across the world.



Augusta lies approximately two hours east of downtown Atlanta by car via I-20. The city is home to Fort Gordon, a major U.S. Army base. In 2016, it was announced that the new National Cyber Security Headquarters would be based in Augusta, bringing as many as 10,000 cyber security specialists to the Fort Gordon area.

Augusta is a regional center of medicine, biotechnology, and cyber security. The city's three largest employers are Augusta University, the Savannah River Site (a Department of Energy nuclear facility), and the U.S. Army Cyber Center of Excellence at Fort Gordon. Other companies that have facilities, headquarters, or distribution centers in Augusta include CareSouth, T-Mobile, Covidien, Solo Cup Company, Automatic Data Processing, International Paper, Teleperformance, Sitel, E-Z-Go, Elanco, Club Car, John Deere, Procter & Gamble, Kellogg's, and Delta Air Lines' baggage call center.

Cybersecurity has become a major focus to help grow the area of Augusta. In 2016, it was announced that the new National Cyber Security Headquarters would be based in Augusta, bringing as many as 10,000 cyber security specialists to the Fort Gordon area. In 2017, Southern Business & Development named Augusta the Mid-Market of the Year to recognize the area's uptick in attracting businesses and jobs, mainly in the cyber sector. In downtown August, a $50 million cyber center will be the start Augusta University's downtown campus.

Other projects helping to revitalize the downtown area of Augusta include two new hotels bringing more than 240 rooms and a $17 million restoration of the 1938 Miller Theater on Broad Street.

The Aiken/North Augusta Region contains the sixth largest military presence in South Carolina, with an annual economic impact of approximately $776 million that is supported by 5,649 jobs. This impact includes the Savannah River Site's National Nuclear Security Administration (NNSA), assorted Department of Defense (DOD) contractor activities, South Carolina military retirees and veterans, and portions of the South Carolina National Guard and the U.S. Army Reserve. In addition, there are likely some residual economic impacts from Fort Gordon in Augusta, Georgia – because some military personnel working at Fort Gordon live in South Carolina. Additionally, Fort Gordon is expanding quickly and adding significant infrastructure to the U.S. Army's Cyber Command, which will bring a measurable impact to the local economy in the future.

The noteworthy NNSA, a partner of the Savannah River Site (SRS) in Aiken, works to enhance national security through the military application of nuclear science. Over $200 million in funding from the U.S. DOD is appropriated to SRS every year for NNSA programs.

## Aiken County

Aiken County is part of the Augusta, GA MSA and is mostly in the Sandhills region of South Carolina with the northern parts reaching the Piedmont and the southern parts reaching into the Coastal plain. The county is named after William Aiken (1779-1831) the first president of the South Carolina Railroad Company and is the only county born from reconstruction.

Bordered by the Savannah River, there are 1,081 square miles in Aiken County, and it is the fourth largest county in South Carolina.  Aiken County's major crops are cotton, corn, bermudagrass, hay, soybeans, timber, and peaches. Other crops include peanuts, small grains, and watermelons. Beef cattle, hogs, chickens, and horses are the most common farm animals. The area is popular with horse



trainers and professional rides because mild winters allow lengthy training seasons. The area is famous for its Triple Crown which consists of the Aiken Trials, the Steeplechase, and the High Goal Polo Game.

Highways, rail lines, and air service all converge in the region making it easy to get products where they need to go. Aiken County is centrally located between major cities and a 2.5 hour drive from two international airports and two ports. Aiken is ideally located close to it all, Easy access to Fort Gordon, Augusta and Columbia there are plenty employment opportunities.  The beach and the mountains are within driving distance.  With the cost of living more than 16% below the national average it is easy to enjoy city life without having to live in a large metropolitan area.

Several industrial parks, owned by Aiken County, the city of Aiken, or the City of North Augusta are available for new and expanding companies. With available industrial sites and buildings and extensive infrastructure services, we're ready to accommodate you. Add in local governments that are committed to economic development and a great quality.

## North Augusta

The city of North Augusta, founded in 1906, is Aiken County's second-largest city and is located just across the Savannah River from Augusta, Georgia. The area was home to three previous towns, including Hamburg, which was the terminus for the Charleston-Hamburg railroad line, the longest in the world at the time of its construction. North Augusta's current incarnation was founded as a residential and resort community, largely based on the establishment of the luxurious Hampton Terrace Hotel in 1902. Though the hotel burned in 1916, the surrounding city thrived and its population approaches that of nearby Aiken. e city boasts a wealth of green space. The Greenway is a paved 7-mile trail that winds through beautiful portions of the city and past the Savannah River. The Living history Park also offers a glimpse into the area's past. Visitors and residents alike find the hospitality of North Augusta unequaled.

## Population

Trends in population are a significant indicator of a structural change within a region's economy. The rate of increase or decrease of an area's population has a direct effect on real estate values. Typically, population growth benefits businesses, creates jobs, and enhances all aspects of the local tax base. Since the supply of land is fixed, an increase in the population base will be reflected in higher demand for real estate. Naturally, this pattern of demand will be translated into value to the whole spectrum of property types.

Population characteristics relative to the subject property are presented in the following table.

**Population**

| Area | Census Population (2020) | Current Population (2023) | Compound Annual Δ 2020 - 2023 | Projected Population (2028) | Compound Annual Δ 2023 - 2028 |
|---|---|---|---|---|---|
| United States | 331,449,520 | 335,707,897 | 0.43% | 343,238,675 | 0.44% |
| South Carolina | 5,118,425 | 5,311,184 | 1.24% | 5,473,930 | 0.61% |
| Augusta-Richmond County, GA-SC (MSA) | 611,000 | 628,401 | 0.94% | 642,272 | 0.44% |
| Aiken County | 168,808 | 173,221 | 0.86% | 176,368 | 0.36% |
| North Augusta CCD | 57,644 | 59,263 | 0.93% | 60,791 | 0.51% |

*Source: ESRI (ArcGIS)*



## Transportation

Augusta is linked to Atlanta to the west and Columbia, South Carolina, to the east by Interstate 20 (I-20). I-520 (Bobby Jones Expressway) extends from I-20 exit 196 through Augusta's western and southern suburban areas, eventually crossing the Savannah River to South Carolina, in which it is known as Palmetto Parkway.

U.S. Route 1 (US 1), along with State Route 4 (SR 4), connects Wrens. US 1 also links Augusta with Aiken, South Carolina. US 25 and SR 121 connects Waynesboro with Augusta; across the state line, US 25 and South Carolina Highway 121 (SC 121) links Augusta with Edgefield, South Carolina. In South Carolina, US 1 and US 78 go through Aiken, South Carolina. US 78 further connects with Charleston, South Carolina. US 278 bypasses Aiken and serves as a connecting route to Hilton Head Island, South Carolina.

The Augusta Regional Airport is a city owned public airport south of Augusta in Richmond County, GA. The airport is primarily regional but during the Masters golf tournament an increase in traffic requires more flights and larger equipment from its carriers.

## Employment

The entire Augusta MSA has a growing population, which is young, diverse, educated and upwardly mobile. An area population of more than 600,000 and a workforce of more than 268,000 represent a strong and stable labor pool for new and expanding companies. The millennial population in Augusta has increased by more than 25% in the last 5 years.

The Augusta labor force is strong for many reasons, one being the presence of Fort Gordon, home to the US Army Cyber Command. On average, 150 military personnel separate from the military each month. Of these, 60% have a background in information technology or intelligence.

**Top Manufacturing Employers**

| Employer | # of Employees |
|---|---|
| Textron Specialized Vehicles | 1000 |
| Covidien | 850 |
| Graphic Packaging International | 820 |
| Kellogg's | 535 |
| FPL Food | 500 |
| Proctor & Gamble | 450 |
| Thermal Ceremics | 444 |
| Resolute Forest Products | 374 |
| Boral Brick | 363 |
| Nutrien | 350 |

**Top Public Sector Employers**

| Employer | # of Employees |
|---|---|
| Fort Gordon | 19,884 |
| Augusta University | 4,656 |
| Richmond County School System | 4,418 |
| Augusta Richmond County | 4,418 |
| Univeristy Hospital | 3,200 |
| Augusta University Health System | 3,054 |
| Charlie Norwood VA Medical Center | 2,082 |
| East Central Regional Hospital | 1,488 |
| Doctor's Hospital | 1,210 |
| Doctor's Hospital | 270 |

Employment by industry for the MSA is presented in the following chart:



*Employment by Industry for Aiken County  -  Source: ESRI (ArcGIS)*

## Unemployment

Typically, a good indicator of positive and negative change within an area is the level of job growth or decline. The following table exhibits current and past unemployment rates as obtained from the Bureau of Labor Statistics. Overall, the region compares favorably to the state and the country.



**Unemployment Rates**

| Area | YE 2018 | YE 2019 | YE 2020 | YE 2021 | YE 2022 | 2023[1] |
|---|---|---|---|---|---|---|
| United States | 3.9% | 3.7% | 8.1% | 5.3% | 3.6% | 3.6% |
| South Carolina | 3.4% | 2.8% | 6.0% | 3.9% | 3.2% | 3.0% |
| Augusta-Richmond County, SC-GA (MSA) | 4.2% | 3.7% | 5.7% | 3.9% | 3.5% | 3.4% |
| Aiken County, SC | 3.3% | 2.8% | 4.9% | 3.4% | 3.2% | 3.1% |

*Source: www.bls.gov*          *data not seasonally adjusted;   [1]Annual - most recent for US, others lag by 1-2 mos.)*

## Median Household Income

Total median household income for the region is presented in the following table. Overall, the subject's MSA and county compare unfavorably to the state and the country.

**Income**

| Area | 2023 Median HH Income | 2023 Average HH Income | 2023 Per Capita Income |
|---|---|---|---|
| United States | $72,233 | $104,831 | $41,000 |
| South Carolina | $60,025 | $88,424 | $35,757 |
| Augusta-Richmond County, GA-SC (MSA) | $59,649 | $90,082 | $35,594 |
| Aiken County | $56,703 | $85,498 | $35,532 |
| North Augusta CCD | $58,256 | $84,783 | $34,819 |

*Source: ESRI (ArcGIS)*

## Conclusions

While Georgia's economy made a near-record recovery from the COVID-19 recession in 2022, tighter monetary policy and energy price shocks will likely trigger a mild and brief economic slowdown in 2023. This will be a marked change from the 4% growth the state saw in 2022.With the population expected to grow by nearly 27,000 over the next five years and jobs increasing by 13,000, growth in the region will be slow but steady. Of the nearly 265,000 in the workforce, the majority work in manufacturing, cyber, technology and healthcare, with key employers being Augusta University, Fort Gordon, Savannah River Site and Plant Vogtle.



# City and Neighborhood Analysis

**NEIGHBORHOOD MAP**



**OVERVIEW**

The subject is located in Beech Island in Aiken County. North Augusta is located Aiken and Edgefield counties in the southwestern portion of South Carolina on the north bank of the Savannah River, 67 miles from Columbia, the state capitol.  It is part of the greater Augusta, GA MSA. The estimated population in 2023 is 59,263, which has nearly doubled since the 2020 census. The city is included in the Central Savannah River Area (CSRA).

In 1902, James U. Jackson, who as a boy envisioned a new town in the bluff areas above the flood plains, developed the plans for 600 acres that would make up the new town. He hired the best designers from New York to design this new town--North Augusta. The Savannah River plays a central role in the development of the community, providing opportunities for residents and visitors alike to enjoy an abundance of outdoor activities.

In the mid-20th century, the size of the town nearly quadrupled due to the construction of the Savannah River Plant, a nuclear reservation located adjacent to the Savannah River and 25 miles southeast of Augusta. GA. The plant employees 10,000 people and covers nearly 210 square miles. The city is home to the Georgia Avenue-Butler Avenue Historic District and many historic buildings listed on the National Register of Historic Places.



With the population nearly doubling in the last few years, the city has seen epic growth as well.  New shopping centers, restaurants and businesses have opened along major thoroughfares like Georgia Avenue and Martintown Road. The Savannah riverfront has been transformed into a vibrant mixed-use area with shops, restaurants, residential properties and recreational amenities.

The city's infrastructure improvements, which includes roadways, utilities, and public facilities have supported the economic development coming from industrial expansion. The area's strategic location, access to transportation networks, and business-friendly environment have promoted growth in manufacturing, logistics, and distribution.

## Aiken County

Aiken County is part of the Augusta, GA MSA and is mostly in the Sandhills region of South Carolina with the northern parts reaching the Piedmont and the southern parts reaching into the Coastal plain. The county is named after William Aiken (1779-1831) the first president of the South Carolina Railroad Company and is the only county born from reconstruction.

Bordered by the Savannah River, there are 1,081 square miles in Aiken County, and it is the fourth largest county in South Carolina.  The area is popular with horse trainers and professional rides because mild winters allow lengthy training seasons.

## Neighborhood Location and Boundaries

The site is located less than five miles to downtown Augusta, and this instills the property with considerable appeal as a residential option for newcomers to the area. This strategic positioning not only fosters a growing population but also acts as an incentive for stimulating economic expansion within North Augusta, SC. With population growth as a key driver to economic development, North Augusta has leveraged Augusta's population growth to drive its own economic growth along the Augusta border and further into the surrounding region.

The subject neighborhood is located in the northern section of Beech Island. The area is rural in nature.

Specific boundaries for the neighborhood are difficult to conclude. A reasonable definition of the area is a considered to be a three-mile radius around  the subject property.

## Transportation Access

North Augusta is easily accessible by Interstate 20 which connects Atlanta, GA to Columbia, SC. I20 borders the northern side of North Augusta. Running along the southeastern side of the city is Interstate 520 which connects I20 to the southern side of Augusta. In addition, US 25 runs through the center of the city and provides access to the main commercial areas of the city. Within the immediate area of the subject property, transportation access helps define the character of its development. Major travel and commuter routes within the area of the subject property include US Highway 78 and Interstate 520.  Access to the area is considered good.



## Road Improvements

The South Carolina Department of Transportation (SCDOT) proposes to replace several existing bridges along I-20 in Aiken County. These include bridges over the South Edisto River [westbound and eastbound bridges], over S-980 (Gregory Road) [westbound and eastbound bridges], over SC-19 (Edgefield Highway) [westbound bridge], and over the North Augusta Greenway [westbound bridge]

## Neighborhood Land Use

The subject neighborhood is located in an area with primarily residential or commercial land uses. An approximate breakdown of the development in the area is as follows:

### LAND USES

| | |
|---|---|
| **Developed** | 15% |
| *Residential* | *85%* |
| *Retail* | *10%* |
| *Office* | *5%* |
| *Industrial* | *0%* |
| **Vacant** | 85% |
| **Total** | **100%** |

## Land Use Trends

The neighborhood is experiencing a change in land use from undeveloped vacant land to developed mixed use land.

## Demographics

The following table depicts the area demographics in Beech Island within a one-, three-, and five-mile radius from the subject.



## Neighborhood Demographics

| Radius (Miles) | 1 Mile | 3 Mile | 5 Mile |
|---|---|---|---|
| Trade Area (Sq. Mi.) | 3.14 | 28.27 | 78.54 |
| Trade Density (Pop/Sq. Mi.) | 644 | 864 | 825 |
| **Population** | | | |
| Census Population (2010) | 2,199 | 24,316 | 61,967 |
| Census Population (2020) | 2,033 | 24,242 | 63,138 |
| Current Population (2023) | 2,020 | 24,420 | 64,787 |
| Projected Population (2028) | 1,982 | 24,316 | 66,066 |
| *Compound Annual Growth* | | | |
| 2010 - 2020 | -0.8% | 0.0% | 0.2% |
| 2020 - 2023 | -0.2% | 0.2% | 0.9% |
| 2023 - 2028 | -0.4% | -0.1% | 0.4% |
| **Households** | | | |
| Census Households (2010) | 858 | 9,829 | 24,964 |
| Census Households (2020) | 818 | 10,139 | 26,252 |
| Current Households (2023) | 820 | 10,286 | 27,183 |
| Projected Households (2028) | 816 | 10,377 | 28,137 |
| *Compound Annual Growth* | | | |
| 2010 - 2020 | -0.5% | 0.3% | 0.5% |
| 2020 - 2023 | 0.1% | 0.5% | 1.2% |
| 2023 - 2028 | -0.1% | 0.2% | 0.7% |
| Average Household Size (2023) | 2.46 | 2.34 | 2.31 |

*Source: ESRI (ArcGIS)*                    *(Lat: 33.495604, Lon: -81.91872)*



## Neighborhood Demographics (cont.)

| Radius (Miles) | 1 Mile | 3 Mile | 5 Mile |
|---|---|---|---|
| Trade Area (Sq. Mi.) | 3.14 | 28.27 | 78.54 |
| Trade Density (Pop/Sq. Mi.) | 644 | 864 | 825 |
| **2023 Housing Units** | | | |
| Median Home Value | $88,776 | $126,667 | $175,897 |
| Median Year Built | 1977 | 1971 | 1972 |
| Total Housing Units | 894 | 11,664 | 30,584 |
| Owner-Occupied Housing % | 51.1% | 47.7% | 52.4% |
| Renter-Occupied Housing % | 40.6% | 40.5% | 36.5% |
| Vacant Housing % | 8.3% | 11.8% | 11.1% |
| **2023 Employment** | | | |
| Total Establishments | 62 | 906 | 2,811 |
| Total Employees | 806 | 10,130 | 59,082 |
| Average Commute Time | n/a | n/a | n/a |
| % College Graduates | 11.5% | 16.5% | 25.1% |
| **2023 Income Summary** | | | |
| Median Household Income | $32,363 | $40,122 | $45,882 |
| Average Household Income | $41,831 | $59,360 | $69,418 |
| Avg Spending/Household | $11,717 | $16,713 | $19,419 |
| Per Capita Income | $17,234 | $24,995 | $29,247 |

*Source: ESRI (ArcGIS)*                    *(Lat: 33.495604, Lon: -81.91872)*



**DEMOGRAPHIC MAP**



Source: Bing Maps - approximate 1/3/5 mile radii from subject at 33.495604,-81.918720
Microsoft product screen shots reprinted with permission from Microsoft Corporation

The population is 24,420 within a three-mile radius of the subject property with a projected annual growth rate of -0.1%. There were 11,664 housing units within the three-mile radius. Most housing is owner-occupied. Property values in the area were stable.

The median household income was $40,122 within a three-mile radius of the subject property. The median household income figures suggest residents were within the lower to middle income brackets.

## Nuisances & External Obsolescence
Neighborhood properties have adequate levels of maintenance. No adverse or unfavorable factors were observed.

## Neighborhood Life Cycle
Most neighborhoods are classified as being in four stages: **growth**, **stability**, **decline**, and **renewal**. Overall, the subject neighborhood is in the growth stage of its life cycle.

## Immediate Area Uses
The below aerial photo exhibits the uses located in the subject's immediate vicinity.



**IMMEDIATE AREA USES**



*Source: Google Maps*

Uses along Old Aiken Road in the vicinity of the subject are primarily residential in nature. Recognized uses in the immediate area of the subject include residential neighborhoods, Miracle Toyota of North Augusta, Circle K, Lively's Collision Center and other neighborhood supporting businesses. As shown above, the density of uses in the area is sporadic with some vacant land remaining available in the area.

A drive of the neighborhood revealed that occupancies in the area are adequate. The area is typical of small towns with no major changes expected.

## Analysis and Conclusions

North Augusta's economic development strategy has been multifaceted. It includes the development of parks and recreational facilities, cultural amenities, collaborations between the city and private partnerships to stimulate economic growth and improved infrastructure. Overall, North Augusta's economic development strategy has been developed to enhance the quality of life for its residents and visitors as well as foster sustainable growth and prosperity. The impacts of this growth for long-time North Augusta residents will result in an increase economic opportunities and jobs, more funding for schools, infrastructure, and city services and increase the livability.



# Site Description

The subject site is located the east side of Old Aiken road and north of US Highway 78. The characteristics of the site are summarized as follows:

## Site Characteristics

| | |
|---|---|
| Gross Land Area: | 175.030 Acres or 7,624,307 SF |
| Usable Land Area: | 175.030 Acres or 7,624,307 SF |
| Usable Land %: | 100.0% |
| Shape: | Highly Irregular |
| Average Depth: | feet |
| Topography: | Level |
| Drainage: | Appears adequate |
| Grade: | Below street grade (moderately) |
| Utilities: | Public Utilities available in the area, Water service from VPSA, with a connection to a 24" onsite water line owned and operated by the City of North Augusta |
| Off-Site Improvements: | None |
| Interior or Corner: | Mid-Block |
| Signalized Intersection: | No: |

## Street Frontage / Access

| Frontage Road | Primary | Secondary |
|---|---|---|
| Street Name: | Old Aiken Road | US Highway 78 |
| Street Type: | 2 lane rural road | 4 lane US Highway with a center median |
| Frontage (Linear Ft.): | 3,109.00 | 671.00 |
| Number of Curb Cuts: | 0 | 0 |
| Traffic Count (Cars/Day): | 1,700 | |

## Additional Access

| | |
|---|---|
| Alley Access: | No |
| Water or Port Access: | No |
| Rail Access: | No |

## Flood Zone Data

| | |
|---|---|
| Flood Map Panel/Number: | 45003C0481F |
| Flood Map Date: | 08-16-2018 |
| Portion in Flood Hazard Area: | 0.00% |
| Flood Zone: | Zone X |
| | Zone X (Unshaded) |



This is an area of minimal flood hazard, usually depicted on FIRMs as above the 500 year flood level. Zone X is the area determined to be outside the 500 year flood and protected by levee from 100 year flood.

## Other Site Conditions

Soil Type:

A soils analysis for the site was not provided for the preparation of this appraisal. In the absence of any soil reports, it is a specific assumption that the site has adequate soils to support its highest and best uses.

Environmental Issues:

A Phase 1 Environmental Site Assessment was performed by AEI Consultants on March 3, 2021 in conformance with the scope and limitations of ASTM Standard Practice and the EPA Standards and Practices for all Appropriate Inquiries. The subject site is 1001 Old Aiken Road, North Augusta, Aiken County, South Carolina. AEI did not identify evidence of RECs or CRECs in connection with the subject property during the course of this assessment. AEI recommends no further investigation for the subject property at this time.

Easements/Encroachments:

There is a 50' wide Colonial Pipeline easement traversing the site from Old Aiken Road to the  north

Earthquake Zone:

South Carolina is home to one of the most active earthquake-producing regions in North America, a twenty-five by fifteen-mile oval known as the Middleton Place-Summerville Seismic Zone, whose center lies about twenty-two miles northeast of Charleston.  The last earthquake causing significant damage was 1886.  However, as recently as January 2014, seismic activity of a 2.2 magnitude was recorded.  Within the last five years there have been 20 seismic events ranging in magnitude from 1.6 to 3.6.  Although the potential for a destructive earthquake exists, there is no evidence that value is negatively affected.

Wetlands Classification:

The wetland delineation process for the subject property was completed by Palmetto Environmental Consulting, Inc. on September 17, 2020. The comprehensive assessment showed the presence of wetlands, bodies of water, and tributaries adjacent to Storm Branch Creek. The property has a total water area of 8.6 acres with the wetland coverage extending over 8 acres, while the tributaries comprise 0.6 acres.

## Adjacent Land Uses

North:                    Residential/Commercial/Undeveloped Land

South:                    Residential/Undeveloped Land

East:                     Residential/Undeveloped Land

West:                     Residential/Commercial/Undeveloped Land



## Site Ratings

| | |
|---|---|
| Access: | Average |
| Visibility: | Good |

## Zoning Designation

| | |
|---|---|
| Zoning Jurisdiction: | Aiken County |
| Zoning Classification: | PUD A, Planned Use Development |
| General Plan Designation: | Mixed Use |
| Permitted Uses: | A variety of commercial and residential uses and activities as shown in the district it is planned |
| Zoning Comments: | A type A PUD is one which is similar in use and intensity to the district in which it is to be located. PUD A may be established in any zoning district by review and approval of the planning commission. Permitted uses in Type A PUDs shall include only those listed in Table 1 for the district in which the PUD is to be established. No use shall be permitted in a Type A PUD that is not clearly permitted in the district in which it is to be established. |
| | The purpose of this PUD document is to provide a traditional neighborhood residential development to the approximately 174.47 acres (Parcel #013-12-01-001). The property was rezoned from Urban Development (UD) to PUD A in October 2021. Under the prior zoning residential lots would have to have individual septic tank. With the approved PUD A zoning, the proposed traditional neighborhood development (TND) will have different housing types, walkable and connected streets, alleys, amenity and open space, and a looping trail. Water and sewer to be served through an agreement with Valley Public Sewer Authority (VPSA) and the City of North Augusta. |

## Analysis/Comments on Site

The subject is an interior site and is of adequate shape and size allowing for development. The parcel has adequate access, frontage, and visibility. No detrimental conditions were noted. It should be noted that the land area was based on the survey provided. Based on the characteristics above, the site appears to be suitable for a variety of uses allowed by zoning. Overall, there are no known factors or characteristics of the site which would prevent it from being developed for its highest and best use, if vacant, nor to the use of the site as currently improved.

The subject property, identified by Parcel #013-12-01-001, is accessible via two main roads: Old Aiken Road and Jefferson Davis Highway (US-1/US-78, a 4-lane divided highway. Storm Branch Creek delineates its northeast boundary. Located at the junction of Aiken County and North Augusta, South Carolina, this property  is poised to benefit from the current expansion of Augusta, Georgia.



As planned, the site will be developed into Five Phases with a  total of 411 single family lots and 117 townhouse lots, as indicated in the chart below:

| Phases | Acres | Single Family | Tow nhomes |
|--------|-------|---------------|------------|
| 1 | 40.2 | 62 | 49 |
| 2 | 55.54 | 97 | 68 |
| 3 | 18.36 | 112 | 0 |
| 4 | 36.78 | 63 | 0 |
| 5 | 30.84 | 77 | 0 |
| 6 | 0 | 0 | 0 |

Total cost to develop the horizontal infrastructure was reported at $15,512,042, as shown in the chart below:

| Use | Amount |
|-----|--------|
|  |  |
| Hard Cost | $11,730,572 |
| Soft Cost | $3,781,470 |
| Financing Cost | $0 |
| Total Cost | $15,512,042 |

**Detailed cost available upon request



## SURVEY



## TAX PLAT





**FLOOD MAP**





## PROPOSED DEVELOPMENT MAP





**ZONING MAP**





## TOPOGRAPHIC MAP





# Subject Photographs



Subject property exterior



Subject property exterior



Subject property exterior



Subject property exterior

Additional photos are included in the Addenda.



# Assessment and Tax Data

## Assessment Methodology

Property taxes are based upon an appraisal of the property prepared by the Charleston County Tax Assessor's Office. An appraisal is conducted every five years on properties located within Charleston County and the values are in theory appraised at 100% of market value. This is commonly known as an "equalization" program.

Under the current Law, a property's tax appraisal will increase no more than 3% per year or 15% during each 5-year Equalization cycle, unless there is transferable interest (ATI). An ATI includes sales, gifts, inheritance, and long-term leases (those more than 20 years). When any property encounters an ATI, the Assessor is required to re-appraise it at market value for the following tax year.

Current law provides for an exemption of up to 25% of any increase in property tax re-appraisal because of an ATI and it only applies to properties that are taxed at a 6% assessment ratio. To obtain this exemption, the purchaser must submit a written request to the Assessor between January 1 and January 30 of the tax year following the ATI. If written request is not made or is submitted after January 30, there will be no 25% exemption.

The exemption cannot result in a reduction in the property tax that is less than the property tax due (using Assessor's market value appraisal) at the time of the ATI. Therefore, if the market value re-appraisal based on the ATI is not greater than 25% of the market value appraisal when an ATI occurs, property tax will not change.

At the same time, if an ATI occurs and market value re-appraisal is less than the Assessor's market value appraisal at the time of the ATI property taxes will decrease in the year following the ATI.

This tax system has been in place for enough time that buyers and sellers understand the effects of an ATI. This appraisal is made assuming a buyer would anticipate an ATI and make timely written application for the 25% exemption.

## Assessed Values and Property Taxes

The appraised value(s) are shown in the accompanying chart along with the current property tax due as well as an estimate of the property due for the first year of a holding period.



**Ad Valorem Tax Schedule**
**Tax Parcel Number: 013-12-01-001**

| Aiken County<br>Year | Actual<br>2023 | Market<br>Estimate<br>Year 1 |
|---|---|---|
| **Appraised Value** | | |
| Land: | $1,221,290 | $1,221,290 |
| Improvements: | $0 | $0 |
| Total: | $1,221,290 | $1,221,290 |
| Per Square Foot: | $0.16 | |
| *% Change:* | N/A | 0.0% |
| **Assessment Ratio** | 6.00% | 6.00% |
| **Assessed Value** | | |
| Land: | $73,277 | $73,277 |
| Improvements: | $0 | $0 |
| Total: | $73,277 | $73,277 |
| *% Change:* | N/A | 0.0% |
| **Tax Rate per $1,000** | $238.240000 | $238.240000 |
| *% Change:* | N/A | |
| | Actual | Market Estimate |
| **Tax Expense** | 2023 | Year 1 |
| Tax Amount: | $17,458 | $17,458 |
| Special Assessments: | $244 | $244 |
| Total Taxes: | $17,702 | $17,702 |
| Per Square Foot: | $0.00 | $0.00 |

## Conclusions

The tax estimate above is for the raw land only. Once the lots are developed, they will be reassessed as of December 31, each year. Depending on when the lots are sold to the homebuilders, there will be some shared responsibility for the tax liability. Furthermore, South Carolina Law provides for an optional MLOD (multiple lot discount) when considering tax liability. In some cased, this can equal up to a 70% savings.

For purposes of our discounted cash flow analysis, we have estimated a rolling $200 per lot, per year, tax liability.

# Market Analysis

As with many towns across the southeast, North Augusta has seen tremendous growth over the past few years. Once seen as a sleepy, small town, a bedroom community for Augusta for decades. Today, change and growth has arrived in North Augusta.

According to the U.S. Census in 2010, North Augusta had a population of 21,348. That broke down to 4,764 families and 9,003 households. By 2020, that jumped to 24,379 residents, a 14% increase, 6,461 families, and 9,754 households.

The first sign of what was to come happened in 2012, when a developer approached the city with a plan for 25 acres of undeveloped land near the Savannah River. Cloaked in secrecy with the name "Project Jackson," it ultimately became a new stadium to house the minor league baseball team the Augusta GreenJackets.

That started the dominoes falling. There's upscale housing in Hammond Ferry, restaurants, and small businesses near the stadium, all under the umbrella of Riverside Village, a Live, Work and Play community.

By the end of 2013, the U.S. Army announced it would be moving its cyber security operations and personnel to Fort Gordon and Augusta, bringing an estimated 4,000 new military and civilian personnel, including their family members who would support the surrounding businesses. This would impact North Augusta as part of the seven-county area surrounding the Army post.

The Fort Gordon Growth Management Plan, coordinated by the Central Savannah River Area Regional Commission, estimates growth connected to Fort Gordon and the Cyber Command could bring an additional 6,370 new residents over the next few years.

Still on the horizon are two large-scale, multi-use developments.

One is Bluegrass Place, on land at E. Martintown Road and E. Buena Vista Avenue that was known as the Mealing tract. It is approximately 52 acres and will have single-family homes and an apartment complex. It will also have senior living, professional and commercial properties, and greenspace.

An even more ambitious, and substantially larger project is planned on more than 1,300 acres, bounded by S.C. Highway 25/Edgefield Road, Belvedere-Clearwater Road, Blanchard Road, and S.C. Interstate-520/Palmetto Parkway.

Called Highland Springs, plans call for roughly 5,000 single-family homes and 1,000 apartments. The mixed-use development will have about 3.2 million square feet of industrial area, a 555,000 square foot village square, and an equal amount of space for commercial development.

Residential growth in that area of North Augusta, coupled with development in Belvedere, in unincorporated Aiken County, prompted the Aiken County Public School District to build a new school. Highland Springs Middle School is scheduled to open for the 2023-2024 school year. The district is prepared to add an elementary school to the campus in the future.

## North Augusta Real Estate

With a population of 23,845, there are a total of 9,754 housing units (homes and condos) in North Augusta. With a median house value of $224,978, North Augusta, SC real estate prices are below the national average.

Single-family detached homes are the most prevalent housing type in North Augusta, single-family houses make up 69.14% of the city's housing units. Apartment complexes and condos make up 13.45% of the available housing units in North Augusta, SC.

Owner-occupied, three and four-bedroom single-family detached homes are the most common type of home you see in North Augusta. Owner-occupied homes account for 65.08% of North Augusta's homes. Looking at the owner-occupied properties 61% are either a 3 or 4 bedrooms home.

North Augusta has seen a surge in development over the years, 27% of the available homes were built after 2000. 73% of the housing in North Augusta was built prior to 2000. 40% of the available housing in North Augusta was built from 1970-2000.

A very popular city to move to in South Carolina, North Augusta home appreciation rates have been tracking above the national average when looking at the past ten years. The average annual appreciation rate when looking at the past 10 years has been 4.05%. This appreciation rate places North Augusta, SC in the top 40% nationwide.

Recent data shows that during the latest twelve months, North Augusta's appreciation rate, at 9.41%, has been at or slightly above the national average. Looking at the second quarter of 2021, North Augusta's appreciation rate has been 3.65%, which annualizes to a rate of 15.41%. Looking at the latest quarter this places North Augusta, SC as one of the highest appreciating cities in the nation.

When comparing the average appreciation rate for the past year of 9.41%, to other communities in South Carolina North Augusta ranks in the top 50%



## Latest Data as of February 2024

In February 2024, North Augusta home prices were up 3.7% compared to last year, selling for a median price of $280K. On average, homes in North Augusta sell after 51 days on the market compared to 44 days last year. There were 42 homes sold in February this year, up from 37 last year.

| Median Sale Price | # of Homes Sold | Median Days on Market |
|---|---|---|
| $280,000 | 42 | 51 |
| +3.7% year-over-year | +13.5% year-over-year | +7 year-over-year |



## Market Analysis Conclusions

The rental rate trends, vacancy rate and absorption trends, and existing supply and new construction levels indicate the market is in equilibrium.  The market has seen growth due to solid economic drivers. At one point being undersupplied, developers have entered the market and have viable long term plans to meet current and expected demand. Overall, we expect the market remain strong.

# Highest and Best Use Analysis

The Highest and Best Use of a property is the use that is legally permissible, physically possible, and financially feasible which results in the highest value. An opinion of the highest and best use results from consideration of the criteria noted above under the market conditions or likely conditions as of the effective date of value. Determination of highest and best use results from the judgment and analytical skills of the appraiser. It represents an opinion, not a fact. In appraisal practice, the concept of highest and best use represents the premise upon which value is based.

## Highest and Best Use As Vacant

The primary determinants of the highest and best use as vacant are (1) Legal permissibility, (2) Physical possibility, (3) Financial feasibility, and (4) Maximum productivity.

### Legally Permissible

The subject site is zoned PUD A, Planned Use Development, which controls the general nature of permissible uses and is appropriate for the location and physical elements of the subject property, providing for a consistency of use with the general neighborhood. The location of the subject property is appropriate for the uses allowed, as noted previously, and a change in zoning is unlikely. There are no known easements, encroachments, covenants or other use restrictions that would unduly limit or impede development.

### Physically Possible

The physical characteristics of the subject site are presented in the Site Description and allow for a number of potential uses. Elements such as size, shape, availability of utilities, known hazards (flood, environmental, etc.), and other potential influences were considered. No physical attributes materially limit legally permissible and appropriate development. The most probable use of the site is for residential subdivision development, which conforms to the pattern of land use in the immediate area.

### Financially Feasible

A review of published yield, rental and occupancy rates suggests that there is a balanced supply of residential subdivision and demand is sufficient to support construction costs and timely absorption of additional inventory in this market. Therefore, near-term speculative development of the subject site is financially feasible.

### Maximally Productive

Among the financially feasible uses, the use that results in the highest value (the maximally productive use) is the highest and best use. Considering these factors, the maximally productive use as vacant is for mixed use development.

### Highest and Best Use As Vacant Conclusion

The conclusion of the highest and best use as vacant is for mixed use development.

## Most Probable Buyer

As of the date of value, the most probable buyer of the subject property is an investor or national developer.

# Land Valuation

## Methodology

Site Value is most often estimated using the sales comparison approach. This approach develops an indication of market value by analyzing closed sales, listings, or pending sales of properties similar to the subject, focusing on the difference between the subject and the comparables using all appropriate elements of comparison. This approach is based on the principles of supply and demand, balance, externalities, and substitution, or the premise that a buyer would pay no more for a specific property than the cost of obtaining a property with the same quality, utility, and perceived benefits of ownership.

### Unit of Comparison

The unit of comparison selected depends on the appraisal problem and nature of the property and is intended to explain or mirror market behavior. The primary unit of comparison in the market and applied in this analysis is price per usable acre.

### Elements of Comparison

Elements of comparison are the characteristics or attributes of properties and transactions that cause the prices of real estate to vary. The primary elements of comparison considered in sales comparison analysis are as follows: (1) property rights conveyed, (2) financing terms, (3) conditions of sale, (4) expenditures made immediately after purchase, (5) market conditions, (6) location and (7) physical characteristics.

### Comparable Sales Data

The market was studied to identify sales and listings of comparable properties with a focus on those that appeal to the most probable buyer of the subject site. These properties typically have similar locations and physical characteristics. Of these transactions, sufficient sales data was available for the following sale comparables, which were analyzed to estimate a unit value for the subject property. The following table summarizes the sale comparables utilized and a map illustrating the location of each in relation to the subject property follows. Details of each comparable follow the location map.



**Land Sales Summary**

| Comp. No. | Date of Sale | Usable Acres | Location | | Zoning | Sales Price Actual | Per Acre |
|---|---|---|---|---|---|---|---|
| 1 | February-24 | 125.360 | Whiskey Road | Aiken, South Carolina | Residential | $4,655,625 | $37,138 |
| 2 | March-23 | 36.840 | Powder House Road | Aiken, South Carolina | Residential | $822,570 | $22,328 |
| 3 | February-23 | 94.440 | Sudlow Lake Road | Aiken, South Carolina | Residential | $2,000,000 | $21,177 |
| 4 | December-21 | 130.000 | 1019 Pinion Road | North Augusta, South Carolina | PUD | $5,500,000 | $42,308 |

## COMPARABLE SALES MAP





## LAND COMPARABLE 1

### Property Identification

| | |
|---|---|
| **Property Name** | The Summerall |
| **Address** | Whiskey Road |
| **City County State Zip** | Aiken, Aiken County, South Carolina 29803 |
| **MSA** | Augusta-Aiken, GA-SC |
| **Tax ID** | 122-15-01-004 |
| **VPA Property/Sale ID** | 11446379/1757742 |



2024-04-07_15-56-59

### Transaction Data

| | |
|---|---|
| **Sale Status** | Closed |
| **Sale Date** | 02-28-2024 |
| **Grantor/Seller** | James Watson, et.al |
| **Grantee/Buyer** | Summerall Partners, LLC |
| **Recording Number** | 5142 / 1875 |
| **Property Rights** | Fee Simple |
| **Financing** | Cash to Seller |
| **Conditions of Sale** | Typical |
| **Sales Price** | $4,655,625 |
| **Adjusted Sales Price** | $4,655,625 |

### Adjusted Sales Price Indicators

| | |
|---|---|
| **Price per Gross Acre** | $31,779 |
| **Price per Gross SF** | $.73 |
| **Price per Usable Acre** | $37,138 |
| **Price per Usable SF** | $.85 |
| **Price per Front Foot** | $6,207.50 |

### Property Description

| | |
|---|---|
| **Gross Land Area** | 146.500 Acres/6,381,540 SF |
| **Usable Land Area** | 125.360 Acres/5,460,682 SF |
| **Frontage Feet** | 750.00 |
| **Visibility** | Average |
| **Corner/Interior** | Interior |
| **Shape** | Irregular |
| **Topography** | At about street grade |
| **Utilities** | All Available |
| **Drainage** | Appears adequate |
| **Flood Hazard Zone** | X |
| **% in Flood Hazard** | 0.00% |
| **Zoning Code** | Residential |

### Verification

| | |
|---|---|
| **Confirmed By** | Karl P. Finkelstein |

### Remarks

This was the sale of a tract located off of Powder House Road. A net usable 125.36 acres, the property was annexed into the City of Aiken prior to the sale closing. While not fully entitled, there have been some conceptual approvals for a portion of the property. If fully approved, it would contain both residential and commercial uses.



## LAND COMPARABLE 2



### Property Identification

| | |
|---|---|
| **Property Name** | Clifton Place |
| **Address** | Powder House Road |
| **City County State Zip** | Aiken, Aiken County, South Carolina 29803 |
| **MSA** | Augusta-Aiken, GA-SC |
| **Tax ID** | 122-19-01-002 |
| **VPA Property/Sale ID** | 11446380/1757743 |

### Transaction Data

| | |
|---|---|
| **Sale Status** | Closed |
| **Sale Date** | 03-01-2023 |
| **Grantor/Seller** | James Watson, et.al |
| **Grantee/Buyer** | Clifton Place Parners, LLC |
| **Recording Number** | 5076 / 1275 |
| **Property Rights** | Fee Simple |
| **Financing** | Cash to Seller |
| **Conditions of Sale** | Typical |
| **Sales Price** | $822,570 |
| **Adjusted Sales Price** | $822,570 |

### Adjusted Sales Price Indicators

| | |
|---|---|
| **Price per Gross Acre** | $22,328 |
| **Price per Gross SF** | $.51 |
| **Price per Usable Acre** | $22,328 |
| **Price per Usable SF** | $.51 |
| **Price per Unit** | $4,810 |
| **Price per Front Foot** | $1,645.14 |

### Property Description

| | |
|---|---|
| **Gross Land Area** | 36.840 Acres/1,604,750 SF |
| **Usable Land Area** | 36.840 Acres/1,604,750 SF |
| **Frontage Feet** | 500.00 |
| **Proposed Units** | 171 |
| **Density (Units/Acre)** | 4.64 |
| **Visibility** | Average |
| **Corner/Interior** | Interior |
| **Shape** | Irregular |
| **Topography** | At about street grade |
| **Utilities** | All Available |
| **Drainage** | Appears adequate |
| **Flood Hazard Zone** | X |
| **% in Flood Hazard** | 0.00% |
| **Zoning Code** | Residential |

### Verification

| | |
|---|---|
| **Confirmed By** | Karl P. Finkelstein |

### Remarks

This was the sale of a tract located off of Powder House Road. A net usable 36.84 acres, the property was approved in July of 2023 for development of 171 townhouse units. At the time of sale, there were no entitlements in place.



## LAND COMPARABLE 3

### Property Identification

| | |
|---|---|
| **Property Name** | Residential Development |
| **Address** | Sudlow Lake Road |
| **City County State Zip** | Aiken, Aiken County, South Carolina 29803 |
| **MSA** | Augusta-Aiken, GA-SC |
| **Tax ID** | 035-18-01-001 |
| **VPA Property/Sale ID** | 11446382/1757745 |

### Transaction Data

| | |
|---|---|
| **Sale Status** | Closed |
| **Sale Date** | 02-15-2023 |
| **Grantor/Seller** | Larry S Prather |
| **Grantee/Buyer** | CKJ Properties, LLC |
| **Recording Number** | 5073 / 1966 |
| **Property Rights** | Fee Simple |
| **Financing** | Cash to Seller |
| **Conditions of Sale** | Typical |
| **Sales Price** | $2,000,000 |
| **Adjusted Sales Price** | $2,000,000 |

### Adjusted Sales Price Indicators

| | |
|---|---|
| **Price per Gross Acre** | $21,177 |
| **Price per Gross SF** | $.49 |
| **Price per Usable Acre** | $21,177 |
| **Price per Usable SF** | $.49 |
| **Price per Front Foot** | $4,000.00 |

### Verification

| | |
|---|---|
| **Confirmed By** | Karl P. Finkelstein |

### Property Description

| | |
|---|---|
| **Gross Land Area** | 94.440 Acres/4,113,806 SF |
| **Usable Land Area** | 94.440 Acres/4,113,806 SF |
| **Frontage Feet** | 500.00 |
| **Visibility** | Average |
| **Corner/Interior** | Interior |
| **Shape** | Irregular |
| **Topography** | At about street grade |
| **Utilities** | All Available |
| **Drainage** | Appears adequate |
| **Flood Hazard Zone** | X |
| **% in Flood Hazard** | 0.00% |
| **Zoning Code** | Residential |

### Remarks

This was the sale of a residential tract located off of Sudlow Lake Road. The property was raw with no entitlements at the time of sale.



## LAND COMPARABLE 4

### Property Identification

| | |
|---|---|
| **Property Name** | The Hive |
| **Address** | 1019 Pinion Road |
| **City County State Zip** | North Augusta, Aiken County, South Carolina 29841 |
| **MSA** | Augusta-Aiken, GA-SC |
| **Tax ID** | 01-20-01-004 |
| **VPA Property/Sale ID** | 11446378/1757741 |

### Transaction Data

| | |
|---|---|
| **Sale Status** | Closed |
| **Sale Date** | 12-01-2021 |
| **Grantor/Seller** | Hamrick Associates, LLC |
| **Grantee/Buyer** | Stanley Martin Homes, LLC |
| **Recording Number** | 4981 / 2190 |
| **Property Rights** | Fee Simple |
| **Financing** | Cash to Seller |
| **Conditions of Sale** | Typical |
| **Sales Price** | $5,500,000 |
| **Adjusted Sales Price** | $5,500,000 |

### Adjusted Sales Price Indicators

| | |
|---|---|
| **Price per Gross Acre** | $31,549 |
| **Price per Gross SF** | $.72 |
| **Price per Usable Acre** | $42,308 |
| **Price per Usable SF** | $.97 |
| **Price per Front Foot** | $2,200.00 |

### Verification

| | |
|---|---|
| **Confirmed By** | Karl P. Finkelstein |

### Property Description

| | |
|---|---|
| **Gross Land Area** | 174.330 Acres/7,593,815 SF |
| **Usable Land Area** | 130.000 Acres/5,662,800 SF |
| **Frontage Feet** | 2,500.00 |
| **Rail Access** | No |
| **Visibility** | Excellent |
| **Corner/Interior** | Interior |
| **Shape** | Irregular |
| **Topography** | Rolling |
| **Utilities** | All Available |
| **Drainage** | Appears adequate |
| **Flood Hazard Zone** | X |
| **% in Flood Hazard** | 0.00% |
| **Zoning Code** | PUD |

### Remarks

This was the sale of a large tract that contained 174.33 gross acres. The site has wetlands and a small creek running through the property. It also has a large Dominion OHP easement running through the property. Net usable area is estimated to be 130 acres. The property was approved as a PUD at the time of sale for both residential and commercial uses.

## Land Sales Comparison Analysis

When necessary, adjustments were made for differences in various elements of comparison, including property rights conveyed, financing terms, conditions of sale, expenditures made immediately after purchase, market conditions, location, and other physical characteristics. If the element in comparison is considered superior to that of the subject, a negative adjustment was applied. Conversely, a positive adjustment was applied if inferior. A summary of the elements of comparison follows.

## Transaction Adjustments

Transaction adjustments include: (1) real property rights conveyed, (2) financing terms, (3) conditions of sale, and (4) expenditures made immediately after purchase. These items, which are applied prior to the market conditions and property adjustments, are discussed as follows:

### Real Property Rights Conveyed

Real property rights conveyed influence sales prices and must be considered when analyzing a sale comparable. The property rights appraised reflect the fee simple interest. All of the sale comparables conveyed the same interest; therefore, no adjustments were required.

### Financing Terms

The transaction price of one property may differ from that of an identical property due to different financial arrangements. Sales involving financing terms that are not at or near market terms require adjustments for cash equivalency to reflect typical market terms. A cash equivalency procedure discounts the atypical mortgage terms to provide an indication of value at cash equivalent terms. All of the sale comparables involved typical market terms by which the sellers received cash or its equivalent and the buyers paid cash or tendered typical down payments and obtained conventional financing at market terms for the balance. Therefore, no adjustments for this category were required.

### Conditions of Sale

When the conditions of sale are atypical, the result may be a price that is higher or lower than that of a normal transaction. Adjustments for conditions of sale usually reflect the motivations of either a buyer or a seller who is under duress to complete the transaction. Another more typical condition of sale involves the downward adjustment required to a comparable property's for-sale listing price, which usually reflects the upper limit of value. No adjustments for atypical conditions or for-sale listings were warranted.

### Expenditures Made Immediately After Purchase

A knowledgeable buyer considers expenditures required upon purchase of a property, as these costs affect the price the buyer agrees to pay. Such expenditures may include: costs to demolish and remove any portion of the improvements, costs to petition for a zoning change, and/or costs to remediate environmental contamination.

The relevant figure is not the actual cost incurred, but the cost anticipated by both the buyer and seller. Unless the sales involved expenditures anticipated upon the purchase date, no adjustments to the comparable sales are required for this element of comparison. The parties to these transactions did not anticipate expenditures were required immediately after purchase; therefore, no adjustments were warranted.

## Market Conditions Adjustment

Market conditions change over time because of inflation, deflation, fluctuations in supply and demand, or other factors. Changing market conditions may create a need for adjustment to comparable sale transactions completed during periods of dissimilar market conditions.

Discussions with market participants and a review of market data indicated overall market conditions for vacant land properties have been improving with recent transactions confirming this trend. An annual adjustment factor of 7.00% was applied to each comparable to account for changes in market conditions.

## Property Adjustments

Property adjustments are usually expressed quantitatively as percentages or dollar amounts that reflect the differences in value attributable to the various characteristics of the property. In some instances, however, qualitative adjustments are used. These adjustments are based on locational and physical characteristics and are applied after transaction and market conditions adjustments. The reasoning for the property adjustments made to each sale comparable follows. The discussion analyzes each adjustment category deemed applicable to the subject property.

### Size

The size adjustment addresses variance in the physical size of the comparables and that of the subject, as a larger parcel typically commands a lower price per unit than a smaller parcel. This inverse relationship is due, in part, to the principle of "economies of scale."

However, the subject site is located in a densely developed area in which a premium is attached to larger tracts that offer more development potential and are difficult to find or assemble. The subject site consists of 175.030 acres of useable land and the comparables range from 36.840 to 130.000 acres with no adjustments applied.

### Zoning / Entitlements

The highest and best use of sale comparables should be very similar to that of the subject property. When comparables with the same zoning as the subject are lacking or scarce, parcels with slightly different zoning, but a highest and use similar to that of the subject may be used as comparables. These comparables may require an adjustment for differences in utility if the market supports such adjustment.

The subject was approved for a PUD-A zoning change, allowing for mixed development of the site. Additionally, the developers have secured commitments for utility services. These entitlements greatly increase the value of the site for in addition to having "paper lots" ready to market, the site is essentially shovel ready assuming a ground disturbance permit would be granted.

The market recognizes the entrepreneurial incentive required to apply for and gain the necessary approvals and entitlements. As comparison of Sale 4 which was fully entitled to Sales 2 and 3 which were raw, indicates a premium of 100% is warranted. This is consistent with other markets in which we have experience.

As such, no adjustment was made to sale 4. Sales 2 and 3 were positively adjusted 100% and Sale 1, which was partially entitled with some zoning approvals in place, was positively adjusted 50%.

## Summary of Adjustments

A summary of the adjustments made to the sale comparables is presented in the following table:

### LAND SALES ADJUSTMENT GRID

| | Subject | Sale # 1 | Sale # 2 | Sale # 3 | Sale # 4 |
|---|---|---|---|---|---|
| Sale ID | | 1757742 | 1757743 | 1757745 | 1757741 |
| Date of Value & Sale | April-24 | February-24 | March-23 | February-23 | December-21 |
| Unadjusted Sales Price | | $4,655,625 | $822,570 | $2,000,000 | $5,500,000 |
| Usable Acres | 175.030 | 125.360 | 36.840 | 94.440 | 130.000 |
| **Unadjusted Sales Price per Usable Acre** | | **$37,138** | **$22,328** | **$21,177** | **$42,308** |
| **Transactional Adjustments** | | | | | |
| **Property Rights Conveyed** | *Fee Simple* | *Fee Simple* | *Fee Simple* | *Fee Simple* | *Fee Simple* |
| Adjusted Sales Price | | $37,138 | $22,328 | $21,177 | $42,308 |
| **Financing Terms** | *Cash to Seller* | *Cash to Seller* | *Cash to Seller* | *Cash to Seller* | *Cash to Seller* |
| Adjusted Sales Price | | $37,138 | $22,328 | $21,177 | $42,308 |
| **Conditions of Sale** | *Typical* | *Typical* | *Typical* | *Typical* | *Typical* |
| Adjusted Sales Price | | $37,138 | $22,328 | $21,177 | $42,308 |
| **Expenditures after Sale** | | | | | |
| **Adjusted Sales Price** | | **$37,138** | **$22,328** | **$21,177** | **$42,308** |
| **Market Conditions Adjustments** | | | | | |
| Elapsed Time from Date of Value | | *0.09 years* | *1.09 years* | *1.13 years* | *2.33 years* |
| Market Trend Through | April-24 | 0.6% | 7.6% | 7.9% | 16.3% |
| **Analyzed Sales Price** | | **$37,373** | **$24,028** | **$22,847** | **$49,221** |
| **Physical Adjustments** | | | | | |
| Location | *1001 Old Aiken Road* | *Whiskey Road* | *Powder House Road* | *Sudlow Lake Road* | *1019 Pinion Road* |
| | *Beech Island, South Carolina* | *Aiken, South Carolina* | *Aiken, South Carolina* | *Aiken, South Carolina* | *North Augusta, South Carolina* |
| Adjustment | | - | - | - | - |
| **Shape/Depth** | *Highly Irregular* | *Irregular* | *Irregular* | *Irregular* | *Irregular* |
| Adjustment | | - | - | - | - |
| **Zoning** | *PUD A* | *Residential* | *Residential* | *Residential* | *PUD* |
| Adjustment | | 50.0% | 100.0% | 100.0% | - |
| Net Physical Adjustment | | 50.0% | 100.0% | 100.0% | - |
| **Adjusted Sales Price per Usable Acre** | | **$56,060** | **$48,056** | **$45,693** | **$49,221** |



## Conclusion

The land comparables were adjusted based on pertinent elements of comparison with the unadjusted and adjusted unit sales prices presented in the following table:

**Land Sale Statistics**

| Metric | Unadjusted | Analyzed | Adjusted |
|---|---|---|---|
| Min. Sales Price per Usable Acre | $21,177 | $22,847 | $45,693 |
| Max. Sales Price per Usable Acre | $42,308 | $49,221 | $56,060 |
| Median Sales Price per Usable Acre | $29,733 | $30,701 | $48,639 |
| Mean Sales Price per Usable Acre | $30,738 | $33,367 | $49,758 |

Sale 1 and 4 were considered the most comparable were given the most weight. Based on the adjusted prices and the most comparable sales, a unit value near the upper middle of the adjusted range, or $52,000 per usable acre, was estimated for the subject site. Applying this to the subject land area resulted in a market value of $9,100,000.

Based on this analysis, the land value indication is summarized as follows:

**Land Value Conclusion**

| Reasonable Adjusted Comparable Range | | | | |
|---|---|---|---|---|
| 175.030 acres | x | $45,000 per acre | = | $7,876,350 |
| 175.030 acres | x | $56,000 per acre | = | $9,801,680 |
| **Market Value Opinion** | | | | (Rounded) |
| 175.030 acres | x | **$52,000 per acre** | = | **$9,100,000** |



# Discounted Cash Flow Analysis

## Land Value – As Is – Methodology

Also known as Discounted Cash Flow Analysis (DCF), the methodology is most appropriate for land having multiple lot development in the near term as the highest and best use. The current site value is represented by discounting the anticipated cash flow to a present value, taking into consideration all necessary costs of development, maintenance, administration, and sales throughout the absorption period.

The chronological steps for the DCF method are listed below:

1. The retail price of each lot is estimated. The sum of retail prices is the gross potential sales price of 511 lots in the proposed development.
2. Holding costs, sales expenses, and profit are subtracted to yield net proceeds from sales. In addition, the prospective horizontal construction costs for each phase is also deducted.
3. Net proceeds are discounted over an anticipated absorption period.
4. The resulting present value from discounting is an indication of the value of the land as it sits today.

## Retail Pricing and Gross Retail Price Estimate

The proposed lots are under a letter of intent to purchase with two regional homebuilders. You are referred to the following terms:

Eastwood Homes
Purchase Prices

20' Townhouse Lots for $42,000 each
75' SFR Lots for $63,000 each

Takedowns
30 at substantial completion
15 per qtr. After 6 months
Can be any mix of 20' & 75' lots

Great Southern Homes
Purchase Prices
75' SFR Lots for $70,000 each

Takedowns
40 at substantial completion
10 per qtr. After 12 months

The vast majority of lots in subject market are being or have been developed by and for large national home builders.



When there is a private developer selling lots to a home builder the developer would request a base lot price and 20% of the total house price in excess of the base. In other words, the developer wanted a lot price that was 20% of the total house price. Today, due to the price of land lot true-ups have risen to as high as 35%.

When we consider the aforementioned Median Home price (Market analysis) of $280,000,  and apply various ratios, we get the following  retail pricing support:

| Ratio | Value | $280,000 |
|-------|-------|----------|
| 25% | $70,000 | |
| 30% | $84,000 | |
| 35% | $98,000 | |
| Mean | *$84,000* | |

We also have bulk sales of SFR lots in the market from a Neighborhood known as The Sanctuary ( Off Powderhouse Road). South Georgia Homes is buying developed lots with prices ranging from $60,000 each to $66,500 each. The reader should note these contracts were initially signed in 2022.

The average price between both builders is $67,850 for the SFR lots. The Townhouse lots are $42,000. Based on the date presented above, the letters of intent from both builders is comfortably support by market sales and ratios. Both will be used in our analysis.

## Absorption Rate
The letters of intent spell out a total absorption rate of 130 lots, per year. Currently the market is absorbing about 65 sales per month. With the other new developments coming online, we would expect some pressure on absorption in the first few years. As such, we have also considered scenarios of 72-45 lots per year and 63-36 lots per year.

## Appreciation
It is typical that appreciation occurs over unit absorption. Typically builders pay some increase in lot prices over their takedown period. And Inflation has been high the last several years. Therefore we have used a 8% annual rate (2.0% per quarter).

## Development Costs
We have deducted horizontal construction cost for the various phases over the course of our cash flows.

## Sales Commission & Advertising
4%

## Legal & Accounting
1.0%

## Real Estate Taxes

Previously projected at **$200 per lot per year**, fluctuating over the absorption period. We assume the developer pays this cost on all unsold lots for the period. Assuming a phased construction period, the lots would remain taxed at raw land until they were completed and sold at completion to the builder. For each quarter, we have made a tax cost fully payable at an annual rate for each lot sold, reflecting a rolling period of being put on the rolls at 100% of assessed value after construction is completed. This figure also captures the minor tax due for the raw land itself.

## Developer Profit

Entrepreneurial profit for residential neighborhoods used to be constant at 25% to 35% of gross sales. For this development, profit of 30% of gross sales is reasonable for the total development.  However, there are two profit centers to be earned.

The first is the developer who sees the deal, contracts for the property, obtains all necessary permitting and financing and develops the lots.   The second profit center is the wholesale purchaser who acquires the lots at a discount and sells them at retail to builders.  That is the entrepreneurial profit estimated for the discounted cash flow analysis.  For this development, we have estimated 10% for the developed lots. The property has already been given the necessary approvals for development.

## Discount Rate

The discount rate utilized to estimate the present value of the net cash flows represents the cost of financing incurred during the absorption period.  Since entrepreneurial profit has been deducted as a line item expense, a discount rate merely reflects the cost of acquiring and attracting capital to the project (interest rate and equity return rate) and not risk.  In the forthcoming discounted cash flow model, the discount rate represents a weighted average between financing and the return an entrepreneur would expect on capital.

To estimate the discount rate we have considered market comparables, a band of investment technique, and national survey data.  I considered comparable sales data that indicates rates ranging from 8.5% to 14%.  For a sellout of existing residential units, a reasonable overall rate is near the middle of the range or about 10 to 12%.

We have referred to the *RealtyRates Developer Survey, 4th Quarter 2023* which summarizes discount rates for conventionally financed (interest-only interim or construction financing) subdivisions and planned unit developments (PUDs) nationwide.

### Investor Surveys - Discount Rates

| Survey | Date | Rate Range | | | Average |
|---|---|---|---|---|---|
| Realtyrates.com (all) | 4Q2023 | 14.30% | to | 31.60% | 21.45% |
| Realtyrates.com (100-500 units) | 4Q2023 | 14.66% | to | 29.97% | 21.58% |
| Realtyrates.com (500+) | 4Q2023 | 15.02% | to | 31.33% | 21.94% |
| | **Average** | **14.66%** | **to** | **30.97%** | **21.66%** |

Developer's profit is not treated as a line item expense.  Deducting profit would indicate a range of discount rates from 4.66% to 20.97% with an average around 11.66%.



We have also discussed financing with several knowledgeable bankers in the area. Again, you are referred to the *RealtyRates Developer Survey, 4th Quarter 2023* indicating the interim (construction) financing summary.

| RealtyRates.com DEVELOPER SURVEY - 4th Quarter 2023* | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Interim (Construction) Financing** | | | | | | | |
| PROPERTY TYPE | SPREAD OVER BASE (Prime) | INTEREST RATE | LOAN FEES | LOAN-TO-VALUE RATIO | LOAN-TO-COST RATIO | LOAN TERM (Mos.) | AMORTIZATION |
| Residential Subdivisions & PUDs | | | | | | | |
| Minimum | 0.85% | 9.35% | 1.00% | 50% | 70% | 12 | Interest Only |
| Maximum | 6.50% | 15.00% | 4.00% | 100% | 100% | 60 | Interest Only |
| Average | 3.68% | 12.18% | 2.50% | 75% | 84% | 41 | Interest Only |

Given this information, we believe that an interest rate of 9.5%. Other terms of the loan are 50% loan to value ratio and 20 year amortization period. In many development instances there is an equity lender that puts capital at risk in order to secure a loan. This passive investor desires a return on capital, of which we believe that 10% is reasonable in today's environment.

A discount rate may be calculated as follows:

### Band of Investment Technique

| Criteria | Appraiser Assumptions |
|---|---|
| Mortgage Interest Rate = | 9.50% |
| Mortgage Term = | 20 years |
| Mortgage Ratio (M) = | 50.0% |
| Mortgage Constant ($R_M$) = | 0.11186 |
| Equity Dividend Rate ($R_E$) = | 10.00% |

| Mortgage (LTV) Ratio (M) | | Mortgage Constant ($R_M$) | | Mortgage Component |
|---|---|---|---|---|
| 50.0% | x | 0.11186 | = | 0.05593 |

| 1 - Mortgage Ratio (1-M) | | Equity Dividend Rate ($R_E$) | | Equity Component |
|---|---|---|---|---|
| 50.0% | x | 10.00% | = | 0.05000 |
| | | **Overall Rate ($R_O$)** | **=** | **10.59%** |

Therefore, we believe that a discount rate of 10% is reasonable. DCF models incorporating the assumptions discussed above are presented as follows.



WEEPING WILLOWS<br>LAND VALUATION

**Absorption Forecast**

| Year Starting | 1<br>Apr-24 | 2<br>Apr-25 | 3<br>Apr-26 | 4<br>Apr-27 | 5<br>Apr-28 | 6<br>Apr-29 | 7<br>Apr-30 | 8<br>Apr-31 | 9<br>Apr-32 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Finished SFR Lots | 0 | 85 | 85 | 85 | 85 | 71 | | | | 411 |
| Townhouse Lots | 0 | 45 | 45 | 27 | | | | | | 117 |

| Annual | 0<br>Apr-24 | 1.5<br>Apr-25 | 2.5<br>Apr-26 | 3.5<br>Apr-27 | 4.5<br>Apr-28 | 5.5<br>Apr-29 | 6.5<br>Apr-30 | 7.5<br>Apr-31 | 8.5<br>Apr-32 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Absorption** | | | | | | | | | | **528** |
| Lots Sold | 0 | 130 | 130 | 112 | 85 | 71 | | | 0 | |
| Total Sold to date | 0 | 130 | 260 | 372 | 457 | 528 | 528 | 528 | | |
| Remaining Lots | 528 | 398 | 268 | 156 | 71 | 0 | 0 | 0 | | |
| | | | | | | | | | | |
| **Escalated Retail Lot Values** | | | | | | | | | | |
| *Escalations* | *0.0%* | *0.00%* | *8.00%* | *8.00%* | *8.00%* | *8.00%* | *8.00%* | *8.00%* | *8.00%* | |
| Average SFR Retail Price | $67,850 | $67,850 | $73,278 | $79,140 | $85,471 | $92,309 | $99,694 | $99,694 | $107,669 | |
| Average Townhouse Lot | $42,000 | $42,000 | $45,360 | $48,989 | $52,908 | $57,141 | $61,712 | $66,649 | $71,981 | |
| | | | | | | | | | | |
| **Total Sales Revenues** | **$0** | **$7,657,250** | **$8,269,830** | **$8,049,618** | **$7,265,074** | **$6,553,951** | **$0** | **$0** | **$0** | **$37,795,724** |
| | | | | | | | | | | |
| **Development Costs** | | | | | | | | | | |
| Development Costs | **$6,297,047** | **$3,976,250** | **$1,477,581** | **$1,923,831** | **$1,871,331** | $0 | $0 | $0 | $0 | **$15,546,040** |
| *Annual Escalations* | *0.0%* | *0.0%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* | |
| **Total Development Costs** | **$6,297,047** | **$3,976,250** | **$1,521,908** | **$1,981,546** | **$1,927,471** | **$0** | **$0** | **$0** | **$0** | **$15,704,222** |
| | *Phase 1* | *Phase 2* | *Phase 3* | *Phase 4* | *Phase 5* | | | | | |
| **Holding Costs** | | | | | | | | | | |
| General & Administration | 1.0% | $0 | $76,573 | $82,698 | $80,496 | $72,651 | $65,540 | $0 | $0 | $0 | **$377,957** |
| Settlement & Marketing | 4.0% | $0 | $306,290 | $330,793 | $321,985 | $290,603 | $262,158 | $0 | $0 | $0 | **$1,511,829** |
| Real Estate Taxes | | $25,000 | $79,600 | $53,600 | $31,200 | $14,200 | $0 | $0 | $0 | $0 | **$203,600** |
| **Total Holding Costs** | | **$25,000** | **$462,463** | **$467,092** | **$433,681** | **$377,454** | **$327,698** | **$0** | **$0** | **$0** | **$2,093,386** |
| | | | | | | | | | | |
| **Total Revenues** | | **-$6,322,047** | **$3,218,538** | **$6,325,158** | **$5,692,106** | **$5,016,289** | **$6,226,254** | **$0** | **$0** | **$0** | **$35,702,337** |
| | | | | | | | | $0 | $0 | $0 | |
| **Less Developer Profit** | 10% | **$0** | **$765,725** | **$826,983** | **$804,962** | **$726,507** | **$655,395** | **$0** | **$0** | | **$3,779,572** |
| | | | | | | | | | | |
| **Net Revenues** | | **-$6,322,047** | **$2,452,813** | **$5,498,175** | **$4,887,144** | **$4,289,782** | **$5,570,859** | **$0** | | **$0** | **$16,376,725** |
| | | | | | | | | | | |
| **Discount Factor** | | 1.0000 | 0.8668 | 0.7880 | 0.7164 | 0.6512 | 0.5920 | 0.5382 | 0.4893 | 0.4448 | |
| **Present Value** | | **-$6,322,047** | **$2,126,059** | **$4,332,482** | **$3,500,909** | **$2,793,625** | **$3,298,089** | **$0** | **$0** | **$0** | **$9,729,117** |

| | | |
|---|---|---|
| **Discount Rate** | 10.0% | |
| | | $9,729,117 |
| **Rounded to:** | | $9,730,000 |
| **Unit:** | | $18,428 |



**Absorption Forecast**

| Year Starting | 1<br>Apr-24 | 2<br>Apr-25 | 3<br>Apr-26 | 4<br>Apr-27 | 5<br>Apr-28 | 6<br>Apr-29 | 7<br>Apr-30 | 8<br>Apr-31 | 9<br>Apr-32 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Finished SFR Lots | 0 | 85 | 47 | 47 | 47 | 47 | 47 | 46 | 45 | 411 |
| Townhouse Lots | 0 | 45 | 25 | 25 | 22 | | | | | 117 |

| Annual | | 0<br>Apr-24 | 1.5<br>Apr-25 | 2.5<br>Apr-26 | 3.5<br>Apr-27 | 4.5<br>Apr-28 | 5.5<br>Apr-29 | 6.5<br>Apr-30 | 7.5<br>Apr-31 | 8.5<br>Apr-32 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Absorption** | | | | | | | | | | | **528** |
| Lots Sold | | 0 | 130 | 72 | 72 | 69 | 47 | 47 | 46 | 45 | |
| Total Sold to date | | 0 | 130 | 202 | 274 | 343 | 390 | 437 | 483 | 528 | |
| Remaining Lots | | 528 | 398 | 326 | 254 | 185 | 138 | 91 | 45 | 0 | |
| | | | | | | | | | | | |
| **Escalated Retail Lot Values** | | | | | | | | | | | |
| *Escalations* | | *0.0%* | *0.00%* | *8.00%* | *8.00%* | *8.00%* | *8.00%* | *8.00%* | *8.00%* | *8.00%* | |
| Average SFR Retail Price | | $67,850 | $67,850 | $73,278 | $79,140 | $85,471 | $92,309 | $99,694 | $99,694 | $107,669 | |
| Average Townhouse Lot | | $42,000 | $42,000 | $45,360 | $48,989 | $52,908 | $57,141 | $61,712 | $66,649 | $71,981 | |
| | | | | | | | | | | | |
| **Total Sales Revenues** | | **$0** | **$7,657,250** | **$4,578,066** | **$4,944,311** | **$5,181,132** | **$4,338,531** | **$4,685,614** | **$4,585,920** | **$4,845,124** | **$40,815,949** |
| | | | | | | | | | | | |
| **Development Costs** | | | | | | | | | | | |
| Development Costs | | $6,272,048 | $0 | $3,976,250 | $1,477,581 | $1,923,831 | $1,871,331 | $0 | $0 | $0 | **$15,521,041** |
| *Annual Escalations* | | *0.0%* | *0.0%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* | |
| **Total Development Costs** | | **$6,272,048** | **$0** | **$4,095,538** | **$1,521,908** | **$1,981,546** | **$1,927,471** | **$0** | **$0** | **$0** | **$15,798,511** |
| | | *Phase 1* | | *Phase 2* | *Phase 3* | *Phase 4* | *Phase 5* | | | | |
| **Holding Costs** | | | | | | | | | | | |
| General & Administration | 1.0% | $0 | $76,573 | $45,781 | $49,443 | $51,811 | $43,385 | $46,856 | $45,859 | $48,451 | **$408,159** |
| Settlement & Marketing | 4.0% | $0 | $306,290 | $183,123 | $197,772 | $207,245 | $173,541 | $187,425 | $183,437 | $193,805 | **$1,632,638** |
| Real Estate Taxes | | $25,000 | $238,800 | $195,600 | $152,400 | $111,000 | $82,800 | $54,600 | $27,000 | $0 | **$887,200** |
| **Total Holding Costs** | | **$25,000** | **$621,663** | **$424,503** | **$399,616** | **$370,057** | **$299,727** | **$288,881** | **$256,296** | **$242,256** | **$2,927,997** |
| | | | | | | | | | | | |
| **Total Revenues** | | **-$6,297,048** | **$7,035,588** | **$58,025** | **$3,022,787** | **$2,829,530** | **$2,111,334** | **$4,396,733** | **$4,329,624** | **$4,602,868** | **$37,887,951** |
| | | | | | | | | $0 | $0 | $0 | |
| **Less Developer Profit** | 10% | **$0** | **$765,725** | **$457,807** | **$494,431** | **$518,113** | **$433,853** | **$468,561** | **$458,592** | **$484,512** | **$4,081,595** |
| | | | | | | | | | | | |
| **Horizontal Construction Costs (H&S)** | | | | | | | | | | | **$0** |
| | | | | | | | | | | | |
| **Net Revenues** | | **-$6,297,048** | **$6,269,863** | **-$399,781** | **$2,528,356** | **$2,311,417** | **$1,677,481** | **$3,928,172** | **$3,871,032** | **$4,118,355** | **$18,007,846** |
| | | | | | | | | | | | |
| **Discount Factor** | | 1.0000 | 0.8668 | 0.7880 | 0.7164 | 0.6512 | 0.5920 | 0.5382 | 0.4893 | 0.4448 | |
| **Present Value** | | **-$6,297,048** | **$5,434,618** | **-$315,022** | **$1,811,189** | **$1,505,259** | **$993,111** | **$2,114,161** | **$1,894,007** | **$1,831,834** | **$8,972,108** |

| | | |
|---|---|---|
| **Discount Rate** | 10.0% | |
| | | $8,972,108 |
| **Rounded to:** | | $8,970,000 |
| **Unit:** | | $16,989 |



WEEPING WILLOWS<br>LAND VALUATION

**Absorption Forecast**

| Year Starting | 1<br>Apr-24 | 2<br>Apr-25 | 3<br>Apr-26 | 4<br>Apr-27 | 5<br>Apr-28 | 6<br>Apr-29 | 7<br>Apr-30 | 8<br>Apr-31 | 9<br>Apr-32 | 10<br>Apr-33 | 11<br>Apr-34 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Finished SFR Lots | 0 | 85 | 38 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 411 |
| Townhouse Lots | 0 | 45 | 25 | 25 | 22 | | | | | | | 117 |

| Annual | | 0<br>Apr-24 | 1.5<br>Apr-25 | 2.5<br>Apr-26 | 3.5<br>Apr-27 | 4.5<br>Apr-28 | 5.5<br>Apr-29 | 6.5<br>Apr-30 | 7.5<br>Apr-31 | 8.5<br>Apr-32 | 9.5<br>Apr-33 | 10.5<br>Apr-34 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Absorption** | | | | | | | | | | | | | **528** |
| Lots Sold | | 0 | 130 | 63 | 61 | 58 | 36 | 36 | 36 | 36 | 36 | 36 | |
| Total Sold to date | | 0 | 130 | 193 | 254 | 312 | 348 | 384 | 420 | 456 | 492 | 528 | |
| Remaining Lots | | 528 | 398 | 335 | 274 | 216 | 180 | 144 | 108 | 72 | 36 | 0 | |
| | | | | | | | | | | | | | |
| **Escalated Retail Lot Values** | | | | | | | | | | | | | |
| *Escalations* | | *0.0%* | *0.00%* | *8.00%* | *8.00%* | *8.00%* | *8.00%* | *8.00%* | *8.00%* | *8.00%* | *8.00%* | *8.00%* | |
| Average SFR Retail Price | | $67,850 | $67,850 | $73,278 | $79,140 | $85,471 | $92,309 | $99,694 | $99,694 | $107,669 | $116,283 | $125,586 | |
| Average Townhouse Lot | | $42,000 | $42,000 | $45,360 | $48,989 | $52,908 | $57,141 | $61,712 | $66,649 | $71,981 | $77,739 | $83,958 | |
| | | | | | | | | | | | | | |
| **Total Sales Revenues** | | **$0** | **$7,657,250** | **$3,918,564** | **$4,073,769** | **$4,240,946** | **$3,323,130** | **$3,588,981** | **$3,588,981** | **$3,876,099** | **$4,186,187** | **$4,521,082** | **$42,974,989** |
| | | | | | | | | | | | | | |
| **Development Costs** | | | | | | | | | | | | | |
| Development Costs | | $6,272,048 | $0 | $3,976,250 | $1,477,581 | $0 | $1,923,831 | $0 | $1,871,331 | $0 | $0 | $0 | **$15,521,041** |
| *Annual Escalations* | | *0.0%* | *0.0%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* | |
| **Total Development Costs** | | **$6,272,048** | **$0** | **$4,095,538** | **$1,521,908** | **$0** | **$1,981,546** | **$0** | **$1,927,471** | **$0** | **$0** | **$0** | **$15,798,511** |
| | | *Phase 1* | | *Phase 2* | *Phase 3* | | *Phase 4* | | *Phase 5* | | | | |
| **Holding Costs** | | | | | | | | | | | | | |
| General & Administration | 1.0% | $0 | $76,573 | $39,186 | $40,738 | $42,409 | $33,231 | $35,890 | $35,890 | $38,761 | $41,862 | $45,211 | **$342,677** |
| Settlement & Marketing | 4.0% | $0 | $306,290 | $156,743 | $162,951 | $169,638 | $132,925 | $143,559 | $143,559 | $155,044 | $167,447 | $180,843 | **$1,370,709** |
| Real Estate Taxes | | $25,000 | $238,800 | $201,000 | $164,400 | $129,600 | $108,000 | $86,400 | $64,800 | $43,200 | $21,600 | $0 | **$1,061,200** |
| **Total Holding Costs** | | **$25,000** | **$621,663** | **$396,928** | **$368,088** | **$341,647** | **$274,157** | **$265,849** | **$244,249** | **$237,005** | **$230,909** | **$226,054** | **$2,774,586** |
| | | | | | | | | | | | | | |
| **Total Revenues** | | **-$6,297,048** | **$7,035,588** | **-$573,902** | **$2,183,772** | **$3,899,299** | **$1,067,428** | **$3,323,132** | **$1,417,261** | **$3,639,094** | **$3,955,278** | **$4,295,028** | **$40,200,403** |
| | | | | | | | | $0 | $0 | $0 | $0 | $0 | |
| **Less Developer Profit** | 10% | **$0** | **$765,725** | **$391,856** | **$407,377** | **$424,095** | **$332,313** | **$358,898** | **$358,898** | **$387,610** | **$418,619** | **$452,108** | **$3,426,772** |
| | | | | | | | | | | | | | |
| **Horizontal Construction Costs (H&S)** | | | | | | | | | | | | | **$0** |
| | | | | | | | | | | | | | |
| **Net Revenues** | | **-$6,297,048** | **$6,269,863** | **-$965,758** | **$1,776,395** | **$3,475,204** | **$735,115** | **$2,964,234** | **$1,058,363** | **$3,251,484** | **$3,536,659** | **$3,842,920** | **$19,647,430** |
| | | | | | | | | | | | | | |
| **Discount Factor** | | 1.0000 | 0.8668 | 0.7880 | 0.7164 | 0.6512 | 0.5920 | 0.5382 | 0.4893 | 0.4448 | 0.4044 | 0.3676 | |
| **Present Value** | | **-$6,297,048** | **$5,434,618** | **-$761,003** | **$1,272,521** | **$2,263,150** | **$435,207** | **$1,595,365** | **$517,833** | **$1,446,252** | **$1,430,088** | **$1,412,662** | **$8,749,642** |
| | | | | | | | | | | | | | |
| **Discount Rate** | 10.0% | | | | | | | | | | | | |
| | | $8,749,642 | | | | | | | | | | | |
| **Rounded to:** | | $8,750,000 | | | | | | | | | | | |
| **Unit:** | | $16,572 | | | | | | | | | | | |



## DCF Conclusions

The three scenarios are summarized below, with our concluded value:

**DCF Conclusions**

| Period | Value |
|--------|-------|
| 6 Years | $9,730,000 |
| 9 Years | $8,970,000 |
| 11 Years | $8,750,000 |
| Mean | *$9,150,000* |
| | |
| **Reconciled** | **$9,100,000** |



# Reconciliation

## Summary of Value Indications

The indicated values from the approaches used and our concluded market values for the subject property are summarized in the following table.

| Value Indications | |
| --- | --- |
| **Approach to Value** | **As Is** |
| Sales Comparison | $9,100,000 |
| Cost | Not Developed |
| Income Capitalization | |
| Yield Capitalization (DCF) | $9,100,000 |

| Value Conclusion | |
| --- | --- |
| **Component** | **As Is** |
| Value Type | Market Value |
| Real Property Interest | Fee Simple |
| Effective Date of Value | April 1, 2024 |
| **Value Conclusion** | **$9,100,000** |
| | **$51,991 per Acre** |

To reach a final opinion of value, the reliability and relevance of each value indication was considered based upon the quality of the data and applicability of the assumptions underlying each approach. Given the availability and reliability of data within the Sales Comparison Approach, this approach was given primary weight in reconciling to the final value conclusions. Furthermore, land properties such as the subject property are typically purchased by Investor or National Developers, who primarily rely upon the methods employed by the Sales Comparison Approach. The DCF Analysis is highly supportive of our conclusion.

The findings and conclusions are further contingent upon the following extraordinary assumptions and/or hypothetical conditions, the use of which might have affected the assignment results:

## Extraordinary Assumptions:

- It is assumed the proposed horizontal improvements will be completed in a workman-like manner in accordance with the provided plans and cost budget on the upon completion date of value.

- It is assumed that the proposed Weeping Willows PUD will be developed, as proposed, as of the date of this appraisal. Any change in densities or unit mix could have an impact on the value conclusions.

## Hypothetical Conditions:

- None



## Exposure Time and Marketing Period

Based on statistical information about days on market, escrow length, and marketing times gathered through national investor surveys, sales verification, and interviews of market participants, marketing and exposure time estimates of 12 months or less and 12 months or less, respectively, are considered reasonable and appropriate for the subject property.



# General Assumptions and Limiting Conditions

This appraisal is subject to the following general assumptions and limiting conditions:

1. The legal description – if furnished to us – is assumed to be correct.

2. No responsibility is assumed for legal matters, questions of survey or title, soil or subsoil conditions, engineering, availability or capacity of utilities, or other similar technical matters. The appraisal does not constitute a survey of the property appraised. All existing liens and encumbrances have been disregarded and the property is appraised as though free and clear, under responsible ownership and competent management unless otherwise noted.

3. Unless otherwise noted, the appraisal will value the property as though free of contamination. Valbridge Property Advisors | Charleston will conduct no hazardous materials or contamination inspection of any kind. It is recommended that the client hire an expert if the presence of hazardous materials or contamination poses any concern.

4. The stamps and/or consideration placed on deeds used to indicate sales are in correct relationship to the actual dollar amount of the transaction.

5. Unless otherwise noted, it is assumed there are no encroachments, zoning violations or restrictions existing in the subject property.

6. The appraiser is not required to give testimony or attendance in court by reason of this appraisal, unless previous arrangements have been made.

7. Unless expressly specified in the engagement letter, the fee for this appraisal does not include the attendance or giving of testimony by Appraiser at any court, regulatory or other proceedings, or any conferences or other work in preparation for such proceeding. If any partner or employee of Valbridge Property Advisors | Charleston is asked or required to appear and/or testify at any deposition, trial, or other proceeding about the preparation, conclusions or any other aspect of this assignment, client shall compensate Appraiser for the time spent by the partner or employee in appearing and/or testifying and in preparing to testify according to the Appraiser's then current hourly rate plus reimbursement of expenses.

8. The values for land and/or improvements, as contained in this report, are constituent parts of the total value reported and neither is (or are) to be used in making a summation appraisal of a combination of values created by another appraiser. Either is invalidated if so used.

9. The dates of value to which the opinions expressed in this report apply are set forth in this report. We assume no responsibility for economic or physical factors occurring at some point at a later date, which may affect the opinions stated herein. The forecasts, projections, or operating estimates contained herein are based on current market conditions and anticipated short-term supply and demand factors and are subject to change with future conditions. Appraiser is not responsible for determining whether the date of value requested by Client is appropriate for Client's intended use.

10. The sketches, maps, plats and exhibits in this report are included to assist the reader in visualizing the property. The appraiser has made no survey of the property and assumed no responsibility in connection with such matters.

11. The information, estimates and opinions, which were obtained from sources outside of this office, are considered reliable. However, no liability for them can be assumed by the appraiser.



12.    Possession of this report, or a copy thereof, does not carry with it the right of publication. Neither all, nor any part of the content of the report, or copy thereof (including conclusions as to property value, the identity of the appraisers, professional designations, reference to any professional appraisal organization or the firm with which the appraisers are connected), shall be disseminated to the public through advertising, public relations, news, sales, or other media without prior written consent and approval.

13.    No claim is intended to be expressed for matters of expertise that would require specialized investigation or knowledge beyond that ordinarily employed by real estate appraisers. We claim no expertise in areas such as, but not limited to, legal, survey, structural, environmental, pest control, mechanical, etc.

14.    This appraisal was prepared for the sole and exclusive use of the client for the function outlined herein. Any party who is not the client or intended user identified in the appraisal or engagement letter is not entitled to rely upon the contents of the appraisal without express written consent of Valbridge Property Advisors | Charleston and Client. The Client shall not include partners, affiliates, or relatives of the party addressed herein. The appraiser assumes no obligation, liability or accountability to any third party.

15.    Distribution of this report is at the sole discretion of the client, but third-parties not listed as an intended user on the face of the appraisal or the engagement letter may not rely upon the contents of the appraisal. In no event shall client give a third-party a partial copy of the appraisal report. We will make no distribution of the report without the specific direction of the client.

16.    This appraisal shall be used only for the function outlined herein, unless expressly authorized by Valbridge Property Advisors | Charleston.

17.    This appraisal shall be considered in its entirety. No part thereof shall be used separately or out of context.

18.    Unless otherwise noted in the body of this report, this appraisal assumes that the subject property does not fall within the areas where mandatory flood insurance is effective. Unless otherwise noted, we have not completed nor have we contracted to have completed an investigation to identify and/or quantify the presence of non-tidal wetland conditions on the subject property. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

19.    The flood maps are not site specific. We are not qualified to confirm the location of the subject property in relation to flood hazard areas based on the FEMA Flood Insurance Rate Maps or other surveying techniques. It is recommended that the client obtain a confirmation of the subject property's flood zone classification from a licensed surveyor.

20.    If the appraisal is for mortgage loan purposes 1) we assume satisfactory completion of improvements if construction is not complete, 2) no consideration has been given for rent loss during rent-up unless noted in the body of this report, and 3) occupancy at levels consistent with our "Income and Expense Projection" are anticipated.

21.    It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures which would render it more or less valuable. No responsibility is assumed for such conditions or for engineering which may be required to discover them.



22.    Our inspection included an observation of the land and improvements thereon only. It was not possible to observe conditions beneath the soil or hidden structural components within the improvements. We inspected the buildings involved, and reported damage (if any) by termites, dry rot, wet rot, or other infestations as a matter of information, and no guarantee of the amount or degree of damage (if any) is implied. Condition of heating, cooling, ventilation, electrical and plumbing equipment is considered to be commensurate with the condition of the balance of the improvements unless otherwise stated. Should the client have concerns in these areas, it is the client's responsibility to order the appropriate inspections. The appraiser does not have the skill or expertise to make such inspections and assumes no responsibility for these items.

23.    This appraisal does not guarantee compliance with building code and life safety code requirements of the local jurisdiction. It is assumed that all required licenses, consents, certificates of occupancy or other legislative or administrative authority from any local, state or national governmental or private entity or organization have been or can be obtained or renewed for any use on which the value conclusion contained in this report is based unless specifically stated to the contrary.

24.    When possible, we have relied upon building measurements provided by the client, owner, or associated agents of these parties. In the absence of a detailed rent roll, reliable public records, or "as-built" plans provided to us, we have relied upon our own measurements of the subject improvements. We follow typical appraisal industry methods; however, we recognize that some factors may limit our ability to obtain accurate measurements including, but not limited to, property access on the day of inspection, basements, fenced/gated areas, grade elevations, greenery/shrubbery, uneven surfaces, multiple story structures, obtuse or acute wall angles, immobile obstructions, etc. Professional building area measurements of the quality, level of detail, or accuracy of professional measurement services are beyond the scope of this appraisal assignment.

25.    We have attempted to reconcile sources of data discovered or provided during the appraisal process, including assessment department data. Ultimately, the measurements that are deemed by us to be the most accurate and/or reliable are used within this report. While the measurements and any accompanying sketches are considered to be reasonably accurate and reliable, we cannot guarantee their accuracy. Should the client desire more precise measurement, they are urged to retain the measurement services of a qualified professional (space planner, architect or building engineer) as an alternative source. If this alternative measurement source reflects or reveals substantial differences with the measurements used within the report, upon request of the client, the appraiser will submit a revised report for an additional fee.

26.    In the absence of being provided with a detailed land survey, we have used assessment department data to ascertain the physical dimensions and acreage of the property. Should a survey prove this information to be inaccurate, upon request of the client, the appraiser will submit a revised report for an additional fee.

27.    If only preliminary plans and specifications were available for use in the preparation of this appraisal, and a review of the final plans and specifications reveals substantial differences upon request of the client the appraiser will submit a revised report for an additional fee.



28.     Unless otherwise stated in this report, the value conclusion is predicated on the assumption that the property is free of contamination, environmental impairment or hazardous materials. Unless otherwise stated, the existence of hazardous material was not observed by the appraiser and the appraiser has no knowledge of the existence of such materials on or in the property. The appraiser, however, is not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation or other potentially hazardous materials may affect the value of the property. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required for discovery. The client is urged to retain an expert in this field, if desired.

29.     The Americans with Disabilities Act ("ADA") became effective January 26, 1992. We have not made a specific compliance survey of the property to determine if it is in conformity with the various requirements of the ADA. It is possible that a compliance survey of the property, together with an analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act. If so, this could have a negative effect on the value of the property. Since we have no direct evidence relating to this issue, we did not consider possible noncompliance with the requirements of ADA in developing an opinion of value.

30.     This appraisal applies to the land and building improvements only. The value of trade fixtures, furnishings, and other equipment, or subsurface rights (minerals, gas, and oil) were not considered in this appraisal unless specifically stated to the contrary.

31.     No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated, unless specifically stated to the contrary.

32.     Any income and expense estimates contained in the appraisal report are used only for the purpose of estimating value and do not constitute prediction of future operating results. Furthermore, it is inevitable that some assumptions will not materialize and that unanticipated events may occur that will likely affect actual performance.

33.     Any estimate of insurable value, if included within the scope of work and presented herein, is based upon figures developed consistent with industry practices. However, actual local and regional construction costs may vary significantly from our estimate and individual insurance policies and underwriters have varied specifications, exclusions, and non-insurable items. As such, we strongly recommend that the Client obtain estimates from professionals experienced in establishing insurance coverage. This analysis should not be relied upon to determine insurance coverage and we make no warranties regarding the accuracy of this estimate.

34.     The data gathered in the course of this assignment (except data furnished by the Client) shall remain the property of the Appraiser. The appraiser will not violate the confidential nature of the appraiser-client relationship by improperly disclosing any confidential information furnished to the appraiser. Notwithstanding the foregoing, the Appraiser is authorized by the client to disclose all or any portion of the appraisal and related appraisal data to appropriate representatives of the Appraisal Institute if such disclosure is required to enable the appraiser to comply with the Bylaws and Regulations of such Institute now or hereafter in effect.



35.  You and Valbridge Property Advisors | Charleston both agree that any dispute over matters in excess of $5,000 will be submitted for resolution by arbitration. This includes fee disputes and any claim of malpractice. The arbitrator shall be mutually selected. If Valbridge Property Advisors | Charleston and the client cannot agree on the arbitrator, the presiding head of the Local County Mediation & Arbitration panel shall select the arbitrator. Such arbitration shall be binding and final. In agreeing to arbitration, we both acknowledge that, by agreeing to binding arbitration, each of us is giving up the right to have the dispute decided in a court of law before a judge or jury. In the event that the client, or any other party, makes a claim against Valbridge Property Advisors | Charleston or any of its employees in connections with or in any way relating to this assignment, the maximum damages recoverable by such claimant shall be the amount actually received by Valbridge Property Advisors | Charleston for this assignment, and under no circumstances shall any claim for consequential damages be made.

36.  Valbridge Property Advisors | Charleston shall have no obligation, liability, or accountability to any third party. Any party who is not the "client" or intended user identified on the face of the appraisal or in the engagement letter is not entitled to rely upon the contents of the appraisal without the express written consent of Valbridge Property Advisors | Charleston. "Client" shall not include partners, affiliates, or relatives of the party named in the engagement letter. Client shall hold Valbridge Property Advisors | Charleston and its employees harmless in the event of any lawsuit brought by any third party, lender, partner, or part-owner in any form of ownership or any other party as a result of this assignment. The client also agrees that in case of lawsuit arising from or in any way involving these appraisal services, client will hold Valbridge Property Advisors | Charleston harmless from and against any liability, loss, cost, or expense incurred or suffered by Valbridge Property Advisors | Charleston in such action, regardless of its outcome.

37.  The Valbridge Property Advisors office responsible for the preparation of this report is independently owned and operated by Charleston. Neither Valbridge Property Advisors, Inc., nor any of its affiliates has been engaged to provide this report. Valbridge Property Advisors, Inc. does not provide valuation services, and has taken no part in the preparation of this report.

38.  If any claim is filed against any of Valbridge Property Advisors, Inc., a Florida Corporation, its affiliates, officers or employees, or the firm providing this report, in connection with, or in any way arising out of, or relating to, this report, or the engagement of the firm providing this report, then (1) under no circumstances shall such claimant be entitled to consequential, special or other damages, except only for direct compensatory damages, and (2) the maximum amount of such compensatory damages recoverable by such claimant shall be the amount actually received by the firm engaged to provide this report.

39.  This report and any associated work files may be subject to evaluation by Valbridge Property Advisors, Inc., or its affiliates, for quality control purposes.

40.  Acceptance and/or use of this appraisal report constitutes acceptance of the foregoing general assumptions and limiting conditions.

# Certification – Karl P. Finkelstein

I certify that, to the best of my knowledge and belief:

1.      The statements of fact contained in this report are true and correct.

2.      The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3.      I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4.      The undersigned Karl P. Finkelstein has not performed services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

5.      I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6.      My engagement in this assignment was not contingent upon developing or reporting predetermined results.

7.      My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8.      My analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

9.      Karl P. Finkelstein has personally inspected the subject property.

10.     No one provided significant real property appraisal assistance to those signing this certification, unless otherwise noted.

11.     The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

12.     The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

13.     As of the date of this report, Karl P. Finkelstein completed the continuing education program for Designated Members of the Appraisal Institute.

Karl P. Finkelstein, MAI, MRICS
Senior Managing Director
South Carolina Certified General CG 3396
Expires 06/30/2024

# Certification – Pledger M. Bishop, III

I certify that, to the best of my knowledge and belief:

14. The statements of fact contained in this report are true and correct.

15. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

16. I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

17. The undersigned Pledger M. Bishop, III  performed services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

18. I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

19. My engagement in this assignment was not contingent upon developing or reporting predetermined results.

20. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

21. My analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

22. Pledger M. Bishop, III did not personally inspect the subject property.

23. No one provided significant real property appraisal assistance to those signing this certification, unless otherwise noted.

24. The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

25. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

26. As of the date of this report, Pledger M. Bishop, III completed the continuing education program for Designated Members of the Appraisal Institute.

Pledger M. "Jody" Bishop III,  MAI, SRA, AI-GRS, CRE
Senior Managing Director
South Carolina Certified General CG 795
Expires  6/30/2024

# Addenda

Additional Subject Photographs

Engagement Letter

Glossary

Qualifications

- Karl P. Finkelstein, MAI - Senior Managing Director

- Pledger M. Bishop, III, MAI, SRA, AI-GRS, CRE - Senior Managing Director

Information on Valbridge Property Advisors

Office Locations



## Additional Subject Photographs

 

 

 














## Letter of Engagement



CHARLESTON

March 27, 2024

TRACEY D. TURNER, CEO
Turner Development LLC
2901 North Capital Street, NE
Washington, DC 20002
202 288 2128
traceydturner@turnerdevelopmentllc.com

RE:    Quote for appraisal of Weeping Willows, a proposed residential subdivision at 1001 Old
       Aiken Road, Beach Island, SC 29482

Dear Mr. Turner:

Thank you for the opportunity to submit a fee quote for an appraisal of the referenced property which is a 175 acre, fully entitled and PH 1 and 2 permitted, mixed use residential development tract with potential for 511 residential lots (475 - single family and 117 townhouse) and neighborhood commercial density.

The specific scope of work is to analyze only the residential lot density and none of the commercial density. Please be advised, the conclusions in the report will not reflect the market value of the property in its entirety, rather, only the residential density.

The property owner is Turner Development, LLC (Tracey D. Turner CEO) and the client and intended user of the report. It is my understanding that the report will be used to estimate the current market value of the property for marketing to equity investor purposes.

The effective date(s) of value is the current date, and the property rights appraised will be the fee simple interest.

If the property interest to be valued is a "leased fee," the appraisal will not include any valuation of the property as if the lease(s) on the property are no longer in place (in a "go dark" status), unless requested by Client and stated in this Agreement.

The anticipated scope of work will include general property inspection for real estate appraisal purposes, analyses of the market for like properties and a conclusion of market value. The definition of the type of value will be stated in the report. Valbridge Property Advisors | Charleston is not responsible for determining whether the type of value stated for this assignment is appropriate for Client's intended use, as that determination may be a legal matter or the subject of Client's internal requirements. A "current" value is not a prediction of any future value or a representation of the price the property may be sold for in distress or foreclosure. If a different type of value is necessary, please inform us prior to executing this Agreement.

This quote is for real estate appraisal reports which will conform with and will be subject to the requirements of the Code of Professional Ethics and Standards of Professional Conduct of the Appraisal Institute and the

Valbridge Property Advisors | Charleston





CHARLESTON

Uniform Standards of Professional Appraisal Practice (USPAP). The appraisal report is subject to the limiting conditions and certifications attached to this quote.

I have no current or prospective interest in the referenced properties or in the Client(s). I have not performed any prior services regarding the referenced properties within the three-year period immediately preceding the date of this Agreement, as an appraiser or in any other capacity.

Client(s) agrees to provide documentation required and requested to complete the report. Delays in the receipt of requested documentation may result in the timely delivery of the report.

My fee(s) for this assignment(s) are not to exceed $10,000 and I anticipate a completion date of about 10 days from authorization to proceed which is evidenced by you, returning this quote to me with your signature and a retainer in the amount of $5,000.

As part of our contract for services, the client(s) will pay all costs and expenses incurred by Valbridge Property Advisors | Charleston, in collecting any unpaid past due amounts from Purchaser hereunder, to include but not limited to court costs, all other expenses, incurred by Valbridge Property Advisors | Charleston in litigation, and a reasonable attorney fee. The aggregate amount of all fees and expenses for which Valbridge Property Advisors | Charleston, is entitled to reimbursement shall be added to, and become a part of any judgment entered against Client and in favor of Valbridge Property Advisors | Charleston.

Late payments shall draw interest at the rate of 1.5% per month from the due date. Accrued interest is immediately due and payable, and interest shall accrue on unpaid at the rate of 1.5% per month until paid in full. Interest will accrue on any judgment obtained by Valbridge Property Advisors | Charleston, for payment and interest due at the rate of 18% per annum. Any payments received shall be applied first to the reduction of interest then to the principal.

Once again, thank you for the opportunity to submit this fee quote. Please contact me if you need any additional information.

Respectfully submitted,
Valbridge Property Advisors | Charleston

Pledger M. "Jody" Bishop III, MAI, SRA, AI-GRS, CRE
SC State Certified General
Real Estate Appraiser
License #CG795

Valbridge Property Advisors | Charleston





**AGREED AND ACCEPTED**

*Tracey D. Turner*
_____
Tracey D. Turner, CEO
Turner Development, LLC

3/27/2024
_____
Date

## Glossary

Definitions are taken from The Dictionary of Real Estate Appraisal, 7th Edition (Dictionary), the Uniform Standards of Professional Appraisal Practice (USPAP), and Building Owners and Managers Association International (BOMA).

### Absolute Net Lease

A lease in which the tenant pays all expenses including structural maintenance, building reserves, and management; often a long-term lease to a credit tenant. (Dictionary)

### Amortization

The process of retiring a debt or recovering a capital investment, typically through scheduled, systematic repayment of the principal; a program of periodic contributions to a sinking fund or debt retirement fund. (Dictionary)

### As Is Market Value

The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date. (Interagency Appraisal and Evaluation Guidelines) Note that the use of the "as is" phrase is specific to appraisal regulations pursuant to FIRREA applying to appraisals prepared for regulated lenders in the United States. The concept of an "as is" value is not included in the Standards of Valuation Practice of the Appraisal Institute, Uniform Standards of Professional Appraisal Practice, or International Valuation Standards. (Dictionary)

### Base Rent

The minimum rent stipulated in a lease. (Dictionary)

### Base Year

The year on which escalation clauses in a lease are based. (Dictionary)

### Building Common Area

In office buildings, the areas of the building that provide services to building tenants but that are not included in the office area or store area of any specific tenant. These areas may include, but shall not be limited to, main and auxiliary lobbies, atrium spaces at the level of the finished floor, concierge areas or security desks, conference rooms, lounges or vending areas, food service facilities, health or fitness centers, daycare facilities, locker or shower facilities, mail rooms, fire control rooms, fully enclosed courtyards outside the exterior walls, and building core and service areas such as fully enclosed mechanical or equipment rooms. Specifically excluded from building common area are floor common areas, parking space, portions of loading docks outside the building line, and major vertical penetrations. (BOMA)

### Building Rentable Area

The sum of all floor rentable areas. Floor rentable area is the result of subtracting from the gross measured area of a floor the major vertical penetrations on that same floor. It is generally fixed for the life of the building and is rarely affected by changes in corridor size or configuration. (BOMA)

### Bulk Value

The value of multiple units, subdivided plots, or properties in a portfolio as though sold together in a single transaction. (Dictionary)

### Certificate of Occupancy (COO)

A formal written acknowledgment by an appropriate unit of local government that a new construction or renovation project is at the stage where it meets applicable health and safety codes and is ready for commercial or residential occupancy. (Dictionary)

### Common Area Maintenance (CAM)

The expense of operating and maintaining common areas; may or may not include management charges and usually does not include capital expenditures on tenant improvements or other improvements to the property. (Dictionary)

The amount of money charged to tenants for their shares of maintaining a [shopping] center's common area. The charge that a tenant pays for shared services and facilities such as electricity, security, and maintenance of parking lots. Items charged to common area maintenance may include cleaning services, parking lot sweeping and maintenance, snow removal, security, [amenities,] and upkeep. (ICSC – International Council of Shopping Centers, 4th Ed.)

### Condominium

An attached, detached, or stacked unit within or attached to a structure with common areas that are held as tenants in common (an undivided interest) with other owners in the project. The units can be residential, commercial, industrial, or parking spaces or boat docks. These units are commonly defined by state laws in their locations. Because units can be stacked on top of other units, these units can be defined both vertically and horizontally. (Dictionary)



## Conservation Easement

An interest in real estate restricting future land use to preservation, conservation, wildlife habitat, or some combination of those uses. A conservation easement may permit farming, timber harvesting, or other uses of a rural nature as well as some types of conservation-oriented development to continue, subject to the easement. (Dictionary)

## Contributory Value

A type of value that reflects the amount a property or component of a property contributes to the value of another asset or to the property as a whole.

The change in the value of a property as a whole, whether positive or negative, resulting from the addition or deletion of a property component. Also called deprival value in some countries. (Dictionary)

## Debt Coverage Ratio (DCR)

The ratio of net operating income to annual debt service (DCR = NOI÷$I_m$), which measures the relative ability of a property to meet its debt service out of net operating income; also called *debt service coverage ratio (DSCR)*. A larger *DCR* typically indicates a greater ability for a property to withstand a reduction of income, providing an improved safety margin for a lender. (Dictionary)

## Deed Restriction

A provision written into a deed that limits the use of land. Deed restrictions usually remain in effect when title passes to subsequent owners. (Dictionary)

## Depreciation

In appraisal, a loss in property value from any cause; the difference between the cost of an improvement on the effective date of the appraisal and the value of the improvement on the same date.

In accounting, an allocation of the original cost of an asset, amortizing the cost over the asset's life; calculated using a variety of standard techniques. (Dictionary)

## Disposition Value

The most probable price that a specified interest in property should bring under the following conditions:

1. Consummation of a sale within a specified time, which is shorter than the typical exposure time for such a property in that market.

2. The property is subjected to market conditions prevailing as of the date of valuation;

3. Both the buyer and seller are acting prudently and knowledgeably;

4. The seller is under compulsion to sell;

5. The buyer is typically motivated;

6. Both parties are acting in what they consider to be their best interests;

7. An adequate marketing effort will be made during the exposure time;

8. Payment will be made in cash in U.S. dollars (or the local currency) or in terms of financial arrangements comparable thereto; and

9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

This definition can also be modified to provide for valuation with specified financing terms. (Dictionary)

## Double Net (Net Net) Lease

An alternative term for a type of net lease. In some markets, a net net lease is defined as a lease in which the tenant is responsible to pay both property taxes and premiums for insuring the building(s). (Valbridge)

(The market definition of a double net lease varies depending on the market)

## Easement

The right to use another's land for a stated purpose. (Dictionary)

## EIFS

Exterior Insulation Finishing System. This is a type of exterior wall cladding system. Sometimes referred to as dry-vit.

## Effective Date

1. The date on which the appraisal opinion applies. (SVP)
2. The date to which an appraiser's analyses, opinions, and conclusions apply; also referred to as date of value. (USPAP, 2020-2021 ed.)
3. The date that a lease goes into effect. (Dictionary)

## Effective Gross Income (EGI)

The anticipated income from all operations of the real estate after an allowance is made for vacancy and collection losses and an addition is made for any other income. (Dictionary)

## Effective Rent

Total base rent, or minimum rent stipulated in a lease, over the specified lease term minus rent concessions; the rent that is effectively paid by a tenant net of financial concessions provided by a landlord. (TIs). (Dictionary)

## EPDM

Ethylene Propylene Diene Monomer Rubber. A type of synthetic rubber typically used for roof coverings.



### Escalation Clause

A clause in an agreement that provides for the adjustment of a price or rent based on some event or index. e.g., a provision to increase rent if operating expenses increase; also called *escalator clause, expense recovery clause or stop clause*. (Dictionary)

### Estoppel Certificate

A signed statement by a party (such as a tenant or a mortgagee) certifying, for another's benefit, that certain facts are correct, such as that a lease exists, that there are no defaults, and that rent is paid to a certain date. (Black's) In real estate, a buyer of rental property typically requests estoppel certificates from existing tenants. Sometimes referred to as an *estoppel letter*. (Dictionary)

### Excess Land

Land that is not needed to serve or support the existing use. The highest and best use of the excess land may or may not be the same as the highest and best use of the improved parcel. Excess land has the potential to be sold separately and is valued separately. (Dictionary)

### Excess Rent

The amount by which contract rent exceeds market rent at the time of the appraisal; created by a lease favorable to the landlord (lessor) and may reflect unusual management, unknowledgeable or unusually motivated parties, a lease execution in an earlier, stronger rental market, or an agreement of the parties. (Dictionary)

### Expense Stop

A clause in a lease that limits the landlord's expense obligation, which results in the lessee paying operating expenses above a stated level or amount. (Dictionary)

### Exposure Time

1. The time a property remains on the market.
2. An opinion, based on supporting market data, of the length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. (USPAP, 2020-2021 ed.)

### Extraordinary Assumption

An assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions.

**Comment:** Uncertain information might include physical, legal, or economic characteristics of the subject property; or conditions external to the property, such as market conditions or trends; or the integrity of data used in an analysis. (USPAP)

### Fee Simple Estate

Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat. (Dictionary)

### Floor Common Area

In an office building, the areas on a floor such as washrooms, janitorial closets, electrical rooms, telephone rooms, mechanical rooms, elevator lobbies, and public corridors which are available primarily for the use of tenants on that floor. In essence, floor common area represents all of the area on the floor that is common to that respective floor with the exception of those areas that penetrate through the floor, such as the elevator shaft and stairwell. The significant point to be made is that floor common area is not part of the tenant's usable area. (BOMA)

### Full Service (Gross) Lease

A lease in which the landlord receives stipulated rent and is obligated to pay all of the property's operating and fixed expenses; also called a *full service lease*. (Dictionary)

### Furniture, Fixtures, and Equipment (FF&E)

Business trade fixtures and personal property, exclusive of inventory. (Dictionary)

### Going-Concern Value

An outdated label for the market value of all the tangible and intangible assets of an established and operating business with an indefinite life, as if sold in aggregate; more accurately termed the *market value of the going concern* or *market value of the total assets of the business.* (Dictionary)

### Gross Building Area (GBA)

1. Total floor area of a building, excluding unenclosed areas, measured from the exterior of the walls of the above-grade area. This includes mezzanines and basements if and when typically included in the market area of the type of property involved.
2. Gross leasable area plus all common areas.
3. For residential space, the total area of all floor levels measured from the exterior of the walls and including the superstructure and substructure basement; typically does not include garage space. (Dictionary)

### Gross Measured Area

The total area of a building enclosed by the dominant portion (the portion of the inside finished surface of the permanent outer building wall which is 50 percent or more of the vertical floor-to-ceiling dimension, at the given point being measured as one moves horizontally along the wall), excluding parking areas and loading docks (or portions of same) outside the building line. It is



generally not used for leasing purposes and is calculated on a floor by floor basis. (BOMA)

## Gross Up Method

A method of calculating variable operating expenses in income-producing properties when less than 100% occupancy is assumed. Expenses reimbursed based on the amount of occupied space, rather than on the total building area, are described as "grossed up." (Dictionary)

## Gross Sellout Value (Sum of the Retail Values)

The sum of the separate and distinct market value opinions for each of the units in a condominium, subdivision development, or portfolio of properties, as of the date of valuation. The aggregate of retail values does not represent the value of all the units as though sold together in a single transaction; it is simply the total of the individual market value conclusions. An appraisal has an effective date, but summing the sale prices of multiple units over an extended period of time will not be the value on that one day unless the prices are discounted to make the value equivalent to what another developer or investor would pay for the bulk purchase of the units. Also called the *aggregate of the retail values, aggregate retail selling price or sum of the retail values.* (Dictionary)

## Ground Lease

A lease that grants the right to use and occupy land. Improvements made by the ground lessee typically revert to the ground lessor at the end of the lease term. (Dictionary)

## Ground Rent

The rent paid for the right to use and occupy land according to the terms of a ground lease; the portion of the total rent allocated to the underlying land. (Dictionary)

## HVAC

Heating, ventilation, air conditioning (HVAC) system. A unit that regulates the temperature and distribution of heat and fresh air throughout a building. (Dictionary)

## Highest and Best Use

1.  The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity.
2.  The use of an asset that maximizes its potential and that is possible, legally permissible, and financially feasible. The highest and best use may be for continuation of an asset's existing use of for some alternative use. This is determined by the use that a market participant would have in mind for the asset when formulating the price that it would be willing to bid. (IVS)

3.  [The] highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future. (Uniform Appraisal Standards for Federal Land Acquisitions) (Dictionary)

## Hypothetical Condition

1.  A condition that is presumed to be true when it is known to be false. (SVP)
2.  A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

**Comment:** Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis. (USPAP)

## Insurable Value (Replacement Cost for Insurance Purposes)

The estimated cost, at current prices as of the effective date of valuation, of a substitute for the building being valued, using modern materials and current standards, design, and layout for insurance coverage purposes guaranteeing that damaged property is replaced with new property (i.e., depreciation is not deducted). (Dictionary)

## Investment Value

1.  The value of a property to a particular investor or class of investors based on the investor's specific requirements. Investment value may be different from market value because it depends on a set of investment criteria that are not necessarily typical of the market. (Dictionary)
2.  The value of an asset to the owner or a prospective owner given individual investment or operational objectives (may also be known as worth). (IVS)

## Just Compensation

In condemnation, the amount of loss for which a property owner is compensated when his or her property is taken. Just compensation should put the owner in as good a position pecuniarily as he or she would have been if the property had not been taken. (Dictionary)

## Leased Fee Interest

The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires. (Dictionary)



## Leasehold Interest (Leasehold Estate)

The right held by the lessee to use and occupy real estate for a stated term and under the conditions specified in the lease. (Dictionary)

See also Positive Leasehold and Negative Leasehold.

## Lessee (Tenant)

One who has the right to occupancy and use of the property of another for a period of time according to a lease agreement. (Dictionary)

## Lessor (Landlord)

One who conveys the rights of occupancy and use to others under a lease agreement. (Dictionary)

## Liquidation Value

The most probable price that a specified interest in property should bring under the following conditions:

1.  Consummation of a sale within a short time period.

2.  The property is subjected to market conditions prevailing as of the date of valuation.

3.  Both the buyer and seller are acting prudently and knowledgeably.

4.  The seller is under extreme compulsion to sell.

5.  The buyer is typically motivated.

6.  Both parties are acting in what they consider to be their best interests.

7.  A normal marketing effort is not possible due to the brief exposure time.

8.  Payment will be made in cash in U.S. dollars (or the local currency) or in terms of financial arrangements comparable thereto.

9.  The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. (Dictionary)

## Loan to Value Ratio (LTV)

The ratio between a mortgage loan and the value of the property pledged as security, usually expressed as a percentage. (Dictionary)

## Major Vertical Penetrations

Stairs, elevator shafts, flues, pipe shafts, vertical ducts, and the like, and their enclosing walls. Atria, lightwells and similar penetrations above the finished floor are included in this definition. Not included, however, are vertical penetrations built for the private use of a tenant occupying office areas on more than one floor. Structural columns, openings for vertical electric cable or telephone distribution, and openings for plumbing lines are not considered to be major vertical penetrations. (BOMA)

## Market Rent

The most probable rent that a property should bring in a competitive and open market under all the conditions requisite to a fair lease transaction, the lessee and the lessor each acting prudently and knowledgeably, and assuming the rent is not affected by undue stimulus. Implicit in this definition is the execution of a lease as of a specified date under conditions whereby:

1.  Lessee and lessor are typically motivated;

2.  Both parties are well informed or well advised, and acting in what they consider their best interests;

3.  Payment is made in terms of cash or in terms of financial arrangements comparable thereto; and

4.  The rent reflects specified terms and conditions, such as permitted uses, use restrictions, expense obligations, duration, concessions, rental adjustments and revaluations, renewal and purchase options, and tenant improvements (TIs). (Appraisal Institute)

## Market Value

The following definition of market value is used by agencies that regulate federally insured financial institutions in the United States: The most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1.  Buyer and seller are typically motivated;

2.  Both parties are well informed or well advised, and acting in what they consider their own best interests;

3.  A reasonable time is allowed for exposure in the open market;

4.  Payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto; and

5.  The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. (Dictionary;  12 C.F.R. Part 34.42(g); 55 Federal Register 34696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992; 59 Federal Register 29499, June 7, 1994)

## Marketing Time

An opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. Marketing time differs from exposure time, which is always presumed to precede



the effective date of an appraisal. (Advisory Opinion 7 of the Appraisal Standards Board of the Appraisal Foundation)

### Master Lease

1. A lease in which a part or the entire property is leased to a single entity (the master lessee) in return for a stipulated rent. The master lessee then subleases the property to multiple tenants.
2. The first lease in a sandwich lease. (Dictionary)

### Modified Gross Lease

A lease in which the landlord receives stipulated rent and is obligated to pay some, but not all, of the property's operating and fixed expenses. Since assignment of expenses varies among modified gross leases, expense responsibility must always be specified. In some markets, a modified gross lease may be called a *double net lease, net net lease, partial net lease, or semi-gross le*ase. (Dictionary)

### Negative Leasehold

A lease situation in which the market rent is less than the contract rent. (Dictionary)

### Operating Expense Ratio

The ratio of total operating expenses to effective gross income (*TOE/EGI*); the complement of the net income ratio, i.e., *OER = 1 – NIR* (Dictionary)

### Option

A legal contract, typically purchased for a stated consideration, that permits but does not require the holder of the option (known as the *optionee*) to buy, sell, or lease real estate for a stipulated period of time in accordance with specified terms; a unilateral right to exercise a privilege. (Dictionary)

### Partial Interest

Divided or undivided rights in real estate that represent less than the whole, i.e., a fractional interest such as a tenancy in common or easement. (Dictionary)

### Pass Through

A tenant's portion of operating expenses that may be composed of common area maintenance (CAM), real property taxes, property insurance, and any other expenses determined in the lease agreement to be paid by the tenant. (Dictionary)

### Percentage Lease

A lease in which the rent or some portion of the rent represents a specified percentage of the volume of business, productivity, or use achieved by the tenant. (Dictionary)

### Positive Leasehold

A lease situation in which the market rent is greater than the contract rent. (Dictionary)

### Potential Gross Income (PGI)

The total income attributable to property at full occupancy before vacancy and operating expenses are deducted. (Dictionary)

### Prospective Opinion of Value

A value opinion effective as of a specified future date. The term does not define a type of value. Instead, it identifies a value opinion as being effective at some specific future date. An opinion of value as of a prospective date is frequently sought in connection with projects that are proposed, under construction, or under conversion to a new use, or those that have not yet achieved sellout or a stabilized level of long-term occupancy. (Dictionary)

### Replacement Cost

The estimated cost to construct, at current prices as of a specific date, a substitute for a building or other improvements, using modern materials and current standards, design, and layout. (Dictionary)

### Reproduction Cost

The estimated cost to construct, at current prices as of the effective date of the appraisal, an exact duplicate or replica of the building being appraised, using the same materials, construction standards, design, layout, and quality of workmanship and embodying all of the deficiencies, superadequacies, and obsolescence of the subject building. (Dictionary)

### Retrospective Value Opinion

A value opinion effective as of a specified historical date. The term *retrospective* does not define a type of value. Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgments, estate tax, and condemnation. Inclusion of the type of value with this term is appropriate, e.g., "retrospective market value opinion." (Dictionary)

### Sandwich Leasehold Estate

The interest held by the sandwich leaseholder when the property is subleased to another party; a type of leasehold estate. (Dictionary)

### Sublease

An agreement in which the lessee in a prior lease conveys the right of use and occupancy of a property to another, the sublessee, for a specific period of time, which may or may not be coterminous with the underlying lease term. (Dictionary)

### Subordination

A contractual arrangement in which a party with a claim to certain assets agrees to make that claim junior, or subordinate, to the claims of another party. (Dictionary)



### Surplus Land

Land that is not currently needed to support the existing use but cannot be separated from the property and sold off for another use. Surplus land does not have an independent highest and best use and may or may not contribute value to the improved parcel. (Dictionary)

### TPO

Thermoplastic polyolefin, a resilient synthetic roof covering.

### Triple Net (Net Net Net) Lease

An alternative term for a type of net lease. In some markets, a net net net lease is defined as a lease in which the tenant assumes all expenses (fixed and variable) of operating a property except that the landlord is responsible for structural maintenance, building reserves, and management; also called *NNN lease, net net net lease, or fully net lease*. (Dictionary)

(The market definition of a triple net lease varies; in some cases tenants pay for items such as roof repairs, parking lot repairs, and other similar items.)

### Usable Area

The measured area of an office area, store area, or building common area on a floor. The total of all the usable areas for a floor shall equal floor usable area of that same floor. (BOMA)

### Value-in-Use

1. The amount determined by discounting the future cash flows (including the ultimate proceeds of disposal) expected to be derived from the use of an asset at an appropriate rate that allows for the risk of the activities concerned. (FASB Accounting Standards Codification, Master Glossary)
2. Formerly used in valuation practice as a synonym for *contributory value* or *use value*. (Dictionary)

### VTAB (Value of the Total Assets of a Business)

The total amount that the real property, tangible personal property, and intangible property assets of a business would sell for in an asset-based transaction. (Dictionary)



Qualifications



# Karl P. Finkelstein, MAI

Senior Managing Director
**Valbridge Property Advisors | Charleston**

## INDEPENDENT VALUATIONS FOR A VARIABLE WORLD



**KARL P. FINKELSTEIN, MAI**
**Valbridge Property Advisors | Charleston**
kfinkelstein@valbridge.com

1250 Fairmont Avenue
Mount Pleasant, SC 29464

Main: 843.884.1266
Direct: 843.654.7560
Fax: 843.881.7532

## STATE CERTIFICATIONS
South Carolina
North Carolina
Georgia
Tennessee
Virginia
West Virginia

## EDUCATION
Bachelor of Science
Business Administration
University of South Carolina

www.valbridge.com

## MEMBERSHIPS & AFFILIATIONS

Urban Land Institute

- Member

Capital Markets Conference

- Board Member

Appraisal Institute, Member

- MAI Designation, 2006
- South Carolina Chapter President, 2015
- SC Chapter 1st Vice President, 2014
- SC Chapter 2nd Vice President, 2013
- SC Chapter Treasurer, 2012
- SC Chapter Secretary, 2011

## APPRAISAL INSTITUTE & RELATED COURSES

- Income Capitalization 310, 2001
- General Applications 320, 2000
- Standards Part A 410, 2001
- Standards Part B 420, 2001
- Advanced Income Capitalization 510, 2002
- Commercial Report Writing 540, 2003
- Highest and Best Use Analysis 520, 2003
- Adv Sales Comparison, Cost Approach 530, 2003
- Leadership and Development Conference, 2004
- Advanced Applications 550, 2004
- Leadership & Development Conference, 2005
- Leadership & Development Conference, 2006

## EXPERIENCE

**Valbridge Property Advisors | Charleston**

- Senior Managing Director, 2013-Present

**Valbridge Property Advisors, Inc.**

- Vice President of Marketing and Business Development, 2015-present
- Member, Board of Directors, 2013-2015

**Atlantic Appraisals, LLC**

- Principal, 2005 –2013

**Appraisal/valuation and consulting assignments include:** apartment buildings; retail buildings and shopping centers; office buildings; industrial buildings; religious and special purpose properties including schools, churches and cemeteries; hotels and motels; residential subdivisions; and vacant industrial, commercial and residential land.

In the past 36 months Karl Finkelstein, MAI has appraised over 25 multi-family housing projects and 24 hospitality/lodging projects.



## INDEPENDENT VALUATIONS FOR A VARIABLE WORLD



## KARL P. FINKELSTEIN, MAI
**Valbridge Property Advisors | Charleston**
kfinkelstein@valbridge.com

1250 Fairmont Avenue
Mount Pleasant, SC 29464

Main: 843.884.1266
Direct: 843.654.7560
Fax: 843.881.7532

## STATE CERTIFICATIONS
South Carolina
North Carolina
Georgia
Tennessee
Virginia
West Virginia

## EDUCATION
Bachelor of Science
Business Administration
University of South Carolina

www.valbridge.com

# Karl P. Finkelstein, MAI
Senior Managing Director
**Valbridge Property Advisors | Charleston**

## CERTIFICATIONS















**INDEPENDENT VALUATIONS FOR A VARIABLE WORLD**



**Pledger M (Jody) Bishop III, MAI, SRA, AI-GRS, CRE**

**Valbridge Property Advisors | Charleston**
jbishop@valbridge.com

1250 Fairmont Avenue
Mount Pleasant, SC 29464

Main: 843.884.1266
Direct: 843.568.3740
Fax: 843.881.7532

**STATE CERTIFICATIONS**
South Carolina
North Carolina
Georgia

**EDUCATION**
Bachelor of Science
Business Administration
University of South Carolina

**www.valbridge.com**

# Pledger M (Jody) Bishop III, MAI, SRA, AI-GRS, CRE

Senior Managing Director
**Valbridge Property Advisors | Charleston**

## MEMBERSHIPS & AFFILIATIONS

Appraisal Institute, Member

- 2022 President of The Appraisal Institute
- 2021 President Elect
- 2022 Vice President
- AI-GRS Designation, 2018
- MAI Designation, 1995
- SRA Designation, 1989
- Chair General Demonstration Appraisal Grading Panel, 2017-2020
- Audit Committee Member, 2018-2019
- Edward W "Lalo" Adams Outstanding Board Service Award, 2018
- AI Presidents Award, 2017
- Region IX Director, 2014-2018
- ADQC Member 2009-2012
- South Carolina Chapter President, 2010
- SC Chapter 1st Vice President, 2009
- SC Chapter 2nd Vice President, 2008
- SC Chapter Treasurer, 2007
- SC Chapter Secretary, 2006
- LDAC Discussion Leader 2005

National Association of Realtors

- CRE Designation, 2003

Charleston Trident Board of Realtors

- Board of Director Multiple Listing System
- Board of Realtors Professional Standards Committee
- Board of Realtors Grievance Committee

Elder Mount Pleasant Presbyterian Church,1998-2002
Member Charleston County Board of Assessment Appeals, 1993-1996

## EXPERIENCE

**Valbridge Property Advisors| Charleston** - Senior Managing Director,2013-Present
**Atlantic Appraisals, LLC** – Associate 1990-1995 - Principal 1995 – 2013
**Appraisal Consultants, Inc** – 1986 – 1990
**Charleston County Assessor's Office** – 1984 - 1986

Testified before Congress - House Rep Maxine Waters HFSC Hearing in 2022
Recognized as Expert Witness in various Courts of Law
Experienced in valuation of various commercial and residential Real Estate property
Experienced with property valuations for Preservation and Conservation Easements
Experienced with Valuation Review and Consulting assignments
Experienced with Valuations and Consultation for Property Tax Appeal



## FAST FACTS
**COMPANY INFORMATION**

- Valbridge is the largest independent commercial property valuation and advisory service firm in North America.
- Total number of MAI-designated appraisers (200+ on staff) ▪ Total number of office locations (80+ across the U.S.)
- Total number of staff (675+ strong)
- Valbridge covers the entire U.S. from coast to coast.
- Valbridge specializes in appraising all types of real property.
- Valbridge provides independent valuation services. We are NOT owned by a brokerage firm or investment company.
- Every Valbridge office is overseen by a senior managing director who holds the MAI designation of the Appraisal Institute.
- Valbridge is owned by local offices.
- Valbridge welcomes single-property assignments as well as portfolio, multi-market, and other bulk-property engagements.

**Valbridge Property Advisors, Inc.**

3033 Riviera Drive, Suite 106
Naples, FL 34103
Phone: 888.981.2029



**valbridge.com**



# Valbridge
## PROPERTY ADVISORS

## VALBRIDGE PROPERTY ADVISORS OFFICE LOCATIONS

**ALABAMA**
26241 Equity Dr., Ste. 101
Daphne, AL 36526
(251) 929-9090

4245 Balmoral Dr. SW, Unit #201
Huntsville, AL 35801
(256) 210-1555

4732 Woodmere Blvd.
Montgomery, AL 36106
(334) 277-5077

**CALIFORNIA**
3160 Crow Canyon Pl.
San Ramon, CA 94583
(925) 327-1660

825 Colorado Blvd., Ste. 243
Los Angeles, CA 90041
(626) 486-9327

17822 17th St., Ste. 211
Tustin, CA 92780
(714) 449-0852

775 Sunrise Ave., Ste. 260
Roseville, CA 95661
(916) 361-2509

1530 The Alameda, Ste. 100
San Jose, CA 95126
(408) 279-1520

**COLORADO**
5345 Arapahoe Ave., Ste. 7
Boulder, CO 80303
(303) 867-1935

**CONNECTICUT**
17 Covewood Dr.
Norwalk, CT 06853
(860) 246-4606

15 Concord St.
Glastonbury, CT 06033
(860) 246-4606

**FLORIDA**
10950 San Jose Blvd.
Jacksonville, FL 32223
(904) 608-2948

301 Almeria Ave., Ste. 350
Coral Gables, FL 33134
(305) 639-8029

734 Rugby St.
Orlando, FL 32804
(407) 493-6426

2711 Poinsettia Ave.
West Palm Beach, FL 33407
(561) 833-5331

3033 Riviera Dr., Ste. 106
Naples, FL 34103
(239) 514-4646

2601 West Horatio St. Unit 6
Tampa, FL 33609
(321) 228-6488

**GEORGIA**
2675 Paces Ferry Rd., Ste. 425
Atlanta, GA 30339
(404) 354-2331

**IDAHO**
1875 N. Lakewood Dr., Ste. 100
Coeur d'Alene, ID 83814
(208) 292-2965

**ILLINOIS**
566 W. Lake St., Ste. 240
Chicago, IL 60661
(312) 429-0132

**INDIANA**
6801 Lake Plaza Dr., Ste. C-301
Indianapolis, IN 46220
(317) 687-2747

**KANSAS**
10990 Quivira Rd., Ste. 100
Overland Park, KS 66210
(913) 451-1451

**KENTUCKY**
1890 Star Shoot Pkwy.
Lexington, KY 40509
(502) 585-3651

9401 Williamsburg Plaza, Ste. 204
Louisville, KY 40222
(502) 585-3651

**LOUISIANA**
2030 Dickory Ave., Ste. 200
Elmwood, LA 70123
(504) 541-5100

**MARYLAND**
11100 Dovedale Ct.
Marriottsville, MD 21104
(443) 333-5525

**MASSACHUSETTS**
260 Bear Hill Rd., Ste. 106
Waltham, MA 02451
(781) 790-5645

**MICHIGAN**
1420 Washington Blvd.
Detroit, MI 48226
(313) 986-3313

2127 University Park Dr.
Okemos, MI 48864
(517) 336-0001

**MINNESOTA**
255 E. Kellogg Blvd., Ste. 102A
St. Paul, MN 55101
(651) 370-1475

**MISSISSIPPI**
1010 Ford St.
Gulfport, MS 39507
(228) 604-1900

224 Avalon Cir.
Brandon, MS 39047
(601) 853-0736

501 Highway 12 W., Ste. 150-M
Starkville, MS 39759
(662) 617-2350

**CORPORATE OFFICE**
3033 Riviera Drive, Suite 106, Naples, FL 34103 | Phone: (239) 325-8234 | Fax: (239) 325-8356
*Each Valbridge office is independently owned and operated.*

**valbridge.com**
*rev. 013024*



### MISSOURI
1118 Hampton Ave., Ste. 208
St. Louis, MO 63139
(314) 255-1323

### NEVADA
3034 S. Durango Dr., Ste. 100
Las Vegas, NV 89117
(702) 242-9369

1575 Delucchi Ln., Ste. 209
Reno, NV 89502
(775) 204-4100

### NEW MEXICO
7000 Prospect Pl. NE, Ste. B
Albuquerque, NM 87110
(505) 884-4721

### NORTH CAROLINA
5950 Fairview Rd., Ste. 405
Charlotte, NC 28210
(704) 376-5400

412 E. Chatham St.
Cary, NC 27511
(919) 859-2666

### NORTH DAKOTA
118 Broadway N., Ste. 509
Fargo, ND 58091
(701) 289-1676

### OHIO
1655 W. Market St., Ste. 130
Akron, OH 44313
(330) 899-9900

8291 Beechmont Ave., Ste. B
Cincinnati, OH 45255
(513) 785-0820

1422 Euclid Ave., Ste. 1160
Cleveland, OH 44115
(216) 367-9690

### OKLAHOMA
6666 S. Sheridan Rd., Ste. 104
Tulsa, OK 74133
(918) 712-9992

3121 Quail Springs Pkwy., Ste. 150
Oklahoma City, OK 73134
(405) 603-1553

### PENNSYLVANIA
150 S. Warner Rd., Ste. 440
King of Prussia, PA 19406
(215) 545-1900

4701 Baptist Rd., Ste. 304
Pittsburgh, PA 15227
(412) 881-6080

### SOUTH CAROLINA
1250 Fairmont Ave.
Mt. Pleasant, SC 29464
(843) 884-1266

11 Cleveland Ct.
Greenville, SC 29607
(864) 233-6277

920 Bay St., Ste. 26
Beaufort, SC 29902
(843) 884-1266

### TENNESSEE
3500 Ringgold Rd., Ste. 3
Chattanooga, TN 37412
(423) 206-2677

213 Fox Rd.
Knoxville, TN 37922
(865) 522-2424

756 Ridge Lake Blvd., Ste. 225
Memphis, TN 38120
(901) 753-6977

5205 Maryland Way, Ste. 202
Brentwood, TN 37027
(615) 369-0670

### TEXAS
901 Mopac Expy. S., Bldg. 1, Ste. 300
Austin, TX 78746
(737) 242-8585

10210 North Central Expy., Ste. 115
Dallas, TX 75231
(214) 446-1611

974 Campbell Rd., Ste. 204
Houston, TX 77024
(713) 467-5858

2731 81st St.
Lubbock, TX 79423
(806) 744-1188

9901 IH-10 West, Ste. 1035
San Antonio, TX 78230
(210) 227-6229

### UTAH
527 E. Pioneer Rd., Ste. 240
Draper, UT 84020
(801) 262-3388

20 North Main St.
St. George, UT 84770
(435) 773-6300

321 N. County Blvd., Ste. D
American Fork, UT 84003
(801) 492-0000

### VIRGINIA
656 Independence Pkwy., Ste. 220
Chesapeake, VA 23320
(757) 410-1222

1231 Alverser Dr.
Midlothian, VA 23113
(757) 345-0010

5107 Center St., Ste. 2B
Williamsburg, VA 23188
(757) 345-0010

### WASHINGTON
8378 W. Grandridge Blvd., Ste. 110-D
Kennewick, WA 99336
(509) 221-1540

324 N. Mullan Rd.
Spokane Valley, WA 99206
(509) 747-0999

### WISCONSIN
12660 W. North Ave.
Brookfield, WI 53005
(262) 782-7990

**NORTH AMERICA'S LARGEST INDEPENDENT COMMERCIAL VALUATION FIRM**



## Valbridge
### PROPERTY ADVISORS



valbridge.com